# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RITZ CAMERA CENTERS, INC.,[1] | Case No. 09-10617 (MFW) |
| Debtor. | **Bid Procedures Hearing Date:**<br>  July 10, 2009 at __:00 p.m. (proposed)<br>**Bid Procedures Objection Deadline:**<br>  July 9, 2009 at 12:00 p.m. (noon) (proposed)<br><br>**Sale Hearing Date: July 23, 2009 at**<br>___ :00 p.m. (proposed)<br>Sale Objection Deadline:  July 21, 2009 at 4:00 p.m. |

**DEBTOR'S MOTION FOR (I) ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF DEBTOR'S ASSETS, (B) AUTHORIZING DEBTOR TO OFFER CERTAIN BID PROTECTIONS, (C) REQUIRING THE UNITED STATES TRUSTEE TO APPOINT A CONSUMER PRIVACY OMBUDSMAN, AND (D) SCHEDULING FINAL SALE HEARING AND APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (II) ORDER AUTHORIZING AND APPROVING (A) THE SALE OF SUCH ASSETS FREE AND CLEAR OF LIENS AND OTHER INTERESTS AND (B) THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS TO SUCCESSFUL BIDDER(S) AT AUCTION**

Ritz Camera Centers, Inc., the debtor and debtor in possession in the above-captioned case ("Ritz" or the "Debtor"), by and through its undersigned proposed counsel, hereby submits this motion (the "Motion"), pursuant to sections 105(a), 332, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rule 6004-1, for (a) entry of an order (the "Bidding Procedures Order"), inter alia, (i) approving bidding procedures (the "Bidding Procedures") in connection with the sale of all or substantially all of the Debtor's assets (the "Assets"); (ii) authorizing the Debtor to offer certain bidder protections; (iii) ordering the United States Trustee to appoint a consumer privacy

---

[1]  The last four digits of the Debtor's federal tax identification number are 6025.

ombudsman; and (iv) scheduling a final sale hearing (the "Sale Hearing") to consider entry of an order approving the sale of the Assets, and (v) approving the form and manner of notice of the auction for the Assets (the "Auction") and the Sale Hearing (the "Sale Notice"); and (b) an order authorizing and approving (i) the sale of all or substantially all of the Assets free and clear of liens, encumbrances and other interests, and (ii) subject to the terms of a successful bid(s) received and accepted at the Auction, the assumption and assignment of one or more executory contracts to the successful bidder(s) at the Auction. In support of this Motion, the Debtor respectfully represents as follows:

## JURISDICTION

1.       This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b). This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

2.       Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.       The statutory bases for the relief requested herein are sections 105(a), 332, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9008 and 9014, and Local Rule 6004-1.

## BACKGROUND

**A.**     **Introduction**

4.       On February 22, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the Bankruptcy Code.

5.       On March 3, 2009, the Office of the United States Trustee for this District appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee").

6.       The Debtor continues in possession of its properties and continues to operate and manage its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.     No request has been made for the appointment of a trustee or examiner

## B.     **Factual Background**

8.     Ritz is the largest specialty camera and image chain (the "Photo Stores") in the United States. The Photo Stores together comprise the industry leaders in providing cameras, accessories, photographic and digital imaging equipment and other image products. As of the Petition Date, the Debtor operated approximately 800 Photo Stores in over 40 states throughout the country. The chain of Photo Stores include Ritz Camera, Wolf Camera, Kits Cameras, Inkley's and The Camera Shop.

9.     In addition to its Photo Stores, Ritz also operated a chain of 130 boating stores, under the name "Boater's World Marine Centers" ("Boater's World") which sold fishing, boating and water sport products.

10.     Prior to the filing of this case, Ritz retained an investment banker and explored, among other options, a sale of some or all of the Ritz's assets, and additional debt financing. The Debtor ultimately did not receive a satisfactory offer for a transaction.

11.     Ritz then engaged FTI Consulting, Inc. ("FTI") as part of its pre-filing restructuring efforts, and together they undertook an extensive evaluation of Ritz's business.[2] FTI worked intensely with Ritz to develop a plan to address the Debtor's liquidity needs in the short term, and in the longer term to assist Ritz in formulating and implementing strategies to return Ritz to profitability. Ultimately, Ritz, working with FTI, concluded that the only viable option was to seek chapter 11 protection.

---

[2] FTI now provides interim management services, with Mr. Weinsweig serving as the Debtor's Chief Restructuring Officer and Chief Operating Officer, and temporary employees to maximize its value to the Debtor, and the estate.

46460/0002-5795244v5

12.     At the outset of this chapter 11 case, it was crucial to the future success of Ritz to reduce its overhead and inventory, and to close underperforming store locations to ease its liquidity restraints.

13.     Ritz's management, working closely with FTI, set out to accomplish this by (i) liquidating the inventory at the Boater's World stores, and then closing the stores, and (ii) identifying approximately 400 Photo Stores as underperforming stores that should also be closed by means of store closing, or similar themed sales. These actions were designed to maintain Ritz's position as the industry leader, and leave the company poised for future success.

## C.     Liquidation of Boater's World Assets and Closing Photo Stores

14.     After the filing of the bankruptcy case, this Court entered an Order on March 20, 2009 authorizing Ritz to enter into an "Agency Agreement" with a joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC, and to commence going out of business sales at the Boater's World stores [Docket No. 270].

15.     On March 26, 2009, this Court entered an Order authorizing Ritz to enter into a "Consulting Agreement" with a joint venture comprised of Great American Group, LLC, SB Capital Group, LLC, Tiger Capital Group, LLC and Hudson Capital Partners, LLC, and to commence store closing sales at approximately 400 Photo Stores [Docket No. 313].

16.     The going out of business sales began on or around March 21, 2009, and they are now complete. The net proceeds of the Boater's World sale alone totaled approximately $40.1 million. The downsizing successfully reduced Ritz's expenses and cost structure, and significantly increased its liquidity.

