# Exhibit A-2 to Sale Order

*Asset Purchase Agreement*

ASSET PURCHASE AGREEMENT

between

RITZ ACQUISITION GROUP, LLC, as Purchaser

and

RITZ CAMERA CENTERS, INC., as Seller

Date: July 23, 2009

# TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ...........................................................................................2
1.1    Certain Definitions ............................................................................ 2
1.2    Terms Defined Elsewhere in this Agreement .................................... 9
1.3    Other Definitional and Interpretive Matters .................................... 11
**ARTICLE II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF**
       **LIABILITIES** ...................................................................................12
2.1    Purchase and Sale of Assets ............................................................ 12
2.2    Excluded Assets. ............................................................................. 14
2.3    Assumption of Liabilities ................................................................ 16
2.4    Excluded Liabilities ........................................................................ 17
2.5    Executory Contract Designation ..................................................... 17
2.6    Assignment of Contracts and Rights ............................................... 18
2.7    Assets to be Liquidated; Proceeds .................................................. 18
2.8    Further Conveyances and Assumptions ........................................... 19
**ARTICLE III CONSIDERATION** .............................................................................19
3.1    Purchase Price ................................................................................ 19
3.2    Purchase Price Deposit. .................................................................. 21
**ARTICLE IV CLOSING, INVENTORY TAKING AND TERMINATION** ................21
4.1    Closing Date. .................................................................................. 21
4.2    Deliveries by Seller ........................................................................ 21
4.3    Deliveries by Purchaser .................................................................. 22
4.4    Termination of Agreement .............................................................. 22
4.5    Procedure Upon Termination .......................................................... 23
4.6    Effect of Termination ..................................................................... 23
4.7    Inventory Taking for Post-Closing Purchase Price Adjustment. ...... 24
**ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLER** ....................26
5.1    Organization and Good Standing ..................................................... 26
5.2    Authorization of Agreement ............................................................ 27
5.3    Conflicts; Consents of Third Parties ............................................... 27
5.4    Title to Purchased Assets ................................................................ 28
5.5    Taxes ............................................................................................... 28
5.6    Intellectual Property ........................................................................ 28
5.7    Environmental Matters .................................................................... 28
5.8    Employee Benefits .......................................................................... 28
5.9    Litigation ......................................................................................... 29
5.10   Material Contracts ........................................................................... 29
5.11   Property ........................................................................................... 30
5.12   Brokers ............................................................................................ 31
5.13   No Other Representations or Warranties; Schedules ....................... 31

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER** ..........31
  6.1  Organization and Good Standing ........................................................ 31
  6.2  Authorization of Agreement ............................................................. 32
  6.3  Conflicts; Consents of Third Parties .................................................. 32
  6.4  Brokers ...................................................................................... 32
  6.5  Adequate Assurance ...................................................................... 33
  6.6  Condition of the Purchased Assets .................................................... 33
  6.7  Communications with Customers and Suppliers ............................................. 33
**ARTICLE VII BANKRUPTCY COURT MATTERS** ....................................................33
  7.1  Reserved .................................................................................... 33
  7.2  Reserved .................................................................................... 33
  7.3  Reserved .................................................................................... 33
  7.4  ............................................................................................ 33
  7.5  Reserved .................................................................................... 33
  7.6  Reserved .................................................................................... 33
  7.7  ............................................................................................ 33
**ARTICLE VIII COVENANTS** ....................................................................33
  8.1  Access to Information ..................................................................... 33
  8.2  Conduct Pending the Closing .............................................................. 34
  8.3  Consents ................................................................................... 35
  8.4  Regulatory Approvals ..................................................................... 36
  8.5  Further Assurances ....................................................................... 37
  8.6  Preservation of Records ................................................................... 37
  8.7  Publicity .................................................................................. 38
  8.8  Schedules and Exhibits ................................................................... 38
  8.9  Payment of Taxes ......................................................................... 38
  8.10  Motions, Orders, etc ..................................................................... 38
  8.11  Title Insurance; Surveys ................................................................. 38
  8.12  Seller Wind Down ........................................................................ 38
**ARTICLE IX EMPLOYEES AND EMPLOYEE BENEFITS** ..............................................39
  9.1  Transferred and Retained Employees ..................................................... 39
  9.2  Employment Tax Reporting ................................................................ 40
  9.3  No Obligations ............................................................................ 40
**ARTICLE X CONDITIONS TO CLOSING** ...........................................................40
  10.1  Conditions Precedent to Obligations of Purchaser ......................................... 40
  10.2  Conditions Precedent to Obligations of Seller ............................................. 41
  10.3  Conditions Precedent to Obligations of Purchaser and Seller ............................... 41
  10.4  Frustration of Closing Conditions ....................................................... 42
**ARTICLE XI Taxes** ..........................................................................42
  11.1  Allocation of Taxes ...................................................................... 42
  11.2  Purchase Price Allocation ................................................................ 42
  11.3  Tax Reporting ............................................................................ 42
  11.4  Cooperation and Audits ................................................................... 42

| 11.5 | Transfer Taxes | 43 |
|---|---|---|
| **ARTICLE XII MISCELLANEOUS** | | 43 |
| 12.1 | No Survival of Representations and Warranties | 43 |
| 12.2 | Expenses | 43 |
| 12.3 | Injunctive Relief | 43 |
| 12.4 | Submission to Jurisdiction; Consent to Service of Process | 43 |
| 12.5 | Waiver of Right to Trial by Jury | 44 |
| 12.6 | Entire Agreement; Amendments and Waivers | 44 |
| 12.7 | Governing Law | 44 |
| 12.8 | Notices | 44 |
| 12.9 | Severability | 46 |
| 12.10 | Assignment | 46 |
| 12.11 | Counterparts | 46 |

## BACK-UP ASSET PURCHASE AGREEMENT

This BACK-UP ASSET PURCHASE AGREEMENT is entered into and dated as of July 23, 2009 (this "Agreement"), by and between Ritz Acquisition Group, LLC, a Delaware limited liability company (the "Purchaser"), and Ritz Camera Centers, Inc., a Delaware corporation (the "Seller").

### WITNESSETH:

WHEREAS, Seller is engaged in the specialty camera and image products retail business (the "Business");

WHEREAS, on February 22, 2009, Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), case no. 09-10617 (MFW) (the "Bankruptcy Case");

WHEREAS, Seller held an auction (the "Auction") for the sale of substantially all of its assets on July 20th and 21st, 2009;

WHEREAS, at the conclusion of the Auction, Seller chose RCI Acquisition, LLC ("RCI") as the bidder submitting the highest or otherwise best bid;

WHEREAS, Purchaser was chosen as the "back-up bidder" in the event RCI fails to close on the proposed transaction by July 24, 2009;

WHEREAS, upon the terms and subject to the conditions set forth herein, including the condition that this Agreement shall only become effective in the event that RCI fails to close on the proposed transaction and the transaction contemplated by this Agreement and the Agency Agreement closes by July 24, 2009 by 6:00 p.m., and as authorized under Sections 105, 363, and 365 of the Bankruptcy Code, Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, substantially all of Seller's assets (other than the Excluded Assets (as defined below)) in exchange for the payment to Seller of the Purchase Price (as defined below) and the assumption by Purchaser of certain of Seller's liabilities and obligations;

WHEREAS, Seller believes, following consultation with its financial advisors and consideration of available alternatives, that, in light of the current circumstances, a sale of its camera business assets on a going concern basis is necessary to maximize value and is in the best interest of Seller, its estate, creditors and parties-in-interest; and

WHEREAS, the transactions contemplated by this Agreement (the "Transactions") will be subject to the approval of the Bankruptcy Court and will be consummated only pursuant to a Sale Order (as defined below) to be entered in the Bankruptcy Case and other applicable provisions of the Bankruptcy Code;

WHEREAS, Purchaser intends to assign certain rights under this Agreement and Agency Agreement to Hilco Merchant Resources, LLC, Gordon Brothers Retail Partners, LLC, Hilco Real Estate Holdings, LLC and DJM Realty Services, LLC; and

WHEREAS, Seller and Purchaser wish to enter into this Agreement, pursuant to which Seller agrees to sell to Purchaser, and Purchaser agrees to buy from Seller, certain of Seller's assets pursuant to the terms hereof.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements hereinafter contained, and intending to be bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1     Certain Definitions. For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1 or in other Sections of this Agreement, as identified in the chart in Section 1.2:

"Acquired Location" means any Location that constitutes Transferred Owned Real Property whereby Purchaser or its designee takes title and any Location subject to an Assumed Lease.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agent" means Purchaser, as provided for in the Agency Agreement, as may be amended by the parties thereto from time to time.

"Assumed Executory Contracts" means all Assumed Contracts and Assumed Leases.

"Assumption Order" means an Order of the Bankruptcy Court authorizing the assumption or the assumption and assignment of a Contract or Lease pursuant to Section 365 of the Bankruptcy Code, which Order may be the Sale Order.

"Bidding Procedure Motion" means the motion filed with the Bankruptcy Court for, among other things, the approval of the Bidding Procedures Order.

"Bidding Procedures Order" means the order entered by the Bankruptcy Court on July 10, 2009, authorizing, *inter alia*, Seller to conduct an action for its assets.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized by law to close.

"Carrying Costs" means all obligations that are specifically attributable to Locations and that accrue from and relate to events occurring on and after the Closing Date, which obligations,

or the pro rata portion thereof, shall include, but not be limited to, rent, ground lease rent, common area maintenance, utilities, real estate taxes, insurance (including, but not limited to property insurance, fire and other casualty insurance), security and other actual out-of-pocket costs relating to any of the Locations.

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Bankruptcy Case.

"Contract" means any contract, indenture, note, bond, lease, license, purchase or sale order, warranties, commitments, or other written or oral agreement, other than a Lease, in each case that is related to the Business.

"Cost Value" shall mean for each item of Eligible Inventory, the cost set out in Seller's file known as "Ritz Perpetual 7 7 2009".

"Cure Costs" means monetary amounts that must be paid and nonmonetary obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assumed Leases and the Assumed Contracts.

"Customer Order" means a partially or completely unfulfilled order by a customer or potential customer of Seller with respect to which the customer has submitted a deposit.

"Debtor Business Investments" means all of Seller's interest in the entities listed in Schedule 1.1(a).

"Designation Deadline" means, with respect to each unexpired Lease, twenty-one (21) calendar days prior to the later of (i) September 22, 2009 for any Lease as to which the landlord has not agreed to extend Seller's deadline under Bankruptcy Code Section 365(d)(4)(A) to assume such lease, (ii) October 31, 2009 for all other Leases, or (iii) such other date as to specific unexpired Leases identified in Schedule 1.1(b). With respect to the Transferred Owned Property, the designation deadline shall be the earlier of (i) nine (9) months or (ii) the date on Seller's chapter 11 case is dismissed or converted to chapter 7, provided that, Seller shall provide Purchaser with at least 30 days notice before it requests that its chapter 11 case be dismissed or converted.

"DIP Credit Agreements" means the debtor in possession financing facilities approved by the Bankruptcy Court.

"Disposition Rights" means the right to direct the disposition of the GOB Assets.

"Distribution Center" means Seller's warehouse located at 1401 NW Moundview Drive, Topeka, Kansas.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Purchased Assets or used or held for use in connection with the Business in each case whether or not in electronic form.

"Effective Date" means 6:00 p.m. Eastern Time on July 24, 2009, only in the event RCI fails to consummate its transaction with Seller on or before that date and time.

"Eligible Inventory" means Inventory other than Excluded Inventory. Eligible Inventory shall be determined by the Inventory Taking or Sampling Inventory Taking, as applicable.