17.     Despite these positive results, Ritz's challenge for its continuing success remains the need for capital and appropriate financing. The proposed sale of all or substantially all of its

remaining assets provides Ritz with the opportunity to seek the capital and financing it needs to survive.

18.     At this point in time, under the DIP loan facility, Ritz does not have sufficient availability to continue operating through the summer as a stand alone entity, and purchase the inventory required for the fall holiday season. Moreover, Ritz will incur unnecessary incremental expenses if it incurs rent charges for locations that will likely close. Now is the time for Ritz to maximize its value through a sale process.

19.     The Debtor's management, with the assistance of FTI, has determined that it is critical to its long-term viability and successful reorganization to sell all or substantially all of the Assets, simultaneously seeking going concern and other (*i.e.*, liquidation) bids, and/or a combination of the foregoing, or on such other terms that will provide the Debtor's estate with the greatest recovery.

20.     The Debtor has also determined, in its business judgment that the net proceeds of the sale of the Assets will be maximized by soliciting bids for a "stalking horse" purchaser and then conducting an auction to sell the Assets to the bidder making the highest or otherwise best bid. The Debtor has had very productive discussions with two possible bidders, but has not been able to reach an acceptable agreement yet with either one. The Debtor is hopeful that it will reach an acceptable agreement to sell at least a portion of the remaining Photo Stores as a going concern to one of the current bidders. However, give certain liquidity and other concerns, the Debtor wishes to put in place a sale process that will permit it to either (1) enter into an agreement with one of the current parties as a stalking horse or, in the alternative and in the event that such an agreement cannot be accomplished in the near future, (2) conduct an open auction process. The

5

Debtor proposes the following timeline to effectuate the sale transaction(s) contemplated herein, subject to the Court's availability and wishes:

| Event | Date[3] |
|---|---|
| Deadline to object to proposed bid procedures | July 9, 2009 at 12:00 noon (EST) |
| Hearing to approve bid procedures | July 10, 2009 at 2:00 p.m. (EST) |
| Deadline for potential buyers to submit bids | July 16, 2009 at 4:00 p.m. (EST) |
| Auction | July 20, 2009 at 10:00 a.m. (EST) |
| Deadline to object to sale | July 21, 2009 at 4:00 p.m. (EST) |
| Hearing to approve sale | July 23 , 2009 at 2:00 p.m. (EST) |

21.     The Debtor seeks authority to conduct an auction for all types of bids (each, a "Bid") for all or substantially all of its Assets, including, but not limited to, Bids for: (a) the "designation rights" for some or all of the Debtor's leasehold interests; (b) goods and merchandise, or agency rights for the disposition of such assets, including the right to augment the Debtor's inventory interests; and/or (c) in intellectual property and other intangibles. A copy of the prepared form of Bidding Procedures Order for the Assets is attached as **Exhibit A** and is incorporated herein. The Debtor, with the cooperation of its professional advisors, has already begun to solicit expressions of interest in the Assets.

22.     The Debtor anticipates that some bids received will include proposals for "store closing" sales ("Store Closing Sales") for the assets located in the Photo Stores. The Debtor proposes that any Store Closing Sales in connection with any bid would commence as early as the first day following the entry of an order approving such transaction, in order to stem the incurrence of unnecessary administrative obligations under its leases, among other potential administrative expense obligations. Accordingly, as part of the sale process described herein, the Debtor shall seek authority to enter into an asset purchase agreement ("APA"), liquidation

---

[3] These dates are subject to change by the Bankruptcy Court.

46460/0002-5795244v5

agency agreement or consulting agreement ("Agency Agreement"), as the circumstances may dictate based on the nature of the bids, which will allow the successful bidders from the Auction (the "Successful Bidders") to serve as the Debtor's agent in conducting Store Closing Sales at the Photo Stores. Any Store Closing Sales will be conducted in a manner consistent with the Store Closing Sales Procedures attached hereto as **Exhibit B**, which procedures and guidelines are typical of and consistent with the procedures approved in this jurisdiction in previously filed chapter 11 cases.

23.     The Debtor also recognizes that in the event the Successful Bidder's winning bid contemplates a going concern transaction, whether in whole or in part, including the requirement that the Debtor assume and assign any executory contract to the successful Bidder, the Debtor must satisfy its obligations under section 365 of the Bankruptcy Code. Any order approving the Bid Procedures shall, therefore, also accommodate the requirement for the Debtor to supply any affected contract counter-parties with notice of the identity of the Successful Bidder, and the ability of the Successful Bidder to provide adequate assurance of future performance, as well as the ability of any affected party to conduct expedited discovery with respect thereto. Between the filing of this Motion and the hearing to be held in connection with the approval of the Bid Procedures, the Debtor intends to work with affected parties in an effort to arrive at a series of consensual procedures that address each of these issues.

## GROUNDS FOR APPROVAL OF THE MOTION

### A.     Section 363(b) of the Bankruptcy Code Authorizes the Sale of Assets Under the Circumstances Present Here

24.     Under section 363 of the Bankruptcy Code, a debtor in possession may sell property of its estate outside of the ordinary course of its business, subject to the approval of the court after notice and a hearing. See 11 U.S.C. § 363(b)(1). In the Third Circuit and elsewhere,

it is well settled that a decision to sell assets outside the ordinary course of business, prior to confirmation of a plan, be based upon the sound business judgment of the debtor. See, e.g., In re Martin, 91 F.3d 389 (3d Cir. 1996), citing, In re Schipper, 933 F.2d 513 (7th Cir. 1991); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); Licensing By Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997) ("A sale of a substantial part of a Chapter 11 estate may be conducted if a good business reason exists to support it."); Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); Stephens Indus. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) ("bankruptcy court can authorize a sale of all a Chapter 11 Debtor's assets under [section] 363(b)(1) when a sound business purpose dictates such action."); Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the Debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the Debtor's conduct.").

25.    Courts typically consider the following four factors in determining whether a proposed sale satisfies this standard:

    (a)    whether a sound business justification exists for the sale;

    (b)    whether adequate and reasonable notice of the sale was given to interested parties;

    (c)    whether the sale will produce a fair and reasonable price for the property; and

    (d)    whether the parties have acted in good faith.