"Employee Benefit Plans" means each deferred compensation and each bonus or other incentive compensation, stock purchase, stock option and other equity compensation plan, program, agreement or arrangement; each severance or termination pay, medical, surgical, hospitalization, life insurance and other "welfare" plan, fund or program (within the meaning of Section 3(1) of ERISA); each profit-sharing, stock bonus or other "pension" plan, fund or program (within the meaning of Section 3(2) of ERISA); each employment, termination, change in control, retention or severance plan, agreement or arrangement; and each other employee benefit plan, fund, program, agreement or arrangement, in each case, that is sponsored, maintained or contributed to or required to be contributed to by Seller or an ERISA Affiliate, that together with Seller would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA, or to which Seller or an ERISA Affiliate is party, whether written or oral, for the benefit of any employee or former employee of Seller or any former subsidiary of Seller.

"Employees" means all individuals, as of the date hereof, who are employed by Seller.

"Encumbrances" means any security interest, lien, collateral assignment, right of setoff, debt, obligation, liability, pledge, levy, charge, escrow, encumbrance, option, right of first refusal, transfer restriction, conditional sale contract, title retention contract, mortgage, lease, deed of trust, hypothecation, indenture, security agreement, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement, or any other agreement, arrangement, contract, commitment, understanding or obligation of any kind whatsoever, whether written or oral.

"Environmental Laws" means all federal, state and local laws, regulations, rules and ordinances, and common law, relating to pollution or protection of human health, safety, or the environment from pollution, including, without limitation, laws relating to releases or threatened releases of Hazardous Substances into the environment (including, without limitation, ambient air, surface water, groundwater, land, surface and subsurface strata).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity that with the subject Person is:

(a)     a member of a controlled group of corporations within the meaning of Section 414(b) of the Code.

(b)     a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code;

(c)     a member of an affiliated service group within the meaning of Section 414(m) of the Code; or

(d)     a member of a group of organizations required to be aggregated under Section 414(o) of the Code.

"Excluded Environmental Liabilities" means any Liability, whenever arising or occurring, whether or not constituting a breach of any representation or warranty herein and whether or not set forth on any disclosure schedule hereto, arising under Environmental Laws with respect to (i) the Excluded Assets, or (ii) any assets other than the Purchased Assets and the Excluded Assets owned, leased, operated or occupied by Seller at any time.

"Excluded Inventory" shall mean Inventory classified by Seller as "RTV/Damaged Goods" and Inventory in the following classes: Class #72 – Processing Supplies, Class #90 - Supplies, Class #94 - Ritz Interactive Inventory, Class #96 – Computer Equip & Supplies, Class 79, Class 80, Class 85, and Class 877.

"Excluded Location" means a Location that is not an Acquired Location.

"Excluded Owned Real Property" means the owned real property, other than the Transferred Owned Real Property, in which Seller has fee title (or equivalent) interest, together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment (other than photo-processing equipment) and items of personal property of Seller attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"Executory Contract" means any Contract or Lease that is executory as that term is used in Section 365 of the Bankruptcy Code.

"Final Order" means an Order of the Bankruptcy Court the operation of which has not been modified or amended without the consent of Purchaser, reversed or stayed, as to which Order no appeal or motion, application, petition or writ seeking reversal, reconsideration, reargument, rehearing, certiorari, amendment, modification, a stay or similar relief is pending, and the time to file any such appeal or motion, application, petition or writ has expired.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned by Seller in conduct of the Business, including all owned artwork, desks, chairs, tables, computer systems, Software, hardware, photo processing equipment, copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies.

"GAAP" means generally accepted accounting principles in the United States, consistently applied throughout the specified period.

"GOB Assets" means all Merchandise and Furniture and Equipment located at or to be moved to Store Closing Locations.

"GOB Sales" means those "store closing" or other similarly themed sales conducted by Agent pursuant to the Agency Agreement and the Sale Order at the Store Closing Locations.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hazardous Substances" means any chemical, mixture, waste, substance, material, pollutant, or contaminant, including without limitation petroleum, asbestos and asbestos-containing materials, with respect to which liability or standards of conduct are imposed under any Environmental Laws.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Insider" shall have the meaning set forth in Section 101(31) of the Bankruptcy Code.

"Intellectual Property" means all intellectual property arising from or in respect of the following: (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (ii) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (iii) copyrights and registrations and applications therefor and works of authorship, and mask work rights, and (iv) all Software of Seller.

"Interest" shall mean an "interest in property" as such phrase is used in Section 363(f) of the Bankruptcy Code.

"Inventory" means all supplies, finished goods, saleable or other items of inventory owned by Seller or used in connection with the Business, including all Merchandise, wherever located and including the classes of Inventory listed in Schedule 1.1(d).

"Knowledge of Seller" means the actual knowledge of those individuals listed on Schedule 1.1(e) attached hereto.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation or common law requirement.

"Leased Real Property" means the real property leased by Seller, as tenant, as described in Schedule 5.11(c), together with, to the extent leased by Seller, all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems,

6

equipment and items of personal property of Seller attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"Leases" means all unexpired and previously unterminated leases, subleases, licenses or other agreements, including all amendments, extensions, renewals, guaranties or other agreements with respect thereto, pursuant to which Seller holds or uses any Leased Real Property.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or not accrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" means any charge against or interest in property to secure payment of a debt (as such term is defined in Section 101(12) of the Bankruptcy Code) or performance of an obligation.

"Location" means the Stores, Office, Distribution Center or other places at which Seller operates the Business.

"Material Decision" means any of the following to the extent the same may affect the Business following the Closing Date: (i) entering into any Material Contract; (ii) terminating any Lease or Contract; (iii) making any material amendment or waiving of Seller's rights in respect of any Lease or Contract; or (iv) taking any action to respond to any material customer or regulatory complaint outside of the normal course of business.

"Material Adverse Effect" means a material adverse effect on the financial condition, result of operations or properties of Seller.

"Merchandise" means all finished goods inventory that is owned by Seller for resale at retail and located at any Location as of the Closing Date. Notwithstanding the foregoing, "Merchandise" shall not include: (i) goods that belong to sublessees, licensees or concessionaires of Seller; (ii) goods held by Seller on memo, on consignment, or as bailee; and (iii) goods in for repair belonging to customers of Seller.

"Office" means the office space located at 6711 Ritz Way, Beltsville, Maryland 20705.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"Permitted Exceptions" means, with respect to any of the property or assets of Seller, whether owned as of the date hereof or hereafter, (i) all defects, exceptions, restrictions, easements, rights of way and encumbrances of record of such property or asset and which would

not individually (or in the aggregate with others) be reasonably expected to materially and adversely affect the use or enjoyment of such asset; (ii) encumbrances of landlords and encumbrances of carriers and warehousemen and other similar Encumbrances arising in the ordinary course of business; (iii) any other imperfections in title, charges, easements, restrictions and encumbrances that do not materially affect the value or use of the affected asset; (iv) all written leases, subleases, licenses and occupancy and/or use agreements affecting any Real Property (or portion thereof); (v) any state of facts as shown on the surveys of the Real Property provided to Purchaser by Seller; (vi) any statutory liens for Taxes, assessments or other governmental charges; (vii) mechanics', carriers', workers', repairers' and similar Liens; (viii) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated or, if any such regulation has been violated, such violation does not materially and adversely affect the use and enjoyment of such asset; and (ix) Liens that constitute Assumed Liabilities.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Petition Date" means February 22, 2009.

"Proceeds" means the aggregate of: (a) the total amount (in dollars) received on all sales of Inventory and Furniture and Equipment owned by Seller under the Agency Agreement, exclusive of sales Taxes; and (b) all proceeds of Seller's insurance for loss or damage to Inventory or Furniture and Equipment owned by Seller or loss of cash arising from events prior to the Designation Date. "Proceeds" shall also include any and all proceeds received by Purchaser or Agent from the disposition, in a commercially reasonable manner, of unsold Inventory and Furniture and Equipment owned by Seller prior to the Designation Deadline, whether through salvage, bulk sale or otherwise.

· "Real Property" means Transferred Owned Real Property and Leased Real Property.

"Retail Value" means, with respect to each item of Eligible Inventory, the lower of: (a) the lowest ticketed, marked or shelf price; and (b) the SKU, price look up, scan or item file price; provided, however, the Retail Value shall not be reduced by any of the following discounts or price adjustments offered by Seller: (i) point-of-sale discounts or similar adjustments, regardless of duration; (ii) employee discounts; (iii) member or customer appreciation points or coupons (including "frequent foto" member discounts); (iv) multi-unit purchase discounts; (v) adjustments for damaged, defective, open box, or "as-is" items; (vi) coupons, catalog, website, or circular prices, "buy, one" get one type discount promotions; and (vi) customer savings pass discounts or bounce back coupons, or discounts for future purchases based on dollar value of past purchases, or similar customer specific, temporary, or employee non-product specific discounts or pricing accommodations. If an item of Eligible Inventory has more than one ticketed price, or if multiple items of the same SKU are ticketed, at different prices, or have a different SKU or PLU price, the lowest ticketed, marked, SKU or PLU price on any such item shall prevail for such item or for all such items within the same SKU (as the case may be, the "Lowest Location Price"), as the case may be, that are located within the same Location, unless it is reasonably determined by Seller and Purchaser that the applicable Lowest Location Price

was mismarked or such item was priced because it was damaged or marked as "as is", in which case the higher price shall control. No adjustment to Retail Value shall be made with respect to different ticketed price, marked price, SKU or PLU prices for items located in different Locations.

"Sale Hearing" means a hearing on the proposed sale of the Purchased Assets at the auction to occur pursuant to the Bidding Procedures Order.

"Sale Order" means an order entered by the Bankruptcy Court in form and substance reasonably satisfactory to the Purchaser.

"Software" means any and all (i) custom computer programs, including any and all custom software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise that are specific to Seller, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (iv) custom screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (v) all documentation including user manuals and other training documentation related to any of the foregoing.

"Store" means any of the stores listed on Schedule 1.1(f).

"Tax Authority" means any government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, (ii) any item described in clause (i) for which a taxpayer is liable as a transferee or successor, by reason of the regulations under Section 1502 of the Code, or by contract, indemnity or otherwise, and (iii) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (i) or (ii).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes (including any attachments thereto or amendments thereof).

"Transferred Owned Real Property" means the owned real property located in Salt Lake City, UT in which Seller has fee title (or equivalent) interest, together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of Seller attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

1.2     Terms Defined Elsewhere in this Agreement. For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
| --- | --- |
| Additional Inventory Taking | 4.7(a)(ii) |
| Additional Stores | 4.7(a)(ii) |
| Agency Agreement | 10.1(b) |
| Agreement | Preamble |
| Allocation Statement | 11.2 |
| Antitrust Division | 8.4(a) |
| Antitrust Laws | 8.4(b) |
| Assigned Permits | 2.1(b)(xii) |
| Assumed Contracts | 2.1(b)(vi) |
| Assumed Leases | 2.1(b)(ii) |
| Assumed Liabilities | 2.3 |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Baseline Cost Value | 3.1(b) |
| Business | Recitals |
| Chief Restructuring Officer | 8.12(b) |
| Closing | 4.1 |
| Closing Date | 4.1 |
| Closing Escrow | 3.1(b) |
| Competing Transaction | 7.1 |
| Deposit | 3.2 |
| Excluded Assets | 2.2 |
| Excluded Executory Contract | 2.5(c) |
| Excluded Liabilities | 2.4 |
| Exclusion Notice | 2.5(c) |
| FTC | 8.4(a) |
| Gross Rings | 4.7(b) |
| Gross Rings Period | 4.7(b) |
| Inventory Completion Date | 4.7(a)(i) |
| Inventory Date | 4.7(a)(i) |
| Inventory Taking | 4.7(a)(i) |
| Inventory Taking Instructions | 4.7(a)(i) |
| Inventory Taking Service | 4.7(a)(i) |
| Material Contracts | 5.10(a) |
| Nikon Contract | 2.1(b)(vi) |
| Periodic Taxes | 11.1 |
| Purchase Price | 3.1(a) |
| Purchased Assets | 2.1(b) |
| Purchased Intellectual Property | 2.1(b)(ix) |
| Purchaser | Preamble |
| Retained Employee | 9.1(a) |
| Sampling Inventory Completion Date | 4.7(a)(ii) |
| Sampling Inventory Date | 4.7(a)(ii) |
| Sampling Inventory Taking | 4.7(a)(ii) |

| | |
|---|---|
| Seller | Preamble |
| Seller Wind Down | 8.12(a) |
| Severance Waiver | 9.1(b) |
| Store Closing Locations | 2.7 |
| Termination Date | 4.4(a) |
| Test Store | 4.7(a)(ii) |
| Test Store Results | 4.7(a)(iii) |
| Transactions | Recitals |
| Transferred Employees | 9.1(a) |
| Variance | 4.7(a)(iii) |
| WARN Act | 9.1(c) |
| Withheld Amount | 3.1(b) |

1.3    Other Definitional and Interpretive Matters. Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars. Any reference in this Agreement to $ means U.S. dollars.

Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings. The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein. The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    Construction. The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or

interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II

### PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    Purchase and Sale of Assets

(a)    On the terms and subject to the conditions set forth in this Agreement, at the Closing, to the fullest extent permitted by Sections 363 and 365 of the Bankruptcy Code, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, convey and deliver to Purchaser all of Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Liens, Claims, Interests and Encumbrances other than those created by Purchaser and other than Permitted Exceptions.

(b)    For all purposes of and under this Agreement, the term "Purchased Assets" means all of the properties, assets, and rights of Seller (other than the Excluded Assets) existing as of the Closing, real or personal, tangible or intangible, including but not limited to:

(i)    the designation rights with respect to the Transferred Owned Real Property as set forth in Section 2.5.

(ii)    all Leases of Seller designated by Purchaser in accordance with Section 2.5 to be assumed and assigned to Purchaser pursuant to the Assumption Order (the "Assumed Leases"), together with Seller's interest in all security deposits related thereto and all permanent fixtures, improvements and appurtenances thereto and associated with such Assumed Leases.

(iii)    all Inventory as of the Closing Date, other than the Inventory constituting part of the GOB Assets;

(iv)    all of any Seller's ownership rights in Debtor Business Investments;

(v)    all goodwill associated with the Business or the Purchased Assets;

(vi)    all Contracts of Seller which shall be assumed and assigned to Purchaser pursuant to the Sale Order or an Assumption Order (the "Assumed Contracts"), together with the right to receive income in respect of such Assumed Contracts on or after the Closing Date, and any causes of action relating to past or present breaches of the Assumed Contracts; provided, however, that the Nikon Pro Dealer Retail Dealer Sales Agreement, dated September 12, 2008, between Nikon, Inc. and Ritz Camera Centers, Inc, as it may have been extended or renewed (the "Nikon Contract") shall not be a Contract of Seller that shall be assumed and assigned to Purchaser;

(vi)    the Disposition Rights;

(vii)    all Furniture and Equipment and other owned assets at any Location;

(viii)    subject to Section 8.9, (x) all rights in and to Intellectual Property rights owned or licensed by Seller, including but not limited to all Intellectual Property associated with Ritz Camera, Ritzpix and Boaters World, to the broadest extent Seller is permitted by law to transfer such Intellectual Property (the "Purchased Intellectual Property") and (y) to the extent such Intellectual Property may not be transferred to Purchaser, Seller shall be deemed to have granted to Purchaser an exclusive, royalty free right and license to use the Intellectual Property from and after the Closing Date, to the broadest extent permitted by law;

(ix)    the designation rights described in Section 2.5;

(x)    all Documents that are used in, held for use in or intended to be used in, or that arise primarily out of, the Business and operations of Seller, including Tax Returns, financial statements, Documents relating to products of Seller, services, marketing, advertising, promotional materials, Purchased Intellectual Property, personnel files for Transferred Employees and all files, customer files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on premises subject to an Assumed Lease, but excluding any Documents exclusively related to an Excluded Asset; provided, however, that Purchaser shall provide Seller reasonable access to any Documents that are Purchased Asset as described in this subclause (x);

(xi)    all Permits used by Seller that relate to the Purchased Assets, to the extent assignable (the "Assigned Permits");

(xii)    subject to Section 2.6, any asset that requires the consent of a third party to be transferred, assumed or assigned notwithstanding the provisions of Section 365 of the Bankruptcy Code, as to which such consent has not been obtained as of the Closing Date; upon receipt of such consent on or after the Closing Date and entry of an appropriate Assumption Order as provided in Section 2.6;

(xiii)    [reserved];

(xiv)    all accounts receivable of Seller due from Ritz Interactive up to an aggregate amount of One Million Dollars ($1,000,000.00);

(xv)    all security deposits with respect to Assumed Leases; and

(xvi)    all deposits relating to Customer Orders with respect to which Purchaser has agree to assume liability pursuant to Section 2.3(f).

(c)    If, prior to November 15, 2009, Purchaser assumes Leases for, enters into new leases for, or owns in the aggregate no less than one hundred (100) Locations at which it operates the Business, other than with respect to the Nikon Contract, Seller shall be deemed, effective as of the Closing, to assign and convey to Purchaser all rights, claims or causes of

action of Seller against third parties relating to the Purchased Assets arising out of events occurring prior to the Petition Date, including (i) any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Seller, and (ii) any causes of action under Chapter 5 of the Bankruptcy Code; provided, however, that Purchaser agrees that it shall not pursue and hereby releases, such Chapter 5 causes of action. For the avoidance of doubt, Seller is not assigning, and will not be deemed to have assigned, to Purchaser any claims and causes of action against any of Seller's current or former Insiders, shareholders and directors or officers.

2.2     Excluded Assets. Notwithstanding anything to the contrary contained herein, nothing herein shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller shall retain all right, title and interest to, in and under, and all obligations with respect to, the Excluded Assets. For all purposes of and under this Agreement, the term "Excluded Assets" means:

(a)     all accounts receivable (other than the accounts receivable due to Seller from Ritz Interactive referred to in Section 2.1(b)(xv) above), notes receivable and other receivables of Seller, including, without limitation, any payments on credit card charges;

(b)     the GOB Assets at the Store Closing Locations as of the Closing Date;

(c)     [reserved];

(d)     all of Seller's prepaid charges and expenses paid exclusively in connection with or relating exclusively to any asset that is not a Purchased Asset;

(e)     all security deposits with respect to Excluded Leases, all utility deposits with respect to any Purchased Asset or Excluded Asset, all holdbacks (including credit card holdback payments), retainers or on account cash paid to Seller's professionals and advisers (whether retained in the Bankruptcy Case or not) in each case related exclusively to any Excluded Lease or other Excluded Asset;

(f)     all personnel records of any Employees that are not Transferred Employees;

(g)     all Permits used exclusively in respect of the Excluded Locations, unless such Permits are also used or held for use in the Business outside of the Excluded Locations;

(h)     documents relating to proposals to acquire the Business by Persons other than Purchaser;

(i)     any rights, claims or causes of action of Seller against third parties to the extent any such claim relates exclusively to an Excluded Asset or Excluded Liability;

(j)     all claims or cause of actions of Seller against any current or former Insiders, shareholders, directors or officers and all rights under insurance policies, including policies providing insurance to Seller's respective directors and officers, and the proceeds thereof with respect to such claims or causes of action;

(k)     any claims under Chapter 5 of the Bankruptcy Code, except for any such claims deemed to be assigned and conveyed to Purchaser pursuant to Section 2.1(c) above;

(l)     all Documents exclusively related to any Excluded Asset; provided, that Seller shall provide copies of such Documents to Purchaser upon request, at Purchaser's cost and expense;

(m)     all rights under insurance policies relating to claims for losses related exclusively to any Excluded Asset;

(n)     any shares of capital stock or other equity interest of Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of Seller;

(o)     any minute books, stock ledgers, corporate seals and stock certificates of Seller, and other similar books and records that Seller is required by Law to retain or that Seller determines is reasonably necessary to retain including Tax Returns, financial statements and corporate or other entity filings; provided, that Seller shall provide Purchaser reasonable access to any Excluded Asset described in this subclause;

(p)     all cash and cash equivalents in the possession of Seller on the Closing Date, including all cash and cash equivalents in depository bank accounts on the Closing Date;

(q)     all (x) of Seller's ownership rights and equity interests in Mufungo, LLC, Ray Enterprises, LLC, and Boat House at Boater's World, LLC, and (y) organizational documents, records, books, copies of Tax and financial records and such other files, books and records of Seller relating to the Non-Debtor Subsidiaries;

(r)     any account receivable due to Seller from RZF Aviation, LLC;

(s)     all of Seller's right, title and interest in and to any additional distributions under a settlement agreement resolving an antitrust litigation against Visa and MasterCard, pending before the United States District Court for the Eastern District of New York (Case No. CV-96-5238-JG-JC);

(t)     the Excluded Owned Real Property, including the Distribution Center; provided, however, that Purchaser shall have a period of ninety (90) days from the Closing Date to remove any Purchased Assets from the Distribution Center, or such longer period of time, if, within such 90-day period, Purchaser and Seller have entered into a lease of the Distribution Center on mutually agreeable terms;

(u)     all of Seller's right, title and interest to any Tax refunds, vendor credits, warranty payments, rebates, prepaid expenses and other funds owed to Seller as a result of its pre-Closing Date business activities; and

(v)     any rights of Seller under this Agreement.

2.3     Assumption of Liabilities.  On the terms and subject to the conditions and limitations set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, the following Liabilities (without duplication) existing as of the Closing Date (collectively, the "Assumed Liabilities") and no others:

(a)     all Liabilities of Seller under the Assumed Executory Contracts arising after the Closing Date, including any and all benefits and burdens of post-Closing adjustments under any Assumed Executory Contract;

(b)     all Cure Costs related to the Assumed Executory Contracts;

(c)     all Liabilities arising out of Purchaser's ownership of the Purchased Assets after the Closing Date;

(d)     all Carrying Costs relating to any period on or after the Closing Date prepaid by Seller pursuant to Leases for the portion of month in which the Closing Date occurs, which reimbursement shall be made no later than thirty (30) days after the Closing Date occurs;

(e)     [reserved];

(f)     all Liabilities with respect to Customer Orders to the extent such liabilities were incurred at or through a Store which had not been closed or designated for closure prior to the Petition Date;

(g)     all obligations of Seller with respect to any gift cards sold or issued after the Petition Date up to a maximum aggregate amount of Nine Hundred Thousand Dollars ($900,000.00);

(h)     [reserved];

(i)     all Liabilities which Purchaser assumes pursuant to other provisions of this Agreement or any Purchaser Documents;

(j)     all liabilities and obligations with respect to claims arising out of the ownership of the Purchased Assets or the employment of any of the Transferred Employees after the Closing Date;

(k)     [reserved];

(l)     all costs and expenses described in Section 2.5(d);

(m)     with respect to any Assumed Lease, the "Restructured Lease Savings Fee" payable to Hilco Real Estate, LLC ("Hilco"), as such term is defined in that certain Real Estate Consulting and Advisory Services Agreement, dated as of April 22, 2009, between Hilco and Seller (the "Hilco Agreement"), inclusive of Paragraphs 3(a)(i) & (ii) of the Hilco Agreement;

(n)     [reserved];

(o)     all costs of a privacy ombudsman appointed in the Bankruptcy Case by the Bankruptcy Court; and

(p)     all Liabilities of Seller under the Agency Agreement.

2.4     <u>Excluded Liabilities</u>.  Purchaser shall not assume and shall be deemed not to have assumed, and Seller shall be solely and exclusively liable with respect to, (i) the Excluded Environmental Liabilities, but only to the extent of applicable law, (ii) all Liabilities for salary, severance, benefits and bonuses for any Transferred Employee to the extent such liabilities accrued prior to the Closing Date, or (iii) any other Liabilities of Seller of whatever nature, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise, other than the Assumed Liabilities (collectively, the "<u>Excluded Liabilities</u>").