See, e.g., In re Weatherly Frozen Food Group, Inc., 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991).

26.     Here, each of these four factors is satisfied. First, sound business reasons exist for the Debtor's efforts to sell all or substantially all of its assets in the proposed manner. The Debtor and its advisors, in close consultation with the Creditors' Committee, has analyzed the viable options for the Photo Stores' business and determined for a number of reasons that a plan to exit bankruptcy as a stand-alone going concern business is not a likely option. Instead, the Debtor has determined that a sale of some or all of the stores as a going concern should be explored. Second, as discussed elsewhere in this Motion, the Debtor will be providing adequate and reasonable notice of the opportunity to bid on the Assets and of the opportunity to object to the sale of those Assets to all interested parties. See, e.g., Folger Adam Security Inc. v. DeMatteis/MacGregor, 209 F.3d 252, 265 (3d Cir. 2000) (stating that notice is sufficient if it includes "the time and place of any public sale, the terms and conditions of any private sale, states the time for filing objections and, if real estate is being sold, provides a general description of the property"); In re WBQ Partnership, 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) ("'notice is sufficient if it includes the terms and conditions of the sale, if it states the time for filing objections, and if the estate is selling real estate, it generally describes the property'") (quoting In re Karpe, 84 B.R. 926, 929 (Bankr. M.D. Pa. 1988)). Third, the Bidding Procedures proposed herein will provide for an open and competitive bidding process for the Assets. Fourth, the Debtor is proceeding in good faith and will make a showing at the Sale Hearing that the purchaser or purchasers of the Assets have acted in good faith.

## B.     Sale of the Debtor's Assets Should be Free and Clear of Liens

27.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(a)    applicable non-bankruptcy law permits the sale of such property free and clear of such interest;

(b)    such entity consents;

(c)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)    such interest is in bona fide dispute; or

(e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

28.    To facilitate the sale of the Assets, the Debtor proposes that any liens, claims and encumbrances asserted against the assets be transferred, and attach, to the sale proceeds received by the Debtor. All liens on the assets will be satisfied or will attach to the proceeds of the sale of the assets with the same force, effect and priority as such liens have on the assets, subject to the rights and defenses, if any, of the Debtor and any party in interest with respect thereto. Accordingly, the Debtor submits that the sale of assets free and clear of liens, claims and encumbrances satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

## THE COURT SHOULD AUTHORIZE THE DEBTOR'S IMPLEMENTATION OF THE BID SOLICITATION AND SALE PROCESS

### C.    The Proposed Bid Procedures Are Appropriate In the Circumstances.

29.    In view of the above-described exigent circumstances, the Debtor requests that the Court approve its proposed Bidding Procedures for the Assets, in substantially the form annexed hereto as **Exhibit C** and incorporated herein, with a final sale hearing to occur on or before July 23, 2009, as the Court's calendar may permit.[4] The salient terms and provisions of the Bidding Procedures are summarized below:

---

[4]    The proposed form of Bidding Procedures Order contains proposed dates from the Debtor. These dates are subject to the approval by, and availability of, the Court and are subject to change.

a       <u>Qualification</u>. In order to perform due diligence and be allowed to submit a bid for all or substantially all of the Assets, a party expressing an interest in the offered assets (a "<u>Potential Bidder</u>") must provide to the Debtor: (a) an executed confidentiality agreement in form and substance satisfactory to the Debtor, and (b) a statement demonstrating to the Debtor's satisfaction a bona fide interest in purchasing all or substantially all of the Assets and describing the Potential Bidder's proposed transaction. A Potential Bidder that satisfies these requirements will become a "<u>Qualified Bidder</u>".

b       <u>Bid Requirements</u>. A Bid is a signed letter from a Qualified Bidder offering to purchase all or substantially all of the Assets that is not subject to any due diligence contingency and is irrevocable until two business days after the earlier of (a) the closing of the sale of the applicable Assets, whether or not the sale is to such Qualified Bidder or (b) 45 days after the Sale Hearing.

c       <u>Required Supporting Materials</u>. A Qualified Bidder shall accompany its Bid with:

- an asset purchase agreement, agency agreement (including a blacklined version showing all proposed changes to the Debtor's proposed form of agreements, copies of which will be filed prior to the Bidding Procedures Hearing, or other deal documentation detailing all of the terms and conditions of the proposed transaction;

- written evidence of available cash, a commitment for financing or ability to obtain a satisfactory commitment if selected as the Successful Bidder (as defined in the Bidding Procedures Order), and such other evidence of ability to consummate the transaction as the Debtor may reasonably request;

d       <u>Good Faith Deposit</u>. Unless such requirement is waived by the Debtor in writing, in its sole discretion, in order to participate in the Auction a Qualified Bidder must accompany its bid with a good faith deposit equal to 5 % of the cash purchase price offered in the form of a wire transfer or certified or cashier's check.

e       <u>Baseline Bid</u>. As soon as practicable after the Bid Deadline, the Debtor may select the bid or bids that will serve as the "Baseline Bid" for the Auction, and may file with the Court a notice of the Debtor's selection of the Baseline Bid (or Bids) for the Auction.

f       <u>Bidding at the Auction</u>. The Debtor retains discretion with respect to how to conduct the Auction if bids are received on differing packages of Assets.

46460/0002-5795244v5

g    <u>Bidding Increment</u>.  The minimum Bidding Increment at the Auction shall be announced at the commencement of the Auction and shall be in such amount as the Debtor, in consultation with its Lenders and Creditors' Committee, determine is appropriate.  If the Debtor has entered into any agreement to provide a Qualified Bidder with a Break-up Fee (as defined below), the Qualified Bidder shall **not** be entitled to credit bid the amount of its Break-up Fee at the Auction.

h    The Debtor, after consultation with its lenders and the Creditors' Committee, will determine, in the Debtor's discretion, which Bids should be selected as the highest or otherwise best Bid or Bids.  Interested parties and their counsel will promptly be advised of the winning bidder by email, if provided, so that in the event a liquidation bid prevails, landlords may review the store closing guidelines.

i    <u>Return of Deposits</u>.  The Good Faith Deposit of a Qualified Bidder shall be returned within three business days of the earlier of (a) the closing of a sale transaction on the portion of the Assets on which the Qualified Bidder made a bid or (b) 45 days after the Sale Hearing.