2.5     <u>Executory Contract Designation</u>.

(a)     Subject to Purchaser's right to designate any or all Executory Contracts and Transferred Owned Property prior to the Designation Deadline pursuant to <u>Section 2.5(b)</u>, Purchaser has elected to not have the Transferred Owned Property transferred to it or any Executory Contracts assumed and assigned to it on the Closing Date, except as may be provided in the Sale Order.  Notwithstanding any prior designations, Seller shall take all necessary action (including, if appropriate, notifying the Bankruptcy Court and applicable landlords) to provide that no other Executory Contract will be an Assumed Executory Contract on the Closing Date, and Purchaser shall have the right to designate any or all Executory Contracts and Transferred Owned Property in accordance with <u>Section 2.5(b)</u> after the Closing Date.

(b)     On or prior to the Designation Deadline, Purchaser may designate any Executory Contract that Seller has not rejected pursuant to Section 365 of the Bankruptcy Code as an Assumed Executory Contract without being required to pay Seller any additional Purchase Price, and Seller shall use its reasonable efforts to seek an Assumption Order with respect any such Executory Contract so designated; <u>provided, however,</u> that Purchaser shall be obligated to pay any Cure Costs with respect to any such Assumed Executory Contract in accordance with any agreement with the non-Debtor party to such Assumed Executory Contract or as set forth in the Assumption Order; <u>provided, further, however,</u> that Purchaser timely advances or reimburses Seller for any and all costs (including the professional fees associated with) related to or incurred in connection with obtaining for Purchaser the entry of an Assumption Order with respect to such Executory Contract; and <u>provided, further, however,</u> that Purchaser shall be required to provide adequate assurance of future performance with respect to any Assumed Executory Contract and, notwithstanding anything to the contrary, Seller shall not have any liability for Purchaser's failure to satisfy such requirement of the Bankruptcy Code.  On or prior to the Designation Deadline, Purchaser may designate the Transferred Owned Property to be transferred to it or its designee without being required to pay Seller any additional Purchase Price, and Seller shall use its reasonable efforts to seek an order from the Bankruptcy Court transferring such Transferred Owned Property free and clear of all liens, claims and encumbrances; <u>provided, however,</u> that Purchaser timely advances or reimburses Seller for any and all costs (including the professional fees associated with) related to or incurred in connection

with obtaining for Purchaser the entry of the order with respect to such Transferred Owned Property.

(c) From the Effective Date through the Designation Deadline, Seller shall not reject any Executory Contract or encumber or sell the Transferred Owned Property unless otherwise agreed to, in writing, by Purchaser, subject to Purchaser's compliance with the provisions of Section 2.5(d) below. Purchaser shall have the right to exclude Executory Contracts or the Transferred Owned Property (each, an "Excluded Executory Contract") from this transaction by providing written notice to Seller of Purchaser's exercise of such right no later than the conclusion of the Designation Deadline (an "Exclusion Notice"). Upon receipt of an Exclusion Notice from Purchaser for the Transferred Owned Property or an Executory Contract, Seller shall have the right to sell the Transferred Owned Property or assume, assign or reject any such Excluded Executory Contract pursuant to Section 363 and 365 of the Bankruptcy Code. Seller shall have the right to reject any Executory Contract which has not been designated by Purchaser on or before the Designation Deadline.

(d) With respect to each Executory Contract and the Transferred Owned Property, Purchaser shall pay all Carrying Costs owed by Seller for all periods on or after the Closing Date, other than with respect to the Seller Wind Down expenses in excess of the services provided by Purchaser at no cost and expense to Seller under Section 8.12, through and including the later of (i) the Designation Deadline for such Executory Contract or Transferred Owned Property; (ii) the date of entry of the Assumption Order with respect to an Executory Contract assumed and assigned to Purchaser or the date of entry of sale order with respect to the Transferred Owned Property; and (iii) the end of the calendar month in which an Exclusion Notice is served. Purchaser shall advance all Carrying Costs on a monthly basis, and not less than ten (10) days prior to the date on which payment is due, provided that, Purchaser shall not be obligated to advance any Carrying Costs for the month of August 2009 or beyond for those Closing Stores (as defined in the Agency Agreement) for which the Purchaser provides a Vacate Notice (as defined in the Agency Agreement) on or before 11:59 p.m. (Eastern Time) on July 24, 2009 to terminate the Lease for such Closing Store.

2.6 Assignment of Contracts and Rights. To the maximum extent permitted by the Bankruptcy Code, the Purchased Assets shall be assumed and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in an Order or this Agreement, as applicable. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if an attempted assignment without the consent of a third party would constitute a breach or in any way adversely affect the rights of Purchaser or Seller thereunder. If such consent is not obtained or such assignment is not attainable pursuant to Sections 105, 363 or 365 of the Bankruptcy Code other than as a result of the failure to pay Cure Costs, then such Purchased Assets shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in Purchase Price or further obligation of Seller with respect thereto.

2.7 Assets to be Liquidated; Proceeds. Subject to entry by the Bankruptcy Court of the Sale Order and the terms and conditions of the Agency Agreement, Agent shall act as the exclusive agent of Seller for the purpose of liquidating the GOB Assets in those Leased Real

Properties designated by Purchaser from time to time from the date hereof through the Designation Deadline (such locations, the "Store Closing Locations") by conducting Store Closing Sales. The terms, conditions and procedures applicable to the conduct of the Store Closing Sales in the Store Closing Locations and the sale or other disposition of the GOB Assets from the Store Closing Locations are set forth in the Agency Agreement. For purposes of securing the rights of Purchaser and Agent with respect to the Disposition Rights at the Store Closing Locations, Seller hereby grants to Purchaser and Agent, pursuant to Section 364(d) of the Bankruptcy Code, a first priority security interest in and lien upon the Merchandise and Furniture and Equipment owned by Seller located at the Store Closing Locations, and the Proceeds thereof to secure all obligations of Seller to Purchaser and Agent hereunder and under the Agency Agreement. Pursuant to the Sale Order, the security interest granted to Purchaser and Agent hereunder shall be deemed properly perfected without the need for further filings with any state, local or federal office or agency or documentation.

2.8     Further Conveyances and Assumptions.

(a)     From time to time following the Closing, to the extent permitted by law, Seller shall, or shall cause its Affiliates to, make available to Purchaser such non-confidential data in personnel records of any Transferred Employee or Retained Employee as is reasonably necessary for Purchaser to determine whether to employ such Retained Employee or transition such employees into Purchaser's records.

(b)     From time to time following the Closing, Seller shall, or shall cause its Affiliates to, transfer to Purchaser any Purchased Assets received by or in the possession of Seller.

(c)     From time to time following the Closing, Seller and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Transactions.

### ARTICLE III

### CONSIDERATION

3.1     Purchase Price.

(a)     The aggregate consideration for the Purchased Assets (the "Purchase Price") shall be equal to Twenty Seven Million Three Hundred and Sixty Thousand Dollars ($27,360,000.00), which shall include a cash portion equal to Twenty Six Million Four Hundred and Sixty Thousand Dollars ($26,460,000), subject to adjustment as provided in this Section 3.1, and

a portion equal to Nine Hundred Thousand Dollars ($900,000.00) for the assumption of the liabilities set forth in Section 2.3(g).

(b)     At Closing, Twenty Four Million Six Hundred Twenty Four Thousand Dollars ($24,624,000) of the Purchase Price shall be paid to the Seller in cash. Two Million Seven Hundred Thirty Six Thousand Dollars ($2,736,000) of the Purchase Price (the "Withheld Amount") shall at Closing be delivered by the Purchaser as follows: (i) a cash payment into an escrow account with an escrow agent under an escrow agreement to be mutually acceptable to Purchaser and Seller (the "Closing Escrow"); (ii) delivery to Seller of an irrevocable standby letter of credit, in form and substance and from a bank reasonably acceptable to Seller, naming Seller as beneficiary; (iii) an assignment to Seller of an irrevocable standby letter of credit in form and substance and from a bank reasonably acceptable to Seller naming Purchaser as beneficiary; or (iv) any combination of the foregoing..

(i)     If the actual Cost Value of the Eligible Inventory, as determined in accordance with Section 4.7, is less than Fifty-Three Million Dollars ($53,000,000.00) (the "Baseline Cost Value"), then the Purchase Price shall be reduced by an amount equal to the product of (x) the sum of (i) the Baseline Cost Value, less (ii) the actual Cost Value of the Eligible Inventory, multiplied by (y) 0.60. If the actual Cost Value of the Eligible Inventory, as determined in accordance with Section 4.7, is more than the Baseline Cost Value, then the Purchase Price shall be increased by an amount equal to the product of (x) the sum of (i) the actual Cost Value of the Eligible Inventory, less the Baseline Cost Value, multiplied by (y) 0.60. Within five (5) Business Days of the completion of the Inventory Taking or Sampling Inventory Taking, as applicable (as defined below), the Withheld Amount shall be distributed to Seller (which shall include any portion of the Withheld Amount in excess of the amounts in the Closing Escrow that must paid to Seller from draw downs on any letter of credit delivered to Seller pursuant to Section 3.1(b)(i)), and/or Purchaser, as applicable, with a pro rata share of any income earned in the Closing Escrow, if any, being allocated between Purchaser and Seller on the same basis (using actual earnings while held in the Closing Escrow). In the event that Purchaser has paid to Seller more than it was entitled to under this Section 3.1 after taking into account the adjustment provided in this Section 3.1, Seller shall promptly return to Purchaser such excess. In the event that Purchaser has not paid to Seller what it is entitled to under this Section 3.1 after taking into account the adjustments provided in this Section 3.1, Purchaser shall pay to Seller the balance owed to Seller hereunder within five (5) Business Days of the completion of the Inventory Taking or Sample Inventory Taking, as applicable. In addition, to the extent that any Eligible Inventory that Seller had paid for is received at any Location after the Inventory Date, such Eligible Inventory shall be added to the Cost Value of Eligible Inventory for purposes of calculation under this Section 3.1(b).

(c)     Except for the Eligible Inventory set forth in the file known as "Ritz-Inv with Retail Lower than Cost (7 2 09)" and attached hereto as **Exhibit B**, the aggregate Cost Value of Eligible Inventory shall not exceed the aggregate Retail Value of Eligible Inventory. If, pursuant to the Inventory Taking or Sampling Inventory Taking, as applicable, the aggregate Cost Value of Eligible Inventory exceeds the aggregate Retail Value of Eligible Inventory by an amount greater than as set forth on **Exhibit B**, the Purchase Price shall be reduced by fifty percent (50%) of such excess amount.

(d)    Purchaser shall receive, as a credit against the Purchase Price, an allowance in the amount of Three Hundred Dollars ($300) per Store.

(e)    Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC ("Hilco/GB), jointly and severally unconditionally guarantee to Seller the full and complete performance by Purchaser of all of Purchaser's obligations under this Agreement.  With respect thereto, Hilco/GB hereby waives diligence, presentment, demand of performance, filing of any claim, any right to require any proceeding first against Purchaser, protest, notice and all demands whatsoever in connection with the performance of its obligations set forth in this Section 3.1(e).  This guaranty is a guaranty of performance and payment and not of collection.

3.2    Purchase Price Deposit.  Reserved

## ARTICLE IV

## CLOSING, INVENTORY TAKING AND TERMINATION

4.1    Closing Date.  Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 hereof (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at the offices of Cole, Schotz, Meisel, Forman & Leonard, P.A. at 500 Delaware Avenue, Wilmington, Delaware 19801 (or at such other place as the parties may designate in writing) at or before 6:00 p.m. (Eastern Daylight Time) on the date the conditions set forth in Article X are satisfied or waived (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the parties hereto.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."  Notwithstanding any other provision of this or any other agreement to the contrary, the Closing shall occur on or before 6:00 p.m. on July 24, 2009.