30.    The Bidding Procedures set forth a flexible process by which the Debtor will be soliciting bids on both a going-concern basis for its Assets and bids on a non-going concern (<u>i.e.</u>, liquidation) basis, including bids for the right to act as agent on the liquidation of the Debtor's inventory and/or designation rights with regard to the Debtor's leaseholds and/or contracts.  This flexible process will allow the Debtor to maximize the value of the Assets given the liquidity constraints and accompanying time pressure the Debtor currently faces.

31.    The Debtor expressly reserves the right, after consultation with the Lenders and the Creditors' Committee, to modify the relief requested in this Motion prior to or at the applicable hearings, including modifying the proposed Bidding Procedures.  Moreover, the Debtor reserves the right to adjourn the Auction or the Sale Hearing or remove any assets, from this sale process if the Debtor determines, upon consultation with the Lenders and the Creditors' Committee, that such action will maximize value to its estate for the benefit of all interested stakeholders.

**D.    The Court Should Authorize the Debtor to Offer a Break-Up Fee**

32.    The Debtor has determined, in its reasonable business judgment, that a sale of the Assets at this time, even without a traditional "stalking horse" bidder, is warranted, and indeed, necessary.  The Debtor, however, requests that it be authorized in its discretion to enter into an agreement that provides a bidder who is willing to serve as a stalking horse bidder a break-up fee of up to 2.0 %, at the Debtor's discretion, of the guaranteed value offered by such stalking horse bidder in its Bid (the "Break-Up Fee").

33.    The ability of the Debtor to offer potential purchasers and liquidating agents bidding protections is beneficial to the Debtor's estate and stakeholders because the Debtor can provide the incentive required to induce a bidder to submit or increase its Bid prior to the Auction.  The ability to offer the Break-Up Fee may induce bids for some or all of the Assets that would not otherwise be made.  In addition, to the extent Bids can be improved prior to the Auction, a higher floor is established for further bidding at the Auction.  Thus, even if a Qualified Bidder is awarded a Break-Up Fee, and that Qualified Bidder is not a winning bidder, the Debtor and its estate will have benefited from the higher floor established by such Bid.  The Debtor will exercise prudent business judgment before offering or agreeing to any bidding protection and will only do so if such protection, in the reasonable business judgment of the Debtor, will likely result in the realization of greater value for the Debtor and its estate.

34.    Break-up and other termination fees are a normal, and in some cases necessary, component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code.  See, e.g., In re Integrated Resources, Inc., 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that Break-up fees may be legitimately necessary to convince a single "white knight" to enter the bidding by providing some form of compensation for the risk it is undertaking); In re Financial News Network, Inc., 126 B.R. 152 (S.D.N.Y. 1991), appeal dismissed, 931 F.2d 217

(2d Cir. 1991); In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (Break-up fees in merger agreement approved); In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24, 28-9 (Bankr. S.D.N.Y. 1989) (payment of $500,000 Break-up fee to outbid contract vendee following sale of debtor's property was not unreasonable absent evidence that fee chilled bidding).

35.     In considering whether to approve a break-up fee, courts generally consider the following three factors:  (i) the relationship between the initial bidder and the seller; (ii) whether the fee is designed to encourage bidding; and (iii) the size of the fee in relation to the purchase price. See In re Integrated Resources, 147 B.R. at 657-63.

36.     The Third Circuit has decided that an application for a break-up fee, should not be treated any differently from other applications for administrative expenses under section 503(b)(1)(A).  Therefore, the Third Circuit has announced that the determination of whether Break-up fees or expenses are allowable under section 503(b)(1)(A) is made in reference to general administrative expense jurisprudence, and "depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." Calpine Corporation v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527, 532 (3d Cir. 1999).

37.     Pursuant to Third Circuit jurisprudence, this prong of the analysis can be presumed in a sale situation between the debtor and a third party.  The O'Brien court stated, "[w]e assume that bidding at the sale of O'Brien's assets constituted a transaction with the debtor-in possession for purposes of § 503(b)(1)(A)." Id. at 533.  Similarly, bidding at a sale of the debtor's assets, where the seller is the debtor-in-possession, constitutes a transaction that may entitle a party to an administrative expense.

14

38. In examining the break-up fee at issue in O'Brien, the bankruptcy court identified nine (9) factors that it viewed as relevant in making its Break-up fee determination. While not expressly adopting the factors considered by the bankruptcy court as a "test" for all break-up fee determinations, the Third Circuit nevertheless considered those same factors. O'Brien, 181 F.3d at 536. The bankruptcy court's nine O'Brien factors are as follows:

  a. the relationship of the parties who negotiated the break-up fee;
  b. effect of break-up fee on bidding;
  c. reasonableness of amount of the break-up fee;
  d. importance of fee to competitive bidding;
  e. will the fee serve to attract other bidders;
  f. maximization of value to debtors' estates;
  g. creditor support for the break-up fee;
  h. availability of safeguards; and
  i. impact on unsecured creditors.

39. Given the relatively short due diligence period that parties will have in this case, any stalking horse will likely expend substantial resources in negotiating a stalking horse agreement and performing due diligence on an expedited basis. Approval of a break-up fee in connection with the sale of significant assets in a situation such as the Debtor faces here is an established practice that will facilitate the Debtor's efforts to assure a sale to a contractually-committed bidder at a price(s) the Debtor believes is fair, while at the same time providing the Debtor with the potential of even greater benefit to the estate.

40. A break-up fee which constitutes a fair and reasonable percentage of the proposed purchase price and which is reasonably related to the risk, effort, and expenses of the prospective purchaser is generally permissible. See, e.g., In re 995 Fifth Ave. Assoc., 96 B.R. at 28. Accord In re Integrated Resources, Inc., 147 B.R. at 662 (Break-up fee reasonable percentage of proposed purchase price and in accord with industry averages).