4.2    Deliveries by Seller.  At the Closing, Seller shall deliver to Purchaser:

(a)    one or more special warranty deeds or warranty deeds with covenants against grantor's acts or their equivalent, duly executed by Seller, pursuant to which Seller conveys to Purchaser fee title to the Transferred Owned Real Property;

(b)    one or more duly executed bills of sale in a form to be agreed upon by the parties hereto;

(c)    one or more duly executed assignment and assumption agreements in a form to be agreed upon by the parties hereto and duly executed assignments of the U.S. trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. trademark office, and general assignments of all other Purchased Intellectual Property;

(d)    the officer's certificate, without personal liability to the executing officer, required to be delivered pursuant to Sections 10.1(a) and 10.1(b);

(e)     affidavits executed by Seller that Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(f)     an executed copy of the Sale Order;

(g)     all other documents, instruments or writings of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be reasonably necessary to convey the Purchased Assets to Purchaser, such documents to be identified and provided by Purchaser to Seller in a form acceptable to Purchaser on or before the Closing Date;

(h)     one or more duly executed assignment and assumption agreements in a form to be agreed upon by the parties hereto with respect to each of the Assumed Leases and Assumed Contracts; and

(i)     such other documents, instruments and certificates as Purchaser may reasonably request, such documents to be identified and provided to Purchaser by Seller in a form acceptable to Purchaser on or before the Closing Date.

4.3     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver:

(a)     cash in the amount of the cash portion of the Purchase Price and the Withheld Amount delivered in the manner contemplated pursuant to Section 3.1(b)(i) and the adjustment to the Purchase Price provided for in Section 3.1(d);

(b)     one or more duly executed assignment and assumption agreements in a form to be agreed upon the parties hereto;

(c)     the officer's certificate, without personal liability to the executing officer, required to be delivered pursuant to Sections 10.2(a) and 10.2(b); and

(d)     such other documents, instruments and certificates as Seller may reasonably request, such documents to be identified and provided by Seller to Purchaser in a form acceptable to Seller on or before the Closing Date.

4.4     Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)     by Purchaser or Seller, if the Closing shall not have occurred by the 11:59 p.m. Eastern Time on July 24, 2009 (the "Termination Date"); provided, however, that if the Closing shall not have occurred on or before the Termination Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or Seller, then the breaching party may not terminate this Agreement pursuant to this Section 4.4(a);

(b)     by mutual written consent of Seller and Purchaser;

(c)     by Purchaser, if any condition to the obligations of Purchaser set forth in Section 10.1 or 10.3 shall have become incapable of fulfillment other than as a result of a breach

by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(d) by Seller, if any condition to the obligations of Seller set forth in Section 10.2 or 10.3 shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller;

(e) by Purchaser, if there shall be a breach by Seller of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 10.1 or 10.3 and which breach has not been cured by the earlier of (i) ten (10) Business Days after the giving of written notice by Purchaser to Seller of such breach and (ii) the Termination Date;

(f) by Seller, if there shall be a breach by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Sections 10.2 or 10.3 and which breach has not been cured by the earlier of (i) ten (10) Business Days after the giving of written notice by Seller to Purchaser of such breach and (ii) the Termination Date;

(g) by Seller or Purchaser if there shall be in effect a final non-appealable Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions, it being agreed that the parties hereto shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence);

(h) by Purchaser, if the Sale Order with respect to the Transactions has not been entered on or before July 24, 2009; and

(i) automatically, upon the closing of the transactions between the Seller and RCI.

4.5 Procedure Upon Termination. In the event of termination pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other party or parties and to the Committee, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or Seller. If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers and other material of any other party relating to the Transactions, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.6 Effect of Termination. In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Purchaser or Seller; provided, however, that the provisions of Article XII hereof shall survive any such termination and shall be enforceable hereunder; provided further, however, that nothing in this Section 4.6 shall be deemed to release any party from liability for any breach of its obligations under this Agreement.

4.7    Inventory Taking for Post-Closing Purchase Price Adjustment.

        (a)    Inventory Taking.

                (i)    Commencing on the Closing Date, Seller and Purchaser shall cause to be taken a SKU level physical inventory of the Eligible Inventory located in all Locations (the "Inventory Taking"), which Inventory Taking shall be completed in each of the Locations no later than ten (10) Business Days after the Closing Date (the "Inventory Completion Date"), and the date of the Inventory Taking at each Location being the "Inventory Date" for each such Location). Seller and Purchaser shall jointly employ RGIS, LLC or another mutually acceptable independent inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking at the Stores, or if Seller and Purchaser mutually agree, shall jointly conduct the Inventory Taking at the Stores without utilizing a third party inventory taking service. The Inventory Taking at the Stores shall be conducted in accordance with the procedures and instructions to be mutually agreed by Seller and Purchaser (the "Inventory Taking Instructions"). Purchaser shall be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service. The balance of such fees and expenses, if applicable, shall be paid by Seller. In the event that no third party Inventory Taking Service is utilized, then each of Seller and Purchaser shall bear their respective costs and expenses incurred in the Inventory Taking. Seller, Purchaser and the Committee shall each have the right to have representatives present during the Inventory Taking at the Stores, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service. Notwithstanding the foregoing, Seller shall conduct the Inventory Taking at the Distribution Center in accordance with Seller's historical procedures. Purchaser and the Committee shall each have the right to have representatives present during the Inventory Taking at the Distribution Center, and shall each have the right to review and verify the listing and tabulation of Seller in connection therewith. Each of Seller and Purchaser shall bear their respective costs and expenses in connection with the Inventory Taking at the Distribution Center. Seller agrees that during the conduct of the Inventory Taking in each of the Locations, the applicable Location shall be closed to the public and no sales or other transactions shall be conducted until the Inventory Taking at such Location has been completed, as agreed by Seller and Purchaser. Notwithstanding the foregoing, prior to the completion of the Inventory Taking, Purchaser shall have the right to direct shipments of Inventory from the Distribution Center to the Stores as it deems necessary.

                (ii)    Notwithstanding the process set forth in Section 4.7(a)(i) above, if Purchaser and Seller mutually agree after the execution of this Agreement, the process set forth in this Section 4.7(a)(ii) and Sections 4.7(a)(iii) and 4.7(a)(iv) below shall be used in lieu of the process set forth in Section 4.7(a)(i) above. Subject to the provisions of this Section 4.7(a), Seller and Purchaser shall then use the current book value of the Eligible Inventory to determine the aggregate Cost Value of the Eligible Inventory located in the Stores on the Closing Date in accordance with this Agreement. In order to test the validity of the aggregate Retail Value of the Eligible Inventory as reflected on Seller's current books and records, on or within ten (10) days after the Closing Date (the "Sampling Inventory Completion Date"), Seller and Purchaser shall cause to be taken a SKU retail physical inventory (the "Sampling Inventory Taking") of the Eligible

Inventory located in (i) thirty-six (36) Stores (each a "Test Store" and collectively, the "Test Stores"), which Test Stores shall be jointly selected by Seller and Purchaser, and (ii) the Distribution Center. Store #1694 may be included in the Sampling Inventory Taking; provided, however, the results shall not be applied to the remaining Stores through the process outlined in Section 4.7(a)(iii) below. A representative for the Committee may be present at and observe, without interference, the Sampling Inventory Taking. The date of the Sampling Inventory Taking at each Test Store shall be referred to as the "Sampling Inventory Date" for such Test Store. Seller and Purchaser shall jointly employ RGIS or another mutually acceptable inventory taking service (such selection service, the "Sampling Inventory Taking Service"), to conduct the Sampling Inventory Taking (and, if applicable, the Additional Inventory Taking (as defined below)) at the Test Stores in accordance with the procedures mutually agreed to among Seller and Purchaser within three (3) days of the Effective Date. Notwithstanding the foregoing, Seller shall conduct the Sampling Inventory Taking at the Distribution Center in accordance with Seller's historical procedures. Further, the Sampling Inventory Taking shall be first performed at the Distribution Center prior to any shipments being made from the Distribution Center to the Stores.

        (iii)    The results of the Sampling Inventory Taking at the Test Stores with the exception of Store #1694 (the "Test Store Results") shall be used to determine any adjustment as may be required to the calculation of the aggregate Retail Value of the Eligible Inventory located in the Stores on the Closing Date, as follows: (i) with regard to the Test Stores, Test Store Results shall be compared to the "roll-forward" book value of the Eligible Inventory as of the Closing Date at the Test Stores (i.e., as adjusted for Gross Rings at the Test Stores), and any variance from the book value of the Eligible Inventory as of the Closing Date at the Test Stores shall be determined based on the actual result of the Sampling Inventory Taking at each such Test Store, and (ii) with respect to any Store that is not a Test Store, the aggregate Retail Value of the Eligible Inventory located in such Stores on the Closing Date shall be determined by adjusting the "roll-forward" book value of the Eligible Inventory as of the Closing Date (i.e., as adjusted for Gross Rings at such non-Test Stores) by the Variance (as defined below). For non-Test Stores, the variance between the Test Store Results and the "roll-forward" book value in the Test Stores shall be the percentage variance of the aggregate Retail Value of the Eligible Inventory as determined by the Sampling Inventory Taking at the Test Stores as compared to the book value of the Eligible Inventory as reflected in Seller's books and records as of the date immediately preceding the Closing Date in such Test Stores (the "Variance"); provided, however, for the purposes of calculating the Variance, the Test Stores having the highest and the lowest variance percentage shall be excluded. In the event that the initial Variance is greater than five percent (5%) of the current book value of the Eligible Inventory, then Seller shall have the right to request a Sampling Inventory Taking (the "Additional Inventory Taking") at such additional Stores as shall be designated by Seller and Purchaser (the "Additional Stores"), to establish whether an adjustment to the Variance is required; provided, however, the results of the Additional Inventory Taking, together with the results of the Sampling Inventory Taking, shall be used in calculating the aggregate Retail Value of the Eligible Inventory in the Stores.

(iv)    Purchaser and Seller shall each be responsible for fifty percent (50%) of the costs and fees of the Sampling Inventory Taking Service.  Subject to the immediately preceding sentence, Seller and Purchaser shall bear their respective costs and expenses relative to the Sampling Inventory Taking, including their respective costs and expenses in connection with the Sample Inventory Taking at the Distribution Center. Seller and Purchaser shall each be permitted to have representatives present during the Sampling Inventory Taking and, if applicable, the Additional Inventory Taking.  Seller, Purchaser, and the Committee shall each have the right to review and verify the listing and tabulation of the Sampling Inventory Taking Service.  Purchaser and the Committee shall each have the right to review and verify the listing and tabulation of Seller with respect to the Sampling Inventory Taking at the Distribution Center.  Seller and Purchaser agree that during the conduct of the Sampling Inventory Taking (and the Additional Inventory Taking, where applicable) in each of the Stores, the applicable Store shall be closed to the public (but for no more than twelve (12) hours) and no sales or other transactions shall be conducted until the Sampling Inventory Taking has been completed in that Store, as agreed by Seller and Purchaser.  Seller and Purchaser further agree that neither Seller nor Purchaser shall (i) other than with respect to sales of Eligible Inventory in the ordinary course as part of the Sale, transfer any Eligible Inventory to or from that Store, (ii) move Eligible Inventory within or about the Stores so as to make any such items unavailable for counting as part of the Sampling Inventory Taking, and/or (iii) remove any Seller hang tags, price tickets, or inventory control tags affixed to any Eligible Inventory.  In order to facilitate the Sampling Inventory Taking and, if applicable, the Additional Inventory Taking, Seller agrees to make its SKU data files, retail price files and related computer hardware and software available to Purchaser and the Sampling Inventory Taking Service commencing prior to the Sampling Inventory Date.