41. In the present case, the Break-Up Fee payable in the event that a stalking horse bidder is outbid at the Auction would not exceed 2.0 % of the projected guaranteed value of the

stalking horse's bid. This percentage is of the same order of magnitude as break-up fees

approved in other cases. See, e.g., Consumer News & Business Channel Partnership v.

Financial News Network, Inc. (In re Financial News Network, Inc.), 980 F.2d 165, 167 (2d Cir.

1992) (noting without discussion $8.2 million Break-up fee on $149.3 million transaction (5.5%

of consideration offered)); Cottle v. Stores Communications, 849 F.2d 570, 578-79 (11th Cir

1988) (approving $29 million fee on $2.5 billion transaction, 1.16%); see also LTV Aerospace

& Defense Co. v. Thomson-CSF, S.A. (In re Chateugay Corp.), 1998 B.R. 848, 861 (S.D.N.Y.

1996) (enforcing $20 million "reverse Break-up fee" payable to debtor on $450 million offer

(4.4% of consideration)). The Debtor believes that the ability to offer a Break-Up Fee to induce

a Qualified Bidder to submit a significant and valued Bid in advance of the Auction, and

thereby establish a committed baseline, or floor, upon which all other Bids can be compared

and evaluated, is beneficial to the Debtor's estate and its stakeholders. If any such Break-Up

Fee is ultimately payable to a stalking horse bidder -- by definition, because the Debtor has

received a higher or otherwise better offer and have closed on a superior transaction -- the

stalking horse's bid will have benefited the estate, particularly in the context of the total

consideration received.

42.     The Debtor submits that the proposed Break-up Fee will not chill bidding and is

reasonable and therefore meets the requirements of the business judgment rule, as well as the

Third Circuit's standards as set out in O'Brien. The Debtor also submits that granting

prospective authority to provide the Break-up Fee is appropriate given the expedited nature of

the auction process in this case, as the Debtor may not have a sufficient time and ability to obtain

a separate, subsequent court order blessing an agreement to provide a Break-up Fee between the

time such an agreement is reached and the Bid Deadline. The requested authority to offer the

proposed Break-Up Fee shall be subject to the Court's final approval as part of the approval of any proposed sales transaction.

**E.    The Debtor's Unexpired Nonresidential Real Property Leases**

43.    The Debtor does not intend to assume and assign any unexpired nonresidential real property leases ("Leases") as part of a sale to a buyer. The winning bidder, rather, will acquire Designation Rights in the Leases, giving the winning bidder the right to designate Leases for assumption after Closing, on or before the deadline set for designating leases for assumption and assignment in the final asset purchase agreement. This deadline will be at the Debtor's discretion upon consultation with the Creditors' Committee and lenders. Accordingly, the Debtor is not seeking to assume or assign any Leases as part of the Sale of Assets.

**F.    Assumption and Assignment of Executory Contracts**

44.    To facilitate and effectuate the sale(s) of the Assets, depending upon the terms of any successful bid(s) received and accepted at the Auction, the Debtor may also seek to assume and assign certain executory contracts to the purchaser(s) of the Assets to the extent required by a Successful Bid(s) at the Auction.

45.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign their executory contracts subject to the approval of the Court:

> (a) Except as provided in . . . subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtors.
>
> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from

any failure to perform non-monetary obligations under an expired lease of real property, if it is impossible for the trustee to cure such default by performing non-monetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

(B)   compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)   provides   adequate assurance of future performance under such contract or lease. . . .

(f)(2) The trustee may assign an executory contract or unexpired lease of the debtor only if —

(A)   the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)   adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

See 11 U.S.C. §§ 365(a), (b)(1), (f)(2). Accordingly, section 365 of the Bankruptcy Code authorizes the proposed assumptions and assignments of executory contracts, provided that the defaults under such contracts are cured and adequate assurance of future performance is provided.

46.    It is well settled that the meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but that a contract counterparty is not required to receive an absolute guarantee of future performance. See, e.g., In re Glycogensys, Inc., 352 B.R. 568, 578 (Bankr. D. Mass. 2006) ("[I]t is appropriate to evaluate the financial condition of the assignee and the likelihood that the non-Debtor party will receive the benefit of its bargain from the assignee"); Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (adequate assurance of future performance does not mean

absolute assurance that Debtors will thrive and pay rent); In re Natco Indus., Inc., 54 B.R. 436,

440 (Bankr. S.D.N.Y. 1985) (same).  As set forth above, any Bid that is conditioned upon the

assumption and assignment of executory contracts must (a) be submitted with adequate

assurance packages containing the identity of such contracts and (b) provide evidence of such

bidder's ability to provide adequate assurance of future performance under section 365 of the

Bankruptcy Code.  The Debtor will provide all parties to executory contracts to be assumed and

assigned pursuant to the Sale Motion with such adequate assurance packages and an

opportunity to be heard, and in connection with the Sale Hearing, the Debtor will provide

evidence that all requirements for the assumption and assignment of the executory contracts

proposed to be assigned to the purchaser(s) of the assets will be satisfied.  Thus, the Debtor

respectfully submits that, by the conclusion of the Sale Hearing, assumption and assignment of

the executory contracts should be approved.

**G.    The Court Should Fix a Deadline to Object to (i) the Assumption and Assignment of Executory Contracts (ii) the Cure Amounts as Set Forth in a Cure Schedule**

47.    In connection with the assumption and assignment of executory contracts,

pursuant to any sale transactions for the Assets, the Debtor believes it is necessary to establish a

process by which the Debtor and the counterparties to executory contracts that will be assumed

can establish the cure obligations, if any, to be paid in accordance with section 365 of the

Bankruptcy Code and for the counterparties of such assumed contracts to assert any objection

they may have to the assumption and assignment of same.  As soon as practicable, but no later

than July 14, 2009, the Debtor will file a schedule of such cure obligations (the "Cure

Schedule") with the Court and serve such schedule by first class mail on the parties to executory

contracts that may be assumed and assigned in connection with a sale of the Assets.  The Debtor

proposes that any objections (other than objections to adequate assurance of future performance

for executory contracts to be assumed and assigned pursuant to a Successful Bid) to the assumption and assignment of any executory contract identified on the Cure Schedule, must be in writing, filed with the Court, and be actually received on or before July 21, 2009 at 4:00 p.m. (Eastern Time) upon those parties identified for receipt of such notice in the Bidding Procedures Order (including the Debtor, the Lenders, and the Creditors' Committee, collectively, the "Notice Parties").