(b)    Gross Rings.  For the period from the Closing Date until the Inventory Date for each Store (the "Gross Rings Period"), Purchaser shall keep a strict count of register receipts and reports ("Gross Rings") to determine the actual Cost Value of the merchandise sold by SKU.  All such records and reports shall be made available to Purchaser and Seller during regular business hours upon reasonable notice.  The Cost Value of Inventory shall be calculated on the Gross Rings basis, to account for shrinkage, on the basis of One Hundred Two Percent (102%) of the aggregate Cost Value of Inventory sold during the Gross Rings period.

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that:

5.1    Organization and Good Standing.  Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and in each jurisdiction where it is qualified to do business, subject to the limitations imposed on Seller as a result of having filed a petition for relief under the Bankruptcy Code, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

Schedule 5.1 sets forth the jurisdiction of Seller's organization and each jurisdiction in which Seller is qualified to do business.

    5.2    <u>Authorization of Agreement</u>. Subject to entry of the Sale Order and such other authorization as is required by the Bankruptcy Court, Seller has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder. The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller. This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto, the entry of the Sale Order and receipt of such other authorization as is required by the Bankruptcy Court) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of Seller enforceable against Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

    5.3    <u>Conflicts; Consents of Third Parties</u>.

        (a)    The execution and delivery by Seller of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party, the consummation of the Transactions contemplated hereby and thereby, or compliance by Seller with any of the provisions hereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the certificate of incorporation and by-laws or comparable organizational documents of Seller; (ii) subject to entry of the Sale Order, any Contract, Lease or Permit to which Seller is a party or by which any of the properties or assets of Seller are bound; (iii) subject to entry of the Sale Order, any Order of any Governmental Body applicable to Seller or any of the properties or assets of Seller as of the date hereof; or (iv) subject to entry of the Sale Order, any applicable Law, other than, in the case of clauses (i), (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

        (b)    Except as set forth on <u>Schedule 5.3(b)</u> and except to the extent not required if the Sale Order is entered, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Seller in connection with the execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which it is a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, the assignment or conveyance of the Purchased Assets, or the taking by Seller of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act, if any, (ii) the entry of the Sale Order and (iii) such other consents, waivers, approvals, Orders, Permits, authorizations,

declarations, filings and notifications, the failure of which to obtain or make would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.4 <u>Title to Purchased Assets</u>. Seller either owns, leases or has the right to transfer the Purchased Assets and the GOB Assets, including, without limitation, the Transferred Owned Real Property and the Leased Real Property, and subject to the entry of the Sale Order, Purchaser will be vested with good title to such Purchased Assets, free and clear of all Liens, Claims, Interests and Encumbrances, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.

5.5 <u>Taxes</u>.

(a) To the Knowledge of Seller, Seller has timely filed all Tax Returns required to be filed with the appropriate Tax Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of Seller). To the Knowledge of Seller, Seller has not received any written notice or written inquiry from any jurisdiction where Seller does not currently file Tax Returns to the effect that such filings may be required with respect to the Purchased Assets or the Business, or that the Business may otherwise be subject to taxation by such jurisdiction. No power of attorney currently in force has been granted by Seller with respect to the Business that would be binding on Purchaser with respect to taxable periods commencing on or after the Closing Date. To the Knowledge of Seller, except as to Taxes of Seller the payment of which is or will be prohibited or stayed by the Bankruptcy Code, Seller has paid all Taxes due and payable by it (whether or not such Taxes are shown on any Tax Return). Other than those set forth on <u>Schedule 5.5(a)</u>, there are no Tax Liens on any of the Purchased Assets other than Permitted Exceptions.

(b) Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code.

5.6 <u>Intellectual Property</u>. Except as set forth on <u>Schedule 5.6</u>, Seller owns or has valid licenses to use all material Purchased Intellectual Property. Except as set forth on <u>Schedule 5.6</u>, no claims are pending against Seller before a Governmental Body or, to the Knowledge of Seller, threatened with regard to the ownership by Seller of any Purchased Intellectual Property.

5.7 <u>Environmental Matters</u>. Except as set forth on <u>Schedule 5.7</u>, Seller has not received written, or to the Knowledge of Seller, oral, notice of any pending or, to the Knowledge of Seller, threatened claim or investigation by any Governmental Authority or any other Person concerning material potential liability of any Seller under Environmental Laws in connection with the ownership or operation of the Business, the Real Property, or any real property currently owned, leased or occupied by Seller.

5.8 <u>Employee Benefits</u>.

(a) <u>Schedule 5.8(a)</u> sets forth a complete and correct list of all Employee Benefit Plans of Seller.

(b)     Each Employee Benefit Plan has been operated and administered in all material respects in accordance with its terms and applicable law, except where any failure to be so operated and administered would not, individually or in the aggregate, be expected to have a Material Adverse Effect or as otherwise resulting from the Bankruptcy Case.

(c)     Each Employee Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code is so qualified and the trusts maintained thereunder are exempt from taxation under Section 501(a) of the Code.

(d)     There are no pending, or to the Knowledge of Seller, threatened claims by or on behalf of any Employee Benefit Plan, by any employee or beneficiary covered under any such Plan, or otherwise involving any such Employee Benefit Plan (other than routine claims for benefits).

(e)     No amounts payable under the Employee Benefit Plans will fail to be deductible for federal income tax purposes by virtue of Section 280G of the Code.

(f)     There are no material outstanding Liabilities of, or related to, any Employee Benefit Plan, other than Liabilities for benefits to be paid in the ordinary course to participants in such Employee Benefit Plan and their beneficiaries in accordance with the terms of such Employee Benefit Plan or as otherwise resulting from the Bankruptcy Case.

5.9     Litigation.  Except as set forth on Schedule 5.9, there are no Legal Proceedings pending or, to the Knowledge of Seller, threatened against Seller before any Governmental Body, which, if adversely determined, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.10    Material Contracts.

(a)     Schedule 5.10(a) contains a correct and complete list, as of the date hereof, of all Contracts (the "Material Contracts") pursuant to which Seller has any rights or benefits or undertakes any obligations or liabilities with respect to the Business, that:

(i)     has a duration of one year or more and is not terminable without penalty upon 90 days or less prior written notice by any party;

(ii)    requires or could reasonably be expected to require any party thereto to pay $25,000 or more in any 12 month period, or $100,000 or more in the aggregate;

(iii)   requires any severance, retention, or other termination payments to its employees on or after the Closing Date;

(iv)    contains any non-competition covenant or exclusivity arrangement;

(v)     involves any contract (i) granting or obtaining any right to use any Intellectual Property (other than contracts granting rights to use readily available commercial Software having an annual license and/or maintenance fee of less than

$10,000 in the aggregate for all such related contracts) or (ii) restricting Seller's rights to any Purchased Intellectual Property.

(vi)     regards the employment, services, consulting, termination or severance from employment relating to or for the benefit of any director, officer, employee, sales agent, distributor, dealer, independent contractor or consultant;

(vii)     constitutes joint venture, partnership and similar contracts involving a sharing of profits or expenses (including but not limited to joint research and development and joint marketing contracts); or

(viii)     constitutes master lease agreements providing for the leasing of material personal property.

(b)     Except as set forth in Schedule 5.10(b), to the Knowledge of Seller, all of the Material Contracts are in full force and effect, except for breaches and defaults of the type referred to in Section 365(b)(2) of the Bankruptcy Code.

5.11     Property.

(a)     Title to the Transferred Owned Real Property is, and at Closing shall be, insurable and fee simple, held in the name of Seller free and clear of all free and clear of all Liens, Claims, Interests and Encumbrances, other than Permitted Exceptions. No Person, other than Seller, will be leasing, using or occupying any portion of the land, property, structures, fixtures and improvements covered by the Transferred Owned Real Property or any part thereof as of the Closing Date.

(b)     Schedule 5.11(b) identifies, for each Transferred Owned Real Property, the date of the most recent survey of such Transferred Owned Real Property, the preparer of each such survey, and the most recent owner's policy of title insurance issued for each Transferred Owned Real Property.

(c)     Schedule 5.11(c) sets forth the address or other description of each parcel of Leased Real Property, and a true, correct and complete list of all Leases for each Leased Real Property held by Seller (including the date, if available, and name of each of the parties to such Lease document). Seller has delivered or made available to Purchaser a true and complete copy of each of the aforementioned Lease documents and, except as set forth on Schedule 5.11(c), such Leases have not been amended, modified, restated or otherwise supplemented. Except as set forth in Schedule 5.11(c), with respect to each of the aforementioned Leases: (i) except as results from the pendency of the Bankruptcy Case, Seller has a valid and subsisting leasehold estate in and the right to quiet enjoyment of such Leased Real Property for the full term of such Lease, and such Lease is legal, valid, binding and enforceable against Seller and in full force and effect; (ii) to the Knowledge of Seller, except as results from the pendency of the Bankruptcy Case, Seller has not received written notice of any current monetary default or material non-monetary default thereunder (or condition or event, which, after notice or a lapse of time or both, would constitute a monetary default or material non-monetary default thereunder); (iii) no security deposit or portion thereof deposited with respect to such Lease has been applied in respect of a breach or default under such Lease which has not been redeposited in full; (iv) Seller

does not owe, nor will they in the future owe, any brokerage commissions or finder's fees with respect to such Lease; (v) except as set forth on Schedule 5.11(c), the other party to such Lease is not an Affiliate of, and otherwise does not have any economic interest in, Seller; (vi) except as set forth on Schedule 5.11(c), there are no Liens on the estate or interest created by such Lease created or suffered to exist by Seller that will not be extinguished pursuant to the Sale Order as against such estate or interest; (vii) except as set forth on Schedule 5.11(c), Seller, and, to the Knowledge of Seller, no other party to such Lease, have assigned the same or sublet any part of the premises covered thereby or exercised any option or right thereunder; (viii) no material penalties are accrued or unpaid under any Lease.

5.12  Brokers. Except as set forth in Schedule 5.12, Seller does not have any obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person in connection with the Transactions.

5.13  No Other Representations or Warranties; Schedules. Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), Seller nor any other Person makes any other express or implied representation or warranty with respect to Seller, Seller's Business, the Purchased Assets, the Assumed Liabilities or the Transactions, and Seller disclaims any other representations or warranties, whether made by Seller, any Affiliate of Seller, or any of Seller's or its Affiliates' respective officers, directors, employees, agents or representatives. Except for the representations and warranties contained in Article V hereof (as modified by the Schedules hereto), Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of Seller or any of its Affiliates). Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of Seller's Business. The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

6.1  Organization and Good Standing. It is an entity duly organized, validly existing and in good standing under the laws of the state of Maryland and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

6.2    Authorization of Agreement. It has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of it. This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered by it and (assuming the due authorization, execution and delivery by the other parties hereto) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of it enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3    Conflicts; Consents of Third Parties.

(a)    The execution and delivery by Purchaser of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party, the consummation of the transactions contemplated hereby and thereby, or compliance by it with any of the provisions hereof or thereof do not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) its certificate of incorporation or bylaws (ii) any contract, lease or Permit to which it is a party or by which any of its properties or assets are bound; (iii) any Order of any Governmental Body applicable to it or any of its properties or assets as of the date hereof; or (iv) any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required in connection with the execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Purchaser is a party, the compliance by it with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, its taking of any other action contemplated hereby or thereby, except for (i) compliance with the applicable requirements of the HSR Act and (ii) such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

6.4    Brokers. Purchaser does not have any obligation to pay any fees, commissions or other similar compensation to any broker, finder, investment banker, financial advisor or other similar Person in connection with the Transactions.

6.5    Adequate Assurance. Prior to any hearing to obtain an Assumption Order, , Purchaser shall provide: such information to Seller as Seller believes is reasonably necessary to provide "adequate assurance," as that term is used in Section 365 of the Bankruptcy Code, with respect to Executory Contracts proposed to be assumed by Seller and assigned to Purchaser..

6.6    Condition of the Purchased Assets. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller in Article V hereof (as modified by the Schedules hereto), and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis. Purchaser acknowledges that it will conduct its own due diligence and in making the determination to proceed with the Transaction, Purchaser will be relying on the results of its own independent investigation.