48.     The Debtor requests that any party failing to object to the proposed transactions be deemed to consent to the treatment of their executory contract or unexpired lease under section 365 of the Bankruptcy Code (including the proposed cure amount) and this Sale Motion. See Hargrave v. Twp. of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabeel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). Moreover, the Debtor requests that each such party be deemed to consent to the assumption and assignment of its executory contract notwithstanding any anti-alienation provision or other restriction on assignment. See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii), and (f).

## H.     The Court Should Waive Compliance with State and Local Laws, Statutes, Rules and Ordinances Restricting Going-Out-of-Business Sales

49.     Many state and local laws, statutes, rules and ordinances require special and cumbersome licenses, waiting periods, time limits and other procedures for store closing, liquidation or similar sales. By virtue of 28 U.S.C. § 1334, this Court has exclusive jurisdiction over the Debtor's property wherever located. 28 U.S.C. § 1334. In the context of bankruptcy cases, therefore, since creditors receive notice of the proposed sale, as well as opportunity to be heard in this Court, enforcement of such statutes and regulations is redundant and unnecessary.

46460/0002-5795244v5

50.     The Bankruptcy Code preempts state and local laws that conflict with its underlying policies. See Belculfine v. Aloe (In re Shenango Group, Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code.'. . . '[A] state statute[] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."), aff'd, 112 F.3d 633 (3d Cir. 1997). While preemption of state law is not always appropriate, see Baker & Drake, Inc. v. Public Serv. Comm'n of Nev. (In re Baker & Drake, Inc.), 35 F.3d 1348, 1353-54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure), preemption is appropriate where, as here, the only state laws involved concern economic regulation rather then the protection of public health and safety.[5] See id. at 1353 (finding that "federal bankruptcy preemption is more likely. . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety"); see also In re Scott Housing Sys. Inc., 91 B.R. 190, 196-97 (Bankr. S.D. Ga. 1988) (holding that automatic stay under Section 362 is broad and preempts state law except for those laws designed to protect public health and safety).

51.     It is also necessary that any action by any lessor or any federal, state or local agency, department or governmental authority or any other entity to prevent, interfere with or otherwise hinder consummation of the Store Closing Sales or advertisement of such sales be enjoined, subject to and solely to the extent provided in the proposed form of order approving this Motion. See Missouri v. U.S. Bankruptcy Court, 647 F.2d 768, 776 (8th Cir. 1981) (same), cert. denied, 454 U.S. 1162 (1982) (holding that attempt to enforce state regulations governing

---

[5]     The Debtor will comply with applicable state and local public health and safety laws ("Safety Laws"), and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws").

liquidation of grain warehouses directly conflicted with bankruptcy court's control over property of debtor's estate and therefore violated automatic stay).

52.     The requested waiver is narrowly tailored to facilitate the successful consummation of the Store Closing Sales.  The Debtor does not seek a general waiver of all state and local requirements, but only those that apply specifically to liquidation sales and solely to the extent provided in the proposed form of order approving this Motion.  As noted above, the Debtor fully intends to be bound by and comply with all Consumer and Safety Laws, and will require that its Agent do the same.

53.     The Debtor respectfully requests that the Order approving this Motion include the following language:

> Except as to the States (as to which no injunction shall apply whatsoever), and except as expressly provided for herein or in the Sale Guidelines: no person or entity, including but not limited to any landlord or federal or Local Governmental Unit (as defined below), (i) served with a copy of the Sale Motion; or (ii) served with a copy of this Order who does not object pursuant to the provisions of this Order, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Store Closing Sale, or the advertising and promotion (including the posting of signs) of such Sale, and all such parties and persons of every nature and description, including landlords and utility companies and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, or otherwise impeding the conduct of the Sale and/or (b) instituting any action or proceeding in any court or administrative body seeking an order or judgment against, among others, the Debtor, the Agent, or the Debtor's landlords for the Stores, that might in any way directly or indirectly obstruct or otherwise interfere with or adversely affect the conduct of the Sale or other liquidation sales at the closing Stores and/or seek to recover damages for breach(es) of covenants or provisions in any lease or sublease based upon any relief authorized herein, this Court shall retain exclusive jurisdiction to resolve such dispute, and such parties or persons shall take no action against the Debtor, the Agent, the landlords or the Sale until this Court has resolved such dispute.  This Court shall hear the request of such persons or

parties with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances. No Governmental Units (as defined in Bankruptcy Code section 101(27)) shall be bound by this injunctive provision unless it was either previously served with the Sale Motion or subsequently served with this Order, and has had an opportunity to object as provided in this Order, and failed to timely file an objection.

54. Bankruptcy courts in this and other districts have routinely approved similar store closing sales in retail chapter 11 cases. See, e.g., In re Linens Holdings Co., et al., Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008, Aug. 14, 2008, Aug. 28, 2008, Sept 10, 2008 and Oct. 16, 2008); In re Domain, Inc., Case No. 08-10132 (PJW) (Bankr. D. Del. Feb. 13, 2008); In re KB Toys, Inc., Case No. 04-10120; (Bankr. D. Del Jan. 14, 2004); In re ZB Company, Inc., et al., Case No. 03-13672 (Bankr. D. Del. Dec. 4, 2003); In re New Weathervane, Case No. 04-11649 (PJW) (Bankr. D. Del. June 3, 2004); In re Breuners Home Furnishings Corp., et al., Case No. 04-12030 (PJW) (Bankr. D. Del. July 14, 2004); In re Movie Gallery, Inc., Case No. 07-33 849 (Bankr. E.D. Va. Oct. 17, 2007); In re the Bombay Co., Case No. 07-44084 (Bankr. N.D. Tex. Oct. 16, 2007); In re Musicland Holding Corp., Case No. 06-1064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006); In re CWT Specialty Stores, Inc., Case No. 00-10758 (JHG) (Bankr. S.D.N.Y. Mar. 7, 2000); In re Caldor, Inc.-NY, Case No. 95-44080 (JLG) (Bankr. S.D.N.Y. Feb. 11, 1999); In re The Wiz, Inc., Case No. 97-48257 (CB) (Bankr. S.D.N.Y. Dec. 18, 1997).