6.7    Communications with Customers and Suppliers. Prior to the Closing, Purchaser shall not, and shall cause its Affiliates and representatives not to, contact, or engage in any discussions or otherwise communicate with, any of the Business's customers, suppliers and others with whom it has material commercial dealings without obtaining the prior consent of Seller (which will not be unreasonably withheld but, if given, may be conditioned on Seller having the right to designate an officer of Seller reasonably acceptable to Purchaser, to participate in any meetings or discussions with any such customers, suppliers or others).

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

7.1    Reserved.

7.2    Reserved.

7.3    Reserved.

7.5    Reserved.

7.6    Reserved.

## ARTICLE VIII

## COVENANTS

8.1    Access to Information. Seller agrees that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees, consultants and representatives (including, without limitation, its legal advisors and accountants), to make such investigation of the properties, business and operations of Seller and such examination of the books and records and financial and operating data of Seller, the Business, the Purchased Assets, the Assumed Liabilities and the Leased Real Property, and access to all the officers, key employees, accountants and other representatives of Seller, as it reasonably requests and to make extracts

and copies of such books and records. Any such investigation and examination shall be conducted upon reasonable advance notice and under reasonable circumstances and shall be subject to restrictions under applicable Law. Seller shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Purchaser and Purchaser's representatives in connection with such investigation, examination and access, and Purchaser and its representatives shall cooperate with Seller and its representatives and shall use their reasonable efforts to minimize any disruption to their business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require Seller to disclose information subject to attorney-client privilege, provided Seller advises Purchaser of the specific assertion of such privilege.

8.2     Conduct Pending the Closing.

(a)     Except (i) as required by applicable Law, (ii) as otherwise expressly contemplated by this Agreement or (iii) with the prior written consent of Purchaser, during the period from the date of this Agreement to and through the Closing Date, Seller shall, to the extent commercially reasonable, taking into account the filing of the Bankruptcy Case, use its commercially reasonable efforts to (A) preserve their present business operations, organization and goodwill, and (B) preserve its present relationships with customers and suppliers.

(b)     Except (i) as required by applicable Law, (ii) as otherwise contemplated by this Agreement or (iii) with the prior written consent of Purchaser, Seller shall not:

(A)     make any promise or representation, oral or written, to, or otherwise (1) increase the annual level of compensation payable or to become payable by Seller to any of its directors, executive officers or Employees, (2) grant, or establish or modify any targets, goals, pools or similar provisions in respect of, any bonus, benefit or other direct or indirect compensation to or for any director, executive officer or Employee, (z) increase the coverage or benefits available under any (or create any new) Employee Benefit Plan or (3) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which Seller is a party or involving a director, executive officer or Employee of Seller, except, in each case, as required by any of the Employee Benefit Plans or Employee Agreements;

(B)     enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability or other obligation to any labor organization;

(C)     subject any of the Purchased Assets to any Lien, Interest or Encumbrance, except for Permitted Exceptions;

(D)     cancel or compromise any material debt or claim or waive or release any material right of Seller that constitutes a Purchased Asset other

than customer accounts receivable compromised in the ordinary course of the business of Seller;

(E)     engage in any transaction with any officer, director or Affiliate of Seller or affiliate of any such individual;

(F)     sell, pledge, dispose of, transfer, lease, license or encumber or permit to lapse or authorize the sale, pledge, disposition, transfer, lease, license, or encumbrance of, any Purchased Assets except in the ordinary and usual course of business consistent with past practices and as would not have a Material Adverse Effect;

(G)     transfer, dispose of, permit to lapse (except in accordance with the terms thereof) or grant any right or licenses under, or enter into any settlement regarding the breach or infringement of, any Intellectual Property, or modify any existing rights with respect thereto or enter into any material licensing or similar agreements or arrangements other than such licenses, agreements or arrangements entered into in the ordinary course of business consistent with past practices and as would not have a Material Adverse Effect;

(H)     enter into, assume or terminate any Material Contract or enter into or permit any material amendment, supplement, waiver or other material modification in respect thereof, except in the ordinary and usual course of business consistent with past practices and as would not have a Material Adverse Effect;

(I)     adopt or propose any change in its certificate of incorporation or bylaws, except a change that would not have any adverse effect on the contemplated Transactions;

(J)     declare, set aside, or pay any dividend or other distribution with respect to any shares of its capital stock, or split, combine, or reclassify any of its capital stock, or repurchase, redeem, or otherwise acquire any shares of its capital stock;

(K)     other than as a result of the Transactions, Seller shall not merge or consolidate with any other Person or acquire a material amount of assets of any other Person;

(L)     make a Material Decision; and

(M)     agree to do anything prohibited by this Section 8.2 or do or agree to do anything that would cause Seller's representations and warranties herein to be false in any material respect.

8.3     Consents. Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller, to obtain at the earliest practicable date all consents and approvals

required to consummate the Transactions, including, without limitation, the consents and approvals referred to in Section 5.3(b) hereof; provided, however, that neither Seller nor Purchaser shall be obligated to pay any consideration therefore to any third party from whom consent or approval is required or to initiate any litigation or legal proceedings to obtain any such consent or approval; provided, further, that if requested by Purchaser, Seller shall initiate such litigation or legal proceedings requested by Purchaser to obtain such consents or approvals or an Order but only if Purchaser advances to Seller, Seller's good faith and reasonable estimate of any and all out of pocket expenses and costs (including reasonable attorneys fees) related thereto. With respect to any Executory Contract for which any consent or approval is required in order for such Executory Contract to become an Assumed Contract or Assumed Lease notwithstanding the Sale Order, Seller shall maintain such Executory Contract and shall provide Purchaser with the benefit thereof provided that the Purchaser pays all of Seller's costs and expenses in providing the Purchaser with the benefits of all such Executory Contracts .

8.4     Regulatory Approvals.

(a)     If necessary, Purchaser and Seller shall (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under the HSR Act or other Antitrust Laws with respect to the Transactions as promptly as practicable and, in any event, within ten (10) Business Days after the date hereof in the case of all filings required under the HSR Act and within four weeks in the case of all other filings required by other Antitrust Laws, (ii) comply, to the extent practicable, at the earliest practicable date with any request under the HSR Act or other Antitrust Laws for additional information, documents, or other materials received by each of them or any of their respective subsidiaries from Federal Trade Commission (the "FTC"), the Antitrust Division of the United States Department of Justice (the "Antitrust Division") or any other Governmental Body in respect of such filings or the Transactions, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other Governmental Body under any Antitrust Laws with respect to any such filing or any Transaction. Each such party shall use commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the Transactions. Each such party shall promptly inform the other parties hereto of any oral communication with, and provide copies of written communications with, any Governmental Body regarding any such filings or any Transaction. No party hereto shall independently participate in any formal meeting with any Governmental Body in respect of any such filings, investigation, or other inquiry without giving the other parties hereto prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate. Subject to applicable Law, the parties hereto will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto relating to proceedings under the HSR Act or other Antitrust Laws. Seller and Purchaser may, as each deems advisable and necessary in good faith, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such

outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Seller or Purchaser, as the case may be).

(b)     Each of Purchaser and Seller shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the Transactions under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws"). In connection therewith, if any Legal Proceeding is instituted (or threatened to be instituted) challenging any Transaction is in violation of any Antitrust Law, each of Purchaser and Seller shall cooperate and use its commercially reasonable efforts to contest and resist any such Legal Proceeding, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents, or restricts consummation of the Transactions, including by pursuing all available avenues of administrative and judicial appeal and all available legislative actions, unless, by mutual agreement, Purchaser and Seller decide that litigation is not in their respective best interests. Each of Purchaser and Seller shall use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice periods under the HSR Act or other Antitrust Laws with respect to the Transactions as promptly as possible after the execution of this Agreement. In connection with and without limiting the foregoing, each of Purchaser and Seller agrees to use its commercially reasonable efforts to take promptly any and all steps necessary to avoid or eliminate each and every impediment under any Antitrust Laws that may be asserted by any Federal, state and local and non-United States antitrust or competition authority, so as to enable the parties to close the Transactions as expeditiously as possible.

8.5     Further Assurances. Subject to the other provisions of this Agreement, each of Purchaser and each Seller shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the Transactions and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.

8.6     Preservation of Records. Seller or its successors and Purchaser agree that each of them shall preserve and keep the records held by it or their Affiliates relating to the Purchased Assets for one year after the Closing Date (except as provided below) and shall make such records available to the other as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or tax audits against or governmental investigations of Seller or Purchaser or any of their Affiliates or in order to enable Seller or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby. In the event Seller or Purchaser wishes to destroy such records before or within two years, such party shall first give ninety (90) days prior written notice to the other and such other party shall have the right at its option and expense, upon prior written notice given to such party within such 90 day period, to take possession of the records within one-hundred and eighty (180) days after the date of such notice.

8.7     Publicity. None of the parties hereto shall issue any press release concerning this Agreement or the Transactions without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided that the party intending to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

8.8     Schedules and Exhibits. Seller may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information provided in one Schedule will suffice, without repetition or cross reference, as a disclosure of such information in any other Schedule to which its relevance is reasonably apparent on its face. Prior to Closing, Seller shall update the Schedules to this Agreement as of the Closing Date, provided that no such update shall relieve Seller for any breach, or deprive Purchaser of any remedy, based on the Schedules as originally provided.

8.9     Payment of Taxes. Seller shall be responsible for paying or otherwise discharging all of its Taxes for all periods (or portions thereof) ending on or prior to the Closing Date.

8.10     Motions, Orders, etc. Seller shall promptly provide Purchaser and its counsel with the proposed final drafts of all documents, motions, orders, or pleadings that Seller proposes to file with the Bankruptcy Court which relate to the approval of this Agreement, the Purchased Assets, the Assumed Contracts or Assumed Leases or the consummation of the Transactions, or any provision therein or herein, and shall provide Purchaser and its counsel with a reasonable opportunity to review and comment on such documents, motions, orders, or pleadings prior to filing with the Bankruptcy Court.

8.11     Title Insurance; Surveys. As promptly as practicable hereafter, Seller shall provide Purchaser with all title insurance commitments, policies and riders in Seller's possession with respect to each parcel of real property listed in Schedule 5.11(c). Purchaser shall have the right to conduct title searches on each such parcel.

8.12     Seller Wind Down.

(a)     Following the Closing, Seller will be: (i) developing, filing and implementing a liquidating plan; (ii) taking steps to wind down its affairs; (iii) managing and winding down certain employee benefit plans and other employee arrangements; (iv) preparing and filing certain tax returns; (v) reconciling claims against its estate; and (vi) completing other related activities (collectively, the "Seller Wind Down").

(b)     Purchaser agrees to provide the person to be designated by Seller and any successor administrator or trustee of Seller (the "Chief Restructuring Officer") during the Sale Term (as defined in Agency Agreement) with reasonable access to and use of office space

(including conference rooms), furniture, equipment and systems at the Office (or at such new headquarters should it be established by Purchaser) that are reasonably necessary to conduct the Seller Wind Down, in all events free of charge.

(c)     Following the Closing and through the Sale Term (as defined in Agency Agreement), Purchaser agrees to permit Seller and its directors, officers (including the Chief Restructuring Officer), employees and agents to use and be granted full and complete access to all of the premises, stores or properties, including, without limitation, the Office, as may be reasonably necessary to conduct the Seller Wind Down, in all events free of charge.

(d)     Following the Closing and through the Sale Term (as defined in Agency Agreement), Purchaser agrees to use commercially reasonable efforts to make Transferred Employees available to provide to Seller and its directors, officers (including the Chief Restructuring Officer), employees and agents those services required to complete the Seller Wind Down, upon the reasonable request of the Chief Restructuring Officer, in all events free of charge.