I. **Augmentation of Inventory is Proper**

55. In addition to seeking authority to sell its inventory through the Store Closing Sales pursuant to the Agency Agreement, the Debtor also reserves the right to seek authority to permit the liquidation agent to augment the Debtor's merchandise with like-kind goods (the "Additional Agent Merchandise"), with the Debtor to receive a fee equal to a certain percentage of the gross sale proceeds realized from the sale of such Additional Agent Merchandise, the

terms of which (to the extent applicable) will be more fully described in the Agency Agreement. In similar cases in this and other districts involving inventory liquidations at retail stores, courts have approved agency agreements with similar augmentation provisions. See, e.g., In re Linens Holdings Co., et al., Case No. 08-10832 (CSS) (Bankr. D. Del. Oct. 16, 2008); In re Breuners Home Furnishings Corp., Case No. 04-12030 (Bankr. D. Del. July 30, 2004); In re Levitz Furniture Inc., Case No. 97-1842 (Bankr. D. Del. Sept. 19, 2001); In re Heilig-Meyers Co., Case No. 00-34533 (Bankr. E.D. Va. Apr. 24, 2001); In re HomeLife Corp., Case No. 01-2412 (Bankr. D. Del. Aug. 1, 2001); In re Mondi of Am., Inc., Case No. 99-3986 (Bankr. D. Del. Nov. 12, 1999).

**J.      The Court should Declare Unenforceable any Restrictions on Store Closing Sales in the Debtor's Leases**

56.      Certain of the Debtor's Leases contain provisions purporting to restrict or prohibit the Debtor from conducting store closing, liquidation or similar sales. Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a Debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code. See In re Ames Dep't Stores, Inc., 136 B.R. at 359 (landlord could not recover damages under section 365 of the Bankruptcy Code for debtors' conduct of store closing sale because section 363(b) fosters the fundamental bankruptcy policy of maximizing estate assets and "to enforce the anti-GOB sale clause of the Lease would contravene overriding federal policy requiring Debtors to maximize estate assets. . ."); In re Tobago Bay Trading Co., 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (overruling objection of landlords to store closing program based on lease provisions); In re Lisbon Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (finding lease provisions restraining a going out of business sale were unenforceable in chapter 11). Courts in retail chapter 11 cases have routinely approved orders preventing landlords from

interfering with store closing sales.  See, e.g., In re Movie Gallery, Inc., Case No. 07-33 849 (Bankr. E.D. Va. Oct. 17, 2007); In re the Bombay Co., Case No. 07-44084 (Bankr. N.D. Tex. Oct. 16, 2007); In re Musicland Holding Corp., Case No. 06-1064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006); In re CWT Specialty Stores, Inc., Case No. 00-10758 (JHG) (Bankr. S.D.N.Y. Mar. 7, 2000); In re Caldor, Inc. -NY, Case No. 95-44080 (JLG) (Bankr. S.D.N.Y. Feb. 11, 1999); In re The Wiz, Inc., Case No. 97-48257 (CB) (Bankr. S.D.N.Y. Dec. 18, 1997).

57.     The Order approving this Motion therefore should provide that to the extent that any such provisions or restrictions exist in any of the Debtor's Leases, the lessors may not interfere with or otherwise seek to restrict the Debtor and/or its liquidating agent(s) from conducting any going out of business sales.  Accordingly, the Debtor requests that the Court authorize the Debtor and/or its liquidating agent(s) to conduct any going out of business sales without such interference from any lessors or other persons affected, directly or indirectly, by such sales.

## K.      The Court Should Order the United States Trustee to Appoint a Consumer Privacy Ombudsman no later than 5 Days Before the Sale Hearing

58.     Section 363(b)(1) generally allows a debtor to sell property of the estate outside the ordinary course of business after notice and hearing except that, if a debtor maintains a privacy policy in effect as of the commencement of the case with respect to customers' personally identifiable information, such personally identifiable information cannot be sold unless—

(a)     such sale is consistent with the debtor's prepetition privacy policy, or

(b)     after appointment of a consumer privacy ombudsman in accordance with section 332 of the Bankruptcy Code and after notice and a hearing, the court approves such sale (i) giving due consideration to the facts, circumstances and conditions of the sale and (ii) finding that no showing was made that such sale would violate applicable nonbankruptcy law.

25

11 U.S.C. § 363(b)(1).

59.     Prior to the Petition Date, the Debtor maintained a privacy policy on its Ritzpix.com website found at www.ritzpix.com for its online processing, photo enlargement, and related photo services customers.  The privacy statement does not allow the Debtor to sell, rent or share personally identifiable information collected from customers with third parties except as described in the privacy statement or otherwise agreed by the customers.[6]  Although Ritzpix.com makes up only a fragment of the Debtor's business, and the Debtor will require any purchaser of the Assets to agree not to use the consumer privacy information in a manner inconsistent with its current use, in an abundance of caution, the Debtor seeks the appointment of a consumer privacy ombudsman.  Accordingly, the Debtor respectfully requests that a consumer privacy ombudsman be appointed by the United States Trustee no later than 5 days before the Sale Hearing.

**L.      The Debtor's Proposed Form and Manner of Notice of the Auction and Sale Hearing is Appropriate**

60.     Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide its creditors with 20 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested herein.