(e)     Purchaser and Seller each agree to use commercially reasonable efforts to minimize disruptions (i) to Purchaser's operation of the Business and disposition of the Purchased Assets and (ii) to the Seller Wind Down, respectively, in connection with any of the services provided in this Agreement.

## ARTICLE IX

### EMPLOYEES AND EMPLOYEE BENEFITS

9.1    Transferred and Retained Employees.

(a)     The parties recognize that the continued employment of the personnel of Seller is significant to the business interests of both Purchaser and Seller. As a result, the orderly transfer of employment relationships is important to both parties and Seller shall use its best efforts to accomplish the transition with as little disruption to the Business as possible. Purchaser shall have the right (but not the obligation) to offer employment upon terms and conditions determined by Purchaser to substantially all Employees on such terms and conditions as Purchaser determines in its sole discretion, subject to the provisions of Section 9.1(b) below (each of Seller's employees that accepts such an offer and actually commences employment after the Closing Date, the "Transferred Employees", and all other employees of Seller not otherwise terminated prior to the Closing Date, the "Retained Employees").

(b)     As a condition of its offer of employment to any Employee, Purchaser shall obtain a release from such Employee in favor of Seller waiving any and all claims against Seller for severance payable to such Employee in connection with Seller's termination of employment of such Employee (the "Severance Waiver").

(c)     Within ten (10) business days following the later of (i) the execution of this Agreement or (ii) Purchaser's identification of all of the Transferred Employees, Seller shall provide a list of the name and site of employment of any and all Employees who have experienced, or will experience, an employment loss or layoff – as defined by the Worker

Adjustment and Retraining Notification Act of 1988 or any similar applicable state or local law requiring notice to employees in the event of a closing or layoff (the "WARN Act") as a result of the Transactions contemplated by this Agreement.

(d)     Seller and Purchaser shall cooperate to comply with and take all actions necessary to minimize the obligations arising under the WARN Act in connection with any (i) plant closing as defined in the WARN Act affecting any site of employment or one or more facilities or operating units within any site of employment of Seller; (ii) mass layoff as defined in the WARN Act affecting any site of employment of Seller; or (iii) similar action under the WARN Act requiring notice to employees in the event of an employment loss or layoff. Seller shall send such notices under the WARN Act as Purchaser may reasonably request or as may be reasonably required.

9.2     Employment Tax Reporting. With respect to Transferred Employees, Purchaser and Seller shall use the standard procedure set forth in Revenue Procedure 2004-53, 2004-34 I.R.B. 320, for purposes of employment tax reporting.

9.3     No Obligations. Nothing contained in this Agreement shall be construed to require, or prevent the termination of, employment of any individual, require minimum benefit or compensation levels or prevent any change in the employee benefits provided to any individual Transferred Employee. No provision of this Agreement shall create any third party beneficiary rights in any employee or former employee of Seller or any other persons or entities (including any beneficiary or dependent thereof), in respect of continued employment (or resumed employment) for any specified period of any nature or kind whatsoever.

## ARTICLE X

## CONDITIONS TO CLOSING

10.1     Conditions Precedent to Obligations of Purchaser. The obligation of Purchaser to consummate the Transactions is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Seller contained in this Agreement (i) that are not qualified by materiality or Material Adverse Effect shall be true and correct in all respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and except to the extent that the failure of such representations and warranties to be true and correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (ii) that are qualified by materiality or Material Adverse Effect shall be true and correct in all respects on and as of the Closing (disregarding any materiality or Material Adverse Effect qualifier contained therein, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and except to the extent that the failure of such representations and warranties to be true and correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and Purchaser shall have received a certificate signed by an authorized officer of Seller, without personal liability to the executing officer, dated the Closing Date, to the foregoing effect;

(b)     Seller shall have entered into the agreement with the Agent (the "Agency Agreement") providing for the disposal of the GOB Assets, in substantially the form attached hereto as **Exhibit D.**

(c)     Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Purchaser shall have received a certificate signed by an authorized officer of Seller, without personal liability to the executing officer, dated the Closing Date, to the forgoing effect;

(d)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2; and

(e)     RCI shall have failed to close on its transaction with Seller by 6 p.m. on July 24, 2009.

10.2     Conditions Precedent to Obligations of Seller. The obligations of Seller to consummate the Transactions are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)     the representations and warranties of Purchaser contained in this Agreement (i) that are not qualified by materiality shall be true and correct in all respects on and as of the Closing, except to the extent expressly made as of an earlier date, in which case as of such earlier date, and except to the extent that the failure of such representations and warranties to be true and correct would not reasonably be expected to have, individually or in the aggregate, a material adverse change and (ii) that are qualified by materiality shall be true and correct in all respects on and as of the Closing (disregarding any materiality qualifier contained therein), except to the extent expressly made as of an earlier date, in which case as of such earlier date, and except to the extent that the failure of such representations and warranties to be true and correct would not reasonably be expected to have, individually or in the aggregate, a material adverse change, and Seller shall have received a certificate signed by an authorized officer of Purchaser, without personal liability to the executing officer, dated the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, without personal liability to the executing officer, dated the Closing Date, to the foregoing effect; and

(c)     Purchaser shall have delivered to Seller all of the items set forth in Section 4.3.

10.3     Conditions Precedent to Obligations of Purchaser and Seller. The respective obligations of Purchaser and Seller to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions;

(b)     the Bankruptcy Court shall have entered the Sale Order in form and substance reasonably acceptable to Seller and Purchaser; and

(c)     The Bidding Procedures Order shall have been entered and shall have remained in full force and effect and shall not have been stayed, vacated, modified or supplemented in any material respect without Purchaser's prior written consent.

10.4     Frustration of Closing Conditions. No party may rely on the failure of any condition set forth in Sections 10.1, 10.2 or 10.3, as the case may be, if such failure was caused by such party's failure to comply with any provision of this Agreement.

## ARTICLE XI

### TAXES.

11.1     Allocation of Taxes. All Taxes imposed on or with respect of the Purchased Assets on a periodic basis (including but not limited to real estate Taxes and assessments) ("Periodic Taxes") relating to periods beginning on or before and ending after the Closing Date shall be allocated on a per diem basis to Seller and Purchaser, respectively, in accordance with Section 164(d) of the Code. All Periodic Taxes relating to periods ending on or before the Closing Date shall be allocated solely to Seller. All Periodic Taxes relating to the periods beginning after the Closing Date shall be allocated solely to Purchaser. If the actual amounts to be prorated are not known as of the Closing Date, the prorations shall be made on the basis of Periodic Taxes assessed for the prior year; provided, however, for purposes of calculating such prorated amounts, such Periodic Taxes for the prior year shall be increased by five percent (5%).

11.2     Purchase Price Allocation. Seller and Purchaser shall allocate the Purchase Price among the Purchased Assets in accordance with a statement (the "Allocation Statement") provided by Purchaser to Seller as soon as practicable after the Closing, which statement shall be prepared in accordance with Section 1060 of the Code. Purchaser and Seller shall file all Tax Returns (including Form 8594) consistent with, and shall take no tax position inconsistent with the Allocation Statement. Seller and Purchaser shall consult with the Committee with respect to the allocation of the Purchase Price.

11.3     Tax Reporting. Purchaser and Seller shall each be responsible for the preparation and filing of their own Tax Returns.

11.4     Cooperation and Audits. Purchaser and Seller shall cooperate fully with each other regarding tax matters (including the execution of appropriate powers of attorney) and shall make available to the other as reasonably requested all information, records and documents relating to taxes governed by this Agreement until the expiration of the applicable statute of limitations or extension thereof or the conclusion of all audits, appeals or litigation with respect to such taxes. Without limiting the generality of the foregoing, Seller shall execute on or prior to

the Closing Date a power of attorney authorizing Purchaser to correspond, sign, collect, negotiate, settle and administer all tax payments and Tax Returns.

11.5    Transfer Taxes. To the extent that the transfer of the Purchased Assets is a transfer pursuant to Section 1146(c) of the Bankruptcy Code, the making, delivery, filing and recording of various instruments of transfer to be recorded in connection with the sale by Seller of the Purchased Assets to Purchaser shall not be taxed under any law imposing a recording tax, stamp tax, transfer tax or similar tax. To the extent that any transfer, registration, stamp, documentary, sales, use or similar Tax is assessed in connection with the transfer of the Purchased Assets, all such Taxes (including, but not limited to all applicable real estate transfer or gains Taxes), any penalties, interest and additions to Tax, and court, registration and filing fees incurred in connection with the Agreement shall be the responsibility of and be timely paid by Purchaser. Seller and Purchaser shall cooperate in the timely making of all filings, returns, report and forms as may be required in connection therewith.

## ARTICLE XII

### MISCELLANEOUS

12.1    No Survival of Representations and Warranties. The parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder and no Person shall have any liability for any breach thereof. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

12.2    Expenses. Except as otherwise provided in this Agreement, Seller and Purchaser shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Transactions. Purchaser shall pay the filing fee required in connection with the HSR Act filing contemplated by Section 8.4(a).

12.3    Injunctive Relief. Damages at law may be an inadequate remedy for the breach of any of the covenants, promises or agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this Section 12.3 shall be in addition to any other rights which a party hereto may have at law or in equity pursuant to this Agreement.

12.4    Submission to Jurisdiction; Consent to Service of Process.

(a)    Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all

proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.8 hereof; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware and any appellate court thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b) Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.8.

12.5 Waiver of Right to Trial by Jury. Each party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

12.6 Entire Agreement; Amendments and Waivers. This Agreement (including the schedules and exhibits hereto) collectively represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

12.7 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts made and performed in such State.

12.8 Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand, (ii) when sent by facsimile (with written confirmation of transmission) or (iii) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller, to:

Ritz Camera Centers, Inc.
6711 Ritz Way
Beltsville, Maryland 20705
Attn: Marc Weinsweig, CRO

with copies to:

Cole, Schotz, Meisel, Forman & Leonard, P.A.
Court Plaza North
25 Main Street
Hackensack, New Jersey 07601
Attn: Marc P. Press, Esq.
Tel: (201) 525-6271
Fax: (201) 678-6271

with copies to:

Cooley Godward Kronish LLP
1114 Avenue of the Americas
New York, New York 10036
Attn: Jay R. Indyke, Esq. and Cathy Hershcopf, Esq.
Tel: (212) 479-6000
Fax: (212) 479-6275

If to Purchaser, to:

Ritz Acquisition Group, LLC,
5 Revere Drive, Suite 206,
Northbrook, IL 60062
Attn: Joseph Malfitano
Tel: (847) 504-3257
Fax: (847) 897-0868

Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
Attn: Bill Bowden, Esq.
Tel: (302) 654-1888
Fax: (302) 654-2067

Gordon Brothers Retail Partners
101 Huntington Avenue, 10th Floor
Boston, MA 02199
Michael D. Chartock
Tel: (617) 210-7116

Fax: (617) 422-6222

12.9     <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the Transactions are consummated as originally contemplated to the greatest extent possible.

12.10     <u>Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement. No assignment of this Agreement or of any rights or obligations hereunder may be made by either Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void; <u>provided</u> that Purchaser may assign some or all of its rights and obligations hereunder to one or more subsidiaries formed by it prior to the Closing and/or, upon notice to Seller, to one or more Persons that Purchaser determines, in its sole discretion, to partner with in connection with the Transactions. No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations. Upon any such permitted assignment, the references in this Agreement to Seller or Purchaser shall also apply to any such assignee unless the context otherwise requires.

12.11     <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

PURCHASER:

Ritz Acquisition Group, LLC

By: _____
    Name:
    Title:

SELLER:

Ritz Camera Centers, Inc.

By:_____
    Name:
    Title:

HILCO MERCHANT RESOURCES, LLC

By:_____
    Name:
    Title:

GORDON BROTHERS RETAIL PARTNERS, LLC

By:_____
    Name:
    Title:

Each with respect to Section 3.1(e)

i