61.     Courts have held that the notice of a proposed sale of all of the assets of the estate should "(a) place all parties on notice that the debtor is liquidating his business; (b) disclose accurately the full terms of the sale; (c) explain the effect of the sale as terminating the debtor's ability to continue in business; and (d) explain why the proposed price is reasonable and why

---

[6] The Debtor does not collect or maintain consumer privacy information from its retail store customers.

the sale is in the best interest of the estate." Delaware & Hudson Ry., 124 B.R. at 180; accord In re Naron & Wagner, Chartered, 88 B.R. 85, 88 (Bankr. D. Md. 1988).

62.     The proposed form of the Sale Notice (attached hereto as **Exhibit D**) includes, among other things, the date, time and place of the Auction and the Sale Hearing and information for how to learn the deadline for filing any objections to the relief requested herein once they are set by the Court, and, therefore, complies with Bankruptcy Rule 2002(c). Subject to approval of the Court, it is the Debtor's intention to serve the Sale Notice, on all creditors and the other parties in interest within one (1) business day after entry of the Bidding Procedures Order. The Sale Notice also includes instructions for how to obtain a copy of this Sale Motion and the Bidding Procedures Order.

63.     The Debtor submits that the methods of notice described herein comply fully with Bankruptcy Rules 2002 and 9006 and constitute good and adequate notice of the proposed Bidding Procedures and the sale of its Assets. Therefore, the Debtor respectfully requests that this Court approve the proposed notice procedures.

## PROVISIONS THAT MAY IMPLICATE LOCAL RULE 6004-1

64.     Local Rule 6004-1 requires, among other things, that certain provisions contained in sale motions, sale procedures motions and sale orders be highlighted. The Debtor believes that certain provisions of this Motion implicate Local Rule 6004-1 and that such provisions are necessary in the context and circumstances of this case.

65.     As required by Local Rules 6004-1(b)(i) and (ii), a copy of the Agency Agreement substantially similar to the one the Debtor reasonably expects to execute, in the event that this kind of offer proves to be the highest or otherwise best offer for the Assets, will

be filed with the Court prior to the Bid Procedures Hearing, and forms of the proposed orders approving this Motion (the "Sale Order(s)") are attached hereto as **Exhibits E and F**.[7]

66.     As required by Local Rule 6004-1(b)(iii), the Debtor wishes to highlight that it has requested that a consumer privacy ombudsman be appointed.

67.     As required by Local Rule 6004-1(b)(iv)(D), the Debtor wishes to highlight that it intends to expose the Assets to competitive bidding through an auction process pursuant to the Bidding Procedures, attached hereto as **Exhibit C**, and form of Bidding Procedures Order attached hereto as **Exhibit A**, which describe the proposed auction process.  The Debtor believes this process will ensure that the Debtor and its estate receives the maximum realizable value for the Assets, for the benefit of creditors.

68.     As required by Local Rule 6004-1(b)(iv)(F), the Debtor wishes to highlight that the Debtor could require any going concern purchaser to submit a deposit which shall be held by an escrow agent.[8]

69.     As required by Local Rule 6004-1(b)(iv)(J), the Debtor wishes to highlight that it will require any purchaser to provide the Debtor with reasonable access to its books and records.

70.     Local Rule 6004-1(b)(iv)(O) provides that a sale motion must highlight any provision whereby the debtor seeks relief from the ten-day stay imposed by Bankruptcy Rule 6004(h).  The Debtor requests in the proposed Sale Order that this Court order that such stay is not applicable with respect to the sale.

---

[7] The Debtor will use either of the Sale orders or both depending on the structure of the winning bid or bids.

[8] Based on experience in other cases, for bidders proposing to purchase assets based on an agency agreement for a liquidation sale, the Debtor anticipates that the successful bidder under a final agency agreement may not make a good faith deposit towards the purchase price.

46460/0002-5795244v5

71. Pursuant to Local Rule 6004-1(c), the Debtor hereby refers interested parties to the Bidding Procedures Order and Bidding Procedures, which contains provisions governing (i) the qualification of bids and bidders, (ii) purchaser protections, (iii) closing with a back-up bidder, and (iv) provisions governing the auction. The Debtor submits that the Sale Procedure Order thus meets all of the requirements of Local Rule 6004-1(c).

## REQUEST FOR WAIVER OF STAY

72. In addition, by this Motion, the Debtor seeks a waiver of any stay of the effectiveness of the orders approving the relief requested in this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." For the reasons, described above, the Debtor submits that ample cause exists to justify a waiver of the 10-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply.

## NOTICE

73. Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel for the Committee; (iii) counsel to the Agent for the Debtor's prepetition and postpetition secured lenders; (iv) Internal Revenue Service; (v) all lessors of leases for the Photo Stores; and (vi) all parties with executory contracts for the Assets; (vii) all parties entitled to receive notices in this chapter 11 case pursuant to Bankruptcy Rule 2002; (viii) all states attorney's general where Photo Stores are located; (ix) various federal and state taxing authorities, including the Internal Revenue Service; and (x) all other parties who have expressed a bona fide interest in purchasing the Assets. In light of the nature of the relief requested, the Debtor submits that no further notice is required.

46460/0002-5795244v5

74. No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the Debtor respectfully requests that the Court (a) enter the Bidding Procedures Order, in substantially the form attached hereto as **Exhibit A**; (b) enter an order or orders approving the sale of assets to the highest bidder(s) at the Auction and (c) grant such other and further relief to the Debtor as the Court may deem proper.

Dated: July 3, 2009

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By: /s/ Norman L. Pernick
Norman L. Pernick (No. 2290)
Karen M. McKinley (No. 4372)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
(302) 652-3131
(302) 652-3117 (Fax)

-and-

Irving E. Walker, Esquire
Gary H. Leibowitz, Esquire
G. David Dean, Esquire
300 E. Lombard Street, Suite 2000
Baltimore,  MD 21202
(410) 230-0660
(410) 230-0667 (Fax)

Counsel for the Debtor
and Debtor in Possession

46460/0002-5795244v5