# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RCC LIQUIDATING CORP.<br>f/k/a RITZ CAMERA CENTERS, INC.,[1] | Case No. 09-10617 (MFW) |
| Debtor. | |

---

**FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT TO THE FIRST AMENDED JOINT PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE PROPOSED BY THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, DATED MARCH 4, 2010**

---

**COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.**
Norman L. Pernick (No. 2290)
Karen M. Grivner (No. 4372)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: 302-652-3131
Facsimile: 302-652-3117

- and -

Irving E. Walker, Esquire
Gary H. Leibowitz, Esquire
G. David Dean, Esquire
300 East Lombard Street, Suite 2000
Baltimore, MD 21202
Telephone: 410-230-0660
Facsimile: 410-230-0667

Counsel for the Debtor and Debtor in Possession

Dated: March 4, 2010

**COOLEY GODWARD KRONISH LLP**
Jay Indyke
Cathy Hershcopf
Brent Weisenberg
1114 Avenue of the Americas
New York, NY 10036
Telephone: 212-479-6000
Facsimile: 212-479-6275

- and -

**BIFFERATO GENTILOTTI LLC**
Garvan F. McDaniel
800 North King Street, Plaza Level
Wilmington, DE 19801
Telephone: 302-429-1900
Facsimile: 302-429-9600

Counsel for the Official Committee of Unsecured Creditors

---

[1]    The last four digits of the Debtor's federal tax identification number are 6025.

# Table of Contents

**Page**

| | | |
|---|---|---|
| I. | PURPOSE OF DISCLOSURE STATEMENT | 1 |
| II. | DISCLAIMER | 2 |
| III. | GENERAL INFORMATION ON CONFIRMATION PROCEDURE AND VOTING | 3 |
| | 3.1 Confirmation Hearing | 3 |
| | 3.2 Objections to Confirmation | 4 |
| | 3.3 Solicitation Package | 4 |
| | 3.4 Voting on the Plan | 5 |
| | 3.5 Additional Information | 6 |
| IV. | GENERAL INFORMATION CONCERNING THE DEBTOR | 7 |
| | 4.1 Prepetition Business Operations | 7 |
| | 4.2 Prepetition Growth | 7 |
| | 4.3 Debt Structure | 8 |
| | 4.4 Events Leading to the Chapter 11 Filing | 8 |
| V. | The BANKRUPTCY CASE | 10 |
| | 5.1 The Chapter 11 Filing | 10 |
| VI. | KEY PROVISIONS OF THE PLAN | 18 |
| | 6.1 Plan Objectives | 18 |
| | 6.2 Classification and Treatment of Claims and Equity Interests | 19 |
| | 6.3 Treatment of Classified Claims and Equity Interests | 20 |
| | 6.4 Means for Implementation and Execution of the Plan | 22 |
| VII. | PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS | 29 |
| | 7.1 Method of Distributions to Holders of Allowed Claims | 29 |
| | 7.2 Partial Distributions Pending Allowance | 29 |
| | 7.3 Tort Claims | 29 |
| | 7.4 Resolution of Disputed Claims | 30 |
| | 7.5 Estimation of Claims | 30 |
| | 7.6 Amounts Retained to Pay Disputed Claims | 31 |
| | 7.7 Allowance of Disputed Claims | 31 |
| | 7.8 No Distribution in Respect of Disallowed Claims | 31 |
| VIII. | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 31 |
| | 8.1 Executory Contracts and Unexpired Leases to be Rejected | 31 |
| | 8.2 Bar Date for Rejection Claims | 32 |
| | 8.3 Executory Contracts and Unexpired Leases Not Rejected | 32 |

# Table of Contents
## (continued)

|  |  |  |  |
|---|---|---|---|
| | 8.4 | Approval of Rejection of Executory Contract and Unexpired Leases | 32 |
| | 8.5 | Reservation of Rights with Respect to the Debtor's Insurance Policies | 32 |
| IX. | | PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN | 33 |
| | 9.1 | Voting of Claims | 33 |
| | 9.2 | Nonconsensual Confirmation | 33 |
| | 9.3 | Method and Timing of Distributions Under the Plan | 33 |
| X. | | EFFECT OF CONFIRMATION OF PLAN | 35 |
| | 10.1 | Term of Injunctions or Stays | 35 |
| | 10.2 | Preservation of All Causes of Action Not Expressly Settled or Released | 36 |
| | 10.3 | Avoidance Actions | 37 |
| | 10.4 | Exculpation | 37 |
| | 10.5 | Injunction | 37 |
| | 10.6 | Subordination Rights | 38 |
| XI. | | EFFECTIVENESS OF THE PLAN | 38 |
| | 11.1 | Conditions Precedent to the Effective Date | 38 |
| XII. | | RETENTION OF JURISDICTION | 39 |
| XIII. | | MISCELLANEOUS PROVISIONS | 41 |
| | 13.1 | Dissolution of the Committee | 41 |
| | 13.2 | The Oversight Committee | 41 |
| | 13.3 | Termination of Ordinary Course Professionals | 42 |
| | 13.4 | Effectuating Documents and Further Transactions | 42 |
| | 13.5 | Corporate Action | 42 |
| | 13.6 | Exemption from Transfer Taxes | 42 |
| | 13.7 | Request for Expedited Determination of Taxes | 42 |
| | 13.8 | Payment of Statutory Fees | 43 |
| | 13.9 | Modification of Plan | 43 |
| | 13.10 | Withdrawal or Revocation | 43 |
| | 13.11 | Binding Effect | 43 |
| | 13.12 | Service of Certain Plan and Disclosure Statement Exhibits | 44 |
| | 13.13 | Notices | 44 |
| | 13.14 | Severability | 45 |
| | 13.15 | Governing Law | 45 |
| | 13.16 | Headings | 45 |

**Table of Contents**
(continued)

Page

13.17  Plan Controls ................................................................................................45

XIV.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............................45

XV.  FEASIBILITY OF THE PLAN AND BEST INTEREST OF THE CREDITORS ....................49

15.1  Feasibility of the Plan ............................................................................49

15.2  Acceptance of the Plan ..........................................................................50

15.3  Best Interest Test .................................................................................50

15.4  Confirmation Without Acceptance of All Impaired Classes ..........................51

XVI.  CERTAIN RISK FACTORS TO BE CONSIDERED ...............................................52

16.1  Risk of Non-Confirmation of Plan ..........................................................52

16.2  Delays of Confirmation and/or Effective Date .........................................52

16.3  Allowance of Claims .............................................................................52

16.4  The Purchaser's Obligations Under the Sale Agreement ............................53

16.5  Dependence Upon the Purchaser ...........................................................53

16.6  Expected Sale of Owned Real Property ....................................................53

16.7  Liquidation Trustee ..............................................................................54

XVII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............54

17.1  Liquidation Under Chapter 7 .................................................................54

17.2  Alternative Plan ..................................................................................55

XVIII.  RECOMMENDATION AND CONCLUSION ........................................................55

## SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS

| Class | Description | Status | Proposed Treatment | Estimated Recovery |
|---|---|---|---|---|
| Unclassified Claims | Administrative Claims | Unimpaired – Not Entitled to Vote | Except to the extent that a holder of an Allowed Administrative Claim agrees to a different treatment, each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Claim, Cash in an amount equal to such Allowed Administrative Claim, either (i) as soon as reasonably practicable after the Effective Date or (ii) if the Administrative Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim; provided, however, that Allowed Administrative Claims representing obligations incurred in the ordinary course of business of the Debtor may be paid by the Debtor in the ordinary course, consistent with past practice of the Debtor and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions, without further action by the holders of such Administrative Claims or further approval by the Bankruptcy Court. | 100% |
| Unclassified Claims | Priority Tax Claims | Unimpaired – Not entitled to Vote | Except to the extent that any governmental unit entitled to payment of any Allowed Priority Tax Claim has previously agreed or agrees to a different treatment by stipulation or otherwise, pursuant to section 1129(a)(9) of the Bankruptcy Code, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement and release of and in exchange for such Allowed Priority Tax Claim, Cash in an amount equal to such Allowed Priority Tax Claim, (i) as soon as reasonably practicable after the Effective Date or (ii) if the Priority Tax Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim. | 100% |
| Class 1[2] | Lenders Claims | Unimpaired – Not Entitled to Vote | Except to the extent that the Lenders have been paid by the Debtor prior to the Effective Date or agree to a less favorable treatment, the Lenders shall be paid in full in accordance with the terms of the Termination Agreement, which shall continue in full force and effect after the Effective Date. As security for the Borrower's "Continuing Obligations" (as defined in the Termination Agreement) under the Termination Agreement, the Lenders shall retain their lien on the "Wachovia Cash Collateral" (as defined in the Termination Agreement) as set forth in the Termination Agreement. | 100% |

---

[2]     Each of the estimated recovery amounts for Classes 1, 2, 3, and 4 are estimates only. The actual recovery amounts will be based on a number of uncertainties described in this Disclosure Statement which cannot be determined with certainty at this time. Moreover, the Plan will govern the actual recoveries for the various classes.

| Class | Description | Status | Proposed Treatment | Estimated Recovery |
|---|---|---|---|---|
| Class 2 | Other Secured Claims | Unimpaired- Not Entitled to Vote | Except to the extent that a holder of an Allowed Other Secured Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable treatment, at the sole option of the Debtor, with the consent of the Committee, or the Liquidation Trustee, as the case may be, each holder of an Allowed Other Secured Claim that has not elected treatment pursuant to section 1111(b) of the Bankruptcy Code shall receive (a) Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (b) the collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim as soon as reasonably practicable after the Effective Date, or, if the Other Secured Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim. | 100% |
| Class 3 | Priority Non-Tax Claims | Unimpaired- Not Entitled to Vote | Except to the extent that a holder of an Allowed Priority Claim agrees to a less favorable treatment, as soon as reasonably practicable after the Effective Date, or, if the Priority Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Priority Claim becomes an Allowed Priority Claim, each holder of an Allowed Claim in Class 3 shall receive Cash equal to the amount of such Allowed Claim without postpetition interest. | 100% |
| Class 4 | General Unsecured Claims | Impaired- Entitled to Vote | Each holder of an Allowed or partially Allowed General Unsecured Claim shall receive its Pro Rata share (if any) of Distributable Cash on each Distribution Date as set forth in, and on the terms of, Article VI of the Plan and the Liquidation Trust Agreement. | **Estimated at 4-14%** |
| Class 5 | Equity Interests | Impaired- Not entitled to vote | Holders of Equity Interests in the Debtor will receive no distributions under the Plan on account of such Equity Interests, and the Equity Interests will be deemed canceled and extinguished as of the Effective Date without any further act or action under any applicable agreement, law, regulation, order or rule. | **Equity Interests cancelled and extinguished.** |

# I.

## PURPOSE OF DISCLOSURE STATEMENT

This Disclosure Statement is being furnished by RCC Liquidating Corp. f/k/a Ritz Camera Centers, Inc. ("Ritz Camera" or the "Debtor"),[3] and the Official Committee of Unsecured Creditors (the "Committee", and together with the Debtor, the "Plan Proponents"), as proponents of the *First Amended Joint Plan of Liquidation Under Chapter 11 of the United States Bankruptcy Code Proposed by the Debtor and the Official Committee of Unsecured Creditors, Dated March 4, 2010* (including all exhibits thereto and as may be amended from time to time, the "Plan"), pursuant to section 1125 of Title 11 of the United States Code (the "Bankruptcy Code"). The Plan is attached hereto as **Exhibit "A."** This Disclosure Statement is provided in connection with the solicitation of votes (the "Solicitation") for the acceptance or rejection of the Plan, as it may be amended, altered, modified or supplemented from time to time in accordance with its terms, the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

The Bankruptcy Code requires that the party proposing a Chapter 11 plan prepare and file with the Bankruptcy Court a document called a "disclosure statement." This Disclosure Statement summarizes the Plan's contents and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan. This Disclosure Statement also discusses the events leading to the Debtor's filing of the Bankruptcy Case and describes the main events that have occurred in the Debtor's Bankruptcy Case. This Disclosure Statement also describes the Chapter 11 voting procedures and the confirmation process. Finally, this Disclosure Statement outlines risk factors associated with the Plan and certain potential federal income tax consequences to holders of Claims and Equity Interests.

The Bankruptcy Code requires a disclosure statement to contain information of a kind, and in sufficient detail, to enable parties who are affected by the plan to vote intelligently for or against the plan or object to the plan, as the case may be. The Bankruptcy Court has determined that this Disclosure Statement contains adequate information and may be provided to you to solicit your vote on the Plan.

For purposes of this Disclosure Statement, all capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Plan or the Bankruptcy Code, except as expressly provided or unless the context clearly requires otherwise. Whenever the context requires, such meaning shall be equally applicable to both the singular and the plural form of such terms, and the masculine gender shall include the feminine and the feminine gender shall include the masculine.

**ALL HOLDERS OF CLAIMS SHOULD CAREFULLY REVIEW BOTH THIS DISCLOSURE STATEMENT AND THE PLAN BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

---

[3]     Any capitalized term not defined herein shall have the meaning ascribed to such term in the Plan.

# II.

## DISCLAIMER

THIS IS A SOLICITATION BY THE PLAN PROPONENTS, AND IS NOT A SOLICITATION BY THEIR RESPECTIVE ATTORNEYS, FINANCIAL ADVISORS OR OTHER PROFESSIONAL ADVISORS. INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN AS WELL AS CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE PLAN PROPONENTS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE. THE FINANCIAL INFORMATION SUMMARIES AND OTHER DOCUMENTS ATTACHED HERETO OR INCORPORATED BY REFERENCE HEREIN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE UNDERLYING FINANCIAL INFORMATION AND DOCUMENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN, OR THE FINANCIAL INFORMATION AND OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR THE FINANCIAL INFORMATION AND OTHER DOCUMENTS, AS THE CASE MAY BE, SHALL GOVERN FOR ALL PURPOSES.

MOREOVER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, WAIVER OR STATEMENT AGAINST INTEREST BUT RATHER SHOULD BE CONSTRUED AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR. THE PLAN PROPONENTS MAKE THE STATEMENTS AND PROVIDE THE FINANCIAL INFORMATION CONTAINED HEREIN AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.

HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DATE HEREOF UNLESS SO SPECIFIED. EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY BEFORE CASTING A BALLOT.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. ANY PERSONS DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS. NO PARTY IS AUTHORIZED TO PROVIDE TO ANY OTHER PARTY ANY INFORMATION CONCERNING THE PLAN

OTHER THAN THE CONTENTS OF THIS DISCLOSURE STATEMENT. THE PLAN PROPONENTS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF THE DEBTOR'S PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT. HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THE DEBTOR'S MANAGEMENT, THE BANKRUPTCY COURT-APPROVED CHIEF RESTRUCTURING OFFICER, AND THE COMMITTEE HAVE REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE PLAN PROPONENTS HAVE USED THEIR BEST EFFORTS TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE PLAN PROPONENTS ALSO HAVE MADE A DILIGENT EFFORT TO IDENTIFY IN THIS DISCLOSURE STATEMENT CAUSES OF ACTION AND PROJECTED OBJECTIONS TO CLAIMS. HOWEVER, NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR CAUSE OF ACTION OR PROJECTED OBJECTION TO CLAIM IS, OR IS NOT, IDENTIFIED IN THIS DISCLOSURE STATEMENT. **THE PLAN PROPONENTS OR THE LIQUIDATION TRUSTEE, AS THE CASE MAY BE, MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CAUSES OF ACTION AND OBJECTIONS TO CLAIMS AFTER THE CONFIRMATION OR THE EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CAUSES OF ACTION OR OBJECTIONS TO CLAIMS.**

## III.

## GENERAL INFORMATION ON CONFIRMATION PROCEDURE AND VOTING

### 3.1 <u>Confirmation Hearing</u>.

To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of the Bankruptcy Code (the "<u>Confirmation Hearing</u>"). The Bankruptcy Court has scheduled the Confirmation Hearing for **<u>April 20, 2010 at 11:30 a.m.</u>** **<u>(Prevailing Eastern Time)</u>.**

3

### 3.2    Objections to Confirmation.

Any party in interest may object to confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection.  The Bankruptcy Court has set **April 9, 2010 at 5:00 p.m. (Prevailing Eastern Time)** as the deadline for filing and serving objections. Objections to confirmation must be filed with the Bankruptcy Court at the following address:

> Office of the Clerk
> U.S. Bankruptcy Court for the
> District of Delaware
> 824 Market Street, 3rd Floor
> Wilmington, DE  19801

and be served via regular mail upon:

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Norman L. Pernick
npernick@coleschotz.com
Karen M. Grivner
kgrivner@coleschotz.com
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone:  (302) 652-3131
Facsimile:  (302) 652-3117

COOLEY GODWARD KRONISH LLP
Jay Indyke
jindyke@cooley.com
Cathy Hershcopf
chershcopf@cooley.com
Brent Weisenberg
bweisenberg@cooley.com
1114 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 479-6000
Facsimile:  (212) 479-6275

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Irving E. Walker
iwalker@coleschotz.com
Gary H. Leibowitz
gleibowitz@coleschotz.com
300 East Lombard Street, Suite 2000
Baltimore, MD 21202
Telephone:  (410) 230-0660
Facsimile:  (410) 230-0667

BIFFERATO GENTILOTTI LLC
Garvan McDaniel
gmcdaniel@bglawde.com
800 N. King Street
P.O. Box 2165
Wilmington, DE 19801
Telephone:  (302) 429-1900
Facsimile:  (302) 429-8600

FTI CONSULTING, INC.
Charles Reeves
charlie.reeves@fticonsulting.com
2001 Ross Avenue, Suite #400
Dallas, TX 75201
Telephone:  (214) 397-1633
Facsimile:  (214) 397-1791

OFFICE OF THE UNITED STATES TRUSTEE
Joseph McMahon, Esquire
J. Caleb Boggs Federal Building
844 King Street, Room 2207
Lockbox 35
Wilmington, DE 19801

### 3.3    Solicitation Package.

Each person entitled to vote to accept or reject the Plan is being provided with (1) this Disclosure Statement; (2) the Plan; (3) notice of the Confirmation Hearing and objection

4

deadline; (4) an appropriate ballot to be used in voting to accept or reject the Plan; and (5) a pre-addressed return envelope. Any person who receives this Disclosure Statement but does not receive a ballot, and who believes that he is entitled to vote to accept or reject the Plan or who believes he received an incorrect ballot, should contact Kurtzman Carson Consultants, LLC ("KCC", the "Balloting Agent" or "Claims Agent", as the context requires) at the address or telephone number set forth in Paragraph 3.5 of the Disclosure Statement.

### 3.4 Voting on the Plan.

**3.4.1 Who May Vote.** Each holder of an Allowed Claim in an impaired Class of Claims that is entitled to vote on the Plan pursuant to Article III of the Plan (i.e. Class 4), or the holder of a Claim that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a), shall be entitled to vote separately to accept or reject the Plan as provided for in such order as is entered by the Bankruptcy Court approving the Disclosure Statement, or any other order or orders of the Bankruptcy Court. For purposes of calculating the number of Allowed Claims in a Class that has voted to accept or reject the Plan under section 1126(c) of the Bankruptcy Code, all Allowed Claims in such Class held by one entity or its "affiliate" (as defined in the Securities Act of 1933 and the rules and regulations promulgated with respect to such Act) shall be aggregated and treated as one Allowed Claim in such Class; provided, however, that Claims acquired by an entity from unrelated entities shall not be aggregated for purposes of voting.

**Class 4 (General Unsecured Claims) are impaired under the Plan and the holders of such Claims are the only parties entitled to vote to accept or reject the Plan.** Administrative Expense Claims and Priority Tax Claims are not classified for voting purposes and the holders of such Claims are unimpaired and not entitled to vote.

Class 1 (Lenders' Secured Claims), Class 2 (Other Secured Claims) and Class 3 (Priority Non-Tax Claims) are unimpaired and not entitled to vote. Class 5 Equity Interests are impaired under the Plan, but are not entitled to vote on the Plan, because Class 5 Equity Interest holders are deemed to vote to reject the Plan.

**3.4.2 Eligibility.** In order to vote on the Plan, you must hold a Class 4 Claim and have timely filed a proof of Claim or have a Claim that is identified on the Debtor's Schedule of Assets and Liabilities (the "Schedules") that is not listed as disputed, unliquidated or contingent, or be the holder of a Claim that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

**3.4.3 Procedure/Voting Deadlines.** In order for your ballot to count, you must complete, date, sign and properly mail the enclosed ballot (please note that envelopes have been included with the ballot) to the Balloting Agent at the following address:

Ritz Claims Processing Center
c/o Kurtzman Carson Consultants, LLC
2335 Alaska Avenue
El Segundo, CA 90245

1615512 v3/NY

The Balloting Agent must RECEIVE original ballots by mail or overnight delivery on or before **5:00 p.m. April 9, 2010 (Prevailing Pacific Time)** (the "Voting Deadline"). Except as otherwise provided, you may not change your vote once the Balloting Agent receives your ballot.

Any ballot that is timely received, that contains sufficient information to permit the identification of the claimant and that is cast as an acceptance or rejection of the Plan will be counted and will be deemed to be cast as an acceptance or rejection, as the case may be, of the Plan.

The following ballots will not be counted or considered for any purpose in determining whether the Plan has been accepted or rejected:

      **A.**    any ballot received after the Voting Deadline, unless the Plan Proponents granted an extension of the Voting Deadline with respect to such ballot;

      **B.**    any ballot that is illegible or contains insufficient information to permit the identification of the claimant;

      **C.**    any ballot cast by a person or entity that does not hold a Claim in a class that is entitled to vote to accept or reject the Plan;

      **D.**    any ballot cast for a Claim designated as unliquidated, contingent or disputed or as zero or unknown in amount and for which no Rule 3018(a) motion has been filed by the Rule 3018(a) motion deadline;

      **E.**    any ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Plan or that indicates both acceptance and rejection of the Plan;

      **F.**    any unsigned ballot; or

      **G.**    any ballot that is electronically submitted.

### 3.5    **Additional Information.**

Any questions regarding (1) voting procedures, (2) the solicitation package accompanying this Disclosure Statement, (3) the amount of a Claim, or (4) a request for an additional copy of the Plan, Disclosure Statement or any Exhibits to such documents should be directed to:

Kurtzman Carson Consultants, LLC
2335 Alaska Avenue
El Segundo, CA 90245
ritzcamerainfo@kccllc
Telephone: (866) 381-9100

1615512 v3/NY

# IV.

## GENERAL INFORMATION CONCERNING THE DEBTOR

### 4.1    Prepetition Business Operations.

Ritz Camera is a corporation organized under the laws of the State of Delaware.  Its headquarters are located at 6711 Ritz Way, Beltsville, Maryland 20705.  Ritz Camera was the largest specialty camera and image chain in the United States and prior to this Bankruptcy Case, was the industry leader in providing cameras, accessories, photographic and digital imaging equipment and other image products.  As of the date of the filing of the Ritz Camera's chapter 11 petition, February 22, 2009 (the "Petition Date"), Ritz Camera operated approximately 800 Photo Stores ("Photo Stores") in over 40 states throughout the country.  The chain of Photo Stores included Ritz Camera, Wolf Camera, Kits Cameras, Inkley's and The Camera Shops.

In addition to its Photo Stores, Ritz Camera also operated a chain of 130 boating stores, under the name "Boater's World Marine Centers" ("Boater's World"), which sold fishing, boating and water sports products.

Ritz Camera traces its origin back to 1918, when Benjamin Ritz began operating a portrait studio on Atlantic City's boardwalk.  In 1938, Benjamin's younger brother, Edward, opened their first photo processing lab in Washington, D.C.  One year later, the brothers expanded Ritz Camera's business to Baltimore and began to offer a wide selection of cameras and accessories.  They founded the business on the philosophy of "offering customers a quality product at a fair price".

In 1969, Edward's son, David Ritz, joined Ritz Camera and began its expansion.  Under David's leadership, Ritz Camera faced enormous changes in technology and market conditions, to become the industry leader it eventually became.

In 2008, Ritz Camera operated over 900 retail stores with combined trailing twelve-month sales through November 30, 2008 of just under $1 billion.

### 4.2    Prepetition Growth.

Ritz Camera's growth and evolution to become a large, national retail company accelerated in the 1980's and 1990's, when it acquired and consolidated a number of its competitors into one company.  In October 2001, Ritz Camera made its largest acquisition ever when it purchased substantially all of the assets and most of the stores of Wolf Camera from Wolf Camera's bankruptcy estate.

While significantly growing the Photo Stores, Ritz Camera also decided in the late 1980's to diversify its retail business by starting the Boater's World chain.  Over the years, Ritz Camera grew the Boater's World business by opening new stores, until it reached its peak in size in 2007.

The Boater's World business proved to be a positive contributor to Ritz Camera's profitability for a number of years, and generated positive operating cash flow through 2007.  In

7

the Spring of 2008, however, the price of oil skyrocketed, leading to a sharp rise in the price of gas, and that in turn, with other macroeconomic factors, led to a sharp drop in the sales and profitability of the Boater's World business. Boater's World had revenues in 2008 of approximately $130 million, but it lost approximately $12 million in 2008 after store, warehouse and regional costs. Only 24 out of 129 stores contributed positive store profit in 2008.

### 4.3 Debt Structure.

In October 2007, Ritz Camera entered into a new $200 million revolving credit facility (the "Loan Agreement") with a group of lenders comprised of Wachovia Bank, National Association as Agent ("Agent"), Wachovia Capital Markets, LLC, as Sole Lead Arranger, Manager and Bookrunner, The CIT Group/Business Credit, Inc. as Documentation Agent, and Bank of America, N.A. and Wells Fargo Retail Finance, LLC, as Co-Syndication Agents (collectively with the Agent, the "Lenders"). As of December 31, 2008, Wachovia Bank, National Association was acquired by Wells Fargo & Company.

The Loan Agreement also was executed by Ray Enterprises, LLC ("Ray"), a Delaware limited liability company whose sole member is Ritz Camera, as a co-Borrower. Ray was engaged in the business of wholesale photographic supplies, but now has no assets other than a house that is unoccupied and for sale, and two residential lots also for sale. Mufungo, LLC ("Mufungo"), a Maryland limited liability company wholly-owned by Ritz Camera, also executed a Guaranty to guaranty the obligations of Ritz Camera and Ray. Mufungo was engaged in the business of importing and selling miscellaneous items, but it has been liquidated and closed.

As of the Petition Date, the aggregate obligations owed by Ritz Camera to the Lenders under the Loan Agreement was approximately $47,711,000 in revolving credit, and $6,819,000 in letter of credit obligations, for a total of $54,530,000.

In addition to the Credit Facility, Ritz Camera was indebted to certain other parties under a series of Subordinated Debentures issued in January 1995. As of the Petition Date, the aggregate balance due under the Subordinated Debentures was approximately $13,072,960.

Between 1996 and 2001, FPL Holdings, Inc. ("FPL"), a wholly owned subsidiary of Fuji Photo Film Co., Ltd., invested approximately $197,000,000 in Ritz Camera through the purchase of various series of the company's Convertible Preferred Stock. The proceeds of these investments were used by the company to fund expansion including the acquisition of competitors. FPL currently owns 19 shares of the Ritz Camera's Voting Common Stock, 9,420 shares of the company's Non-Voting Common Stock, 43 shares of the Company's Series A Convertible Preferred Stock, and 39 shares of the company's Series D Convertible Preferred Stock. If all preferred stock were converted, FPL would own, on a fully diluted basis, approximately 33.33% of the company's Class A Common Stock and 35.16% of the company's Class B Common Stock.

8

## 4.4    Events Leading to the Chapter 11 Filing.

While Ritz Camera was growing and in many respects performing well, the camera and photo-finishing business began to experience profound changes brought about by the movement of the photographic industry from film to digital cameras. The Photo Stores historically enjoyed enormous profits from the photo-finishing business, but with the shift from film to digital photography over the past several years, that part of Ritz Camera's business began to experience significant declines in revenues and profitability. Despite Ritz Camera's continued success in selling cameras and photographic equipment, the loss of revenues and profit margins from the diminution in the photo-finishing business proved too much of a burden, coupled with the losses experienced by the Boater's World business in 2008, for Ritz Camera to remain a profitable company under its structure existing at the time.

In the midst of these developments, in 2008, the United States economy suffered a major recession which dramatically impacted the retail sector, including Ritz Camera's industry, and 2008 holiday sales proved to be materially lower than prior year sales.

As part of management's overall restructuring plan to address these issues, management retained the investment banking services of Financo, Inc. ("Financo") in December 2008 to market Boater's World to various going concern prospective buyers prior to the filing of this bankruptcy case. Financo assembled financial information, distributed prospectuses, and solicited bids from buyers seeking to purchase the business as a going concern up to February 2009. During this process, Financo received only 4 bids. Those bids were for only a portion of the business and for amounts significantly less than the liquidation value of the Boater's World inventory.

The Lenders also were very concerned about the adverse developments described above. In January 2009, the Agent, acting on behalf of the Lenders, imposed substantial additional reserves on Ritz Camera's borrowing base and thereby reduced its available credit. Facing an immediate liquidity crisis, the Debtor engaged FTI Consulting, Inc. ("FTI") in January 2009 to advise and assist it with respect to addressing its financial restructuring challenges.

Just prior to the filing of this Bankruptcy Case, management, with the assistance of its advisors at FTI, renewed its attempts to sell the Boater's World assets and began soliciting offers from liquidators on February 8, 2009. Non-Disclosure Agreements and packages were sent out to the six main liquidators in the country. These six liquidators joint ventured into two groups with Gordon Brothers and Hilco comprising one group, and Great American Group WF, LLC, Hudson Capital Partners, LLC, SB Capital Group, LLC and Tiger Capital Group, LLC joint venturing as the other. Bids were received on February 17, 2009 for a prepetition going-out-of-business sale starting on February 20, 2009. However, when it became clear that the Debtor would need to seek bankruptcy relief, Ritz Camera delayed any Boater's World sale until after the contemplated Chapter 11 petition was to be filed.

Given Ritz Camera's internal challenges, including unprofitable store leases and Boater's World losses coupled with the overall economic recession, Ritz Camera had no choice but to seek relief under chapter 11 of the United States Bankruptcy Code to preserve the possibility of being able to restructure its business and financial affairs and to continue as a going concern. In

9

consultation with FTI and counsel, and after taking into account, among other things, the anticipated cash needs of Ritz Camera, Ritz Camera determined that filing a voluntary Chapter 11 petition was in the best interest of all parties-in-interest in order to best protect the Debtor's going concern value.

# V.

## THE BANKRUPTCY CASE

### 5.1     The Chapter 11 Filing.

On the Petition Date, Ritz Camera filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

#### 5.1.1   Continuation of Business. After the Petition Date, the Debtor continued to operate its businesses as a debtor in possession under the Bankruptcy Code. Pursuant to the Bankruptcy Code, the Debtor is required to comply with certain statutory reporting requirements, including the filing of monthly operating reports.

#### 5.1.2   Professionals Retained in the Bankruptcy Case.

##### A.     Debtor's Professionals.

The Debtor retained certain attorneys and advisors to assist it in the administration of the Bankruptcy Case. In connection with the commencement of the Bankruptcy Case, the Debtor sought and obtained Bankruptcy Court approval for the retention of Cole, Schotz, Meisel, Forman & Leonard, P.A. as its bankruptcy counsel. The Debtor also retained (i) FTI to provide a chief restructuring officer as well as other temporary employees to assist in the management and oversight of the Debtor's restructuring and operations; (ii) Thomas & Libowitz, P.A. as its Special Corporate Counsel and Conflicts Counsel; (iii) Hogwood, PLLC as its Special Real Estate Counsel; (iv) Ernst & Young LLP as its Accountants; and (v) Hilco Real Estate, LLC as its Real Estate Consultant.

##### B.     The Appointment of the Official Committee of Unsecured Creditors.

On March 3, 2009, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Committee, pursuant to section 1102(a) of the Bankruptcy Code. The Committee is composed of the following members (i) Nikon, Inc.; (ii) Canon USA, Inc.; (iii) SanDisk Corporation; (iv) Tocad America; (v) Vertis, Inc.; (vi) Simon Property Group, Inc.; and (vii) GGP Limited Partnership.

The Committee retained Cooley Godward Kronish LLP as lead counsel, and Bifferato Gentilotti LLP, as Delaware counsel. The Committee retained Deloitte LLP as its financial advisor.

1615512 v3/NY

## C. The Appointment of the Noticing, Claims and Balloting Agent.

By Order entered February 24, 2009, the Bankruptcy Court authorized KCC to serve as the noticing, Claims and balloting agent for the Debtor.

**5.1.3 Significant Events During the Bankruptcy Case.** At the outset of the Bankruptcy Case, the Debtor sought and received authority with respect to various matters designed to assist in the administration of the Bankruptcy Case and to maximize the value of the Debtor's estate. Material events since the commencement of the Bankruptcy Case are summarized below and include:

## A. Debtor-in-Possession Financing.

On the Petition Date, the Debtor filed a motion for Bankruptcy Court approval of a debtor in possession credit agreement (the "DIP Loan Agreement"). The Bankruptcy Court approved the DIP Loan Agreement pursuant to Final Order entered on March 27, 2009 (the "Final DIP Order"). Under the terms of the DIP Loan Agreement, the Debtor obtained a $85,000,000 revolving line of credit.

The proceeds obtained from the DIP Loan Agreement were used to: (1) refinance in full all indebtedness under the Loan Agreement; (2) fund postpetition operating expenses incurred in the ordinary course of business; (3) pay fees and expenses associated with the DIP Loan Agreement; and (4) provide working capital for general corporate purposes in accordance with a budget approved by Wachovia. As security for the repayment of the money loaned under the DIP Loan Agreement, the lenders under the DIP Loan Agreement (the "DIP Lenders") obtained first-priority security interests on all of the Debtor's property, subject only to a carve-out for the payment of estate professional and U.S. Trustee fees (the "Carve-Out") and Other Priority Liens (as that term is defined in the DIP Loan Agreement).

The DIP Loan Agreement was terminated by letter agreement dated July 27, 2009. The Debtor repaid all obligations to the Lenders other than certain continuing obligations relating to letters of credit for which the Agent still holds collateral as security for the prompt payment and performance of such obligations in accordance with the terms and conditions set forth in the letter agreement.

## B. Vendor and Customer Issues.

### (a) Relief at Commencement of the Bankruptcy Case.

In the Debtor's efforts to maintain relationships and goodwill with certain of its vendors, customers, and other parties providing services, the Debtor obtained Orders from the Bankruptcy Court that authorized it to:

- honor certain prepetition obligations to customers under the Debtor's various customer and incentive programs (including customer product warranties, cash

11

discounts, photo clubs and rebates), and to continue and maintain such programs on a postpetition basis;

- pay prepetition Claims of essential shippers (discussed below); and

- pay vendors and suppliers for postpetition delivery of goods and services in the ordinary course of business.

### (b) Essential Shippers.

At the commencement of the Bankruptcy Case, the Debtor recognized the importance of preserving its key business relationships and determined that certain of its shippers were essential to the uninterrupted functioning of the Debtor's business operations (the "Essential Shippers") and that without such parties' essential goods and services, the Debtor likely would be unable to continue operating its businesses. Accordingly, the Debtor included among its first day motions a motion for authority to pay certain Essential Shippers, which was granted by Order of the Bankruptcy Court dated February 24, 2009. The Order authorized, but did not require, the Debtor to pay all or part of the prepetition Claims of Essential Shippers up to an aggregate amount of $1,000,000. In accordance with the Bankruptcy Court order, the Debtor paid approximately $569,929.79 in prepetition Claims of Essential Shippers.

### C. Extension of the Exclusive Right to File and Confirm a Plan.

Pursuant to Bankruptcy Code section 1121, the Debtor is afforded initial periods of 120 days and 180 days from the Petition Date during which it has exclusive rights, respectively, to file and to solicit acceptances of a plan or plans of reorganization (collectively, the "Exclusive Periods"). By motion filed with the Bankruptcy Court, the Debtor requested several relatively short extensions of the Exclusive Periods. The first motion was filed on June 15, 2009, and by order dated July 22, 2009, the Bankruptcy Court extended the Debtor's exclusive time to file a plan or plans and to solicit acceptances thereof until August 21, 2009, and October 20, 2009, respectively. The second motion for an extension of the Exclusive Periods was filed on August 21, 2009 and by order dated September 17, 2009, the Bankruptcy Court extended the Debtor's exclusive time to file a plan or plans and to solicit acceptances thereof until September 21, 2009 and November 29, 2009 respectively. The third motion for an extension of the Exclusive Periods was filed on September 18, 2009 and by order dated October 22, 2009, the Bankruptcy Court extended the Debtor's exclusive time to file a plan and to solicit acceptances thereof to October 26, 2009 and December 24, 2009 respectively.

### D. The Claims Process.

The Debtor filed its Schedules and Statements of Financial Affairs (the "Statements" and, together with the Schedules, the "Schedules and Statements") on April 23, 2009. Among other things, the Schedules and Statements set forth the Claims of known creditors against the Debtor as of the Petition Date, based upon the Debtor's books and records. The Debtor, or the Liquidating Trustee, as the case may be, reserves the right to amend the Schedules during the remaining pendency of the Bankruptcy Case.

1615512 v3/NY

The Bankruptcy Court set August 3, 2009 as the last date by which (i) holders of certain prepetition Claims against the Debtor were required to file proofs of Claim, including prepetition Claims entitled to administrative priority under Section 503(b)(9) of the Bankruptcy Code and (ii) applications for the allowance of Administrative Claims arising between February 22, 2009 and May 31, 2009 be filed (the "Bar Date"). Pursuant to certain notice procedures, notice of the Bar Date was mailed to all known potential creditors and all known equity holders. In addition, notice of the Bar Date was published in the national edition of *The New York Times*. Subject to certain limited exceptions identified in the Bar Date Order and, other than Claims arising from the rejection of executory contracts and leases after the Bar Date, all proofs of Claim must have been submitted by the Bar Date.

On December 29, 2009, the Debtor filed a motion requesting, among other things, entry of an order setting a second bar date for certain employee claims. The Court entered an order approving the Debtor's motion and set a supplemental bar date of March 1, 2010 (the "Supplemental Bar Date"). All employees not subject to the initial bar date order were required to file their claims by the Supplemental Bar Date.

Approximately 3,650 proofs of Claim, asserting Claims totaling more than $283,766,614 against the Debtor, were submitted in response to the Bar Date. These proofs of Claims were filed as follows:[4]

| | |
|---|---|
| Unsecured Claims: | $194,965,424, plus any unliquidated amounts |
| Secured Claims: | $57,129,864, plus any unliquidated amounts |
| Priority Claims: | $23,768,774, plus any unliquidated amounts |
| Administrative Claims: | $7,902,552, plus any unliquidated amounts |

The Debtor has begun the investigation of the Claims filed against the Debtor's Estate to determine the validity of the Claims. As of the filing of this Disclosure Statement, the Debtor has completed reconciliation of nearly 2,862 Claims with $119.6 million in asserted liquidated amounts, and is currently in the process of reconciling the remaining claims.

As of the filing of this Disclosure Statement, the Debtor has filed five omnibus objections to Claims. In those objections, the Debtor requested disallowance of approximately 675 proofs of Claim with approximately $29.4 million in asserted liquidated amounts, plus unliquidated amounts, on the basis of (i) non-substantive objections, including, but not limited to, the filing of duplicate, amended or late-filed Claims; and (ii) substantive objections for claims that do not match the Debtor's books and records.

---

[4] The forgoing amounts reflect the aggregate dollar amount of proofs of Claim filed against the Debtor prior to the Bar Date. The dollar amounts do not reflect the Claim amounts set forth in the Schedules and Statements as undisputed, unliquidated and noncontingent nor do they reflect proofs of Claim on account of rejection damages not yet filed by certain non-debtor parties whose Executory Contract or Unexpired Lease may be rejected by the Debtor.

While the Bankruptcy Court will ultimately determine the liability amounts, if any, that will be allowed as part of the Bankruptcy Case the Debtor believes that a substantial number of Claims will be disallowed, withdrawn and/or favorably reconciled.

### E. Sales of Substantially All of the Debtor's Assets; Sale and Bidding Procedures.

#### (a) Sale and Bidding Procedures.

During the Bankruptcy Case, the Debtor pursued the sale of its Boater's World business and certain of the assets of its underperforming Photo Stores, and then the sale of substantially all of its remaining assets as a going concern. To this end, the Debtor's team of professionals from FTI spent considerable time and effort marketing the Debtor's businesses and assets by identifying and negotiating with potential purchasers and stalking horse bidders and pursuing auctions for both the Boater's World business and the Photo Store business. These marketing efforts produced a number of potential purchasers, many of which executed confidentiality agreements and engaged in a due diligence review of materials relevant to the assets and the Debtor.

In order to effectuate the prompt sale of these assets and maximize the value of the estate for creditors and other parties in interest, the Debtor, with the Bankruptcy Court's approval, generally used uniform bidding and sale procedures (the "Bidding and Sale Procedures") to facilitate the sale of the Boater's World and Photo Store assets. The Bidding and Sale Procedures were designed to ensure that the assets sold were subject to higher and better offers.

The following is a summary of the Bankruptcy Court approved sales of the Debtor's operating assets.

#### (b) Sale of Boater's World.

In connection with its prepetition restructuring efforts, the Debtor's management performed an in-depth analysis of the Debtor's financial performance to identify areas for improvement. This analysis helped management identify some key steps that could be taken to improve the Debtor's overall financial performance – including the closing of stores that were not making material, positive contributions to overall profitability. In this regard, the Debtor's management, working closely with their professionals, began a comprehensive review of the performance of each store and market in which the Debtor operates. As a result of this review, the Debtor determined that the Debtor should liquidate the inventory at the Boater's World stores (the "Boater's World Sales") and close all of the Boater's World stores. Additionally, the Debtor identified approximately 400 photo stores (each a "Closing Photo Store", and collectively, the "Closing Photo Stores") as underperforming stores that should be closed in order to aid the Debtor's reorganization efforts and to ease certain of the liquidity restraints that the Debtor faced, by means of store closing or similar themed sales (the "Closing Photo Store Sales").

On February 27, 2009, the Debtor filed the *Motion of the Debtor for (I) Order (A) Approving Bidding Procedures for the Debtor's Boater's World Assets, (B) Authorizing Debtor to Offer Certain Bid Protections and (C) Scheduling Final Sale Hearing and Approving Form and*

14

*Manner of Notice Thereof, and (II) Order Authorizing and Approving (A) the Sale of Such Assets Free and Clear of Liens and Other Interests and (B) the Assumption and Assignment of Executory Contracts and Unexpired Leases to Successful Bidder(s) at Auction* [Docket No. 69], which ultimately sought approval to sell all of the Debtor's inventory and store fixtures of the Boater's World stores.

On March 20, 2009, the Bankruptcy Court entered an order (the "Boater's World Sale Order") approving the Debtor's proposed sale to a joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (jointly "Hilco-GB") [Docket No. 270]. In conjunction with the Boater's World Sale Order, the Bankruptcy Court approved: (1) an Agency Agreement (the "Agency Agreement") between the Debtor and Hilco-GB to serve as the Debtor's agent in connection with the Boater's World Sales and (2) certain sale guidelines for the conduct of the Boater's World Sales. Pursuant to the Agency Agreement, the Boater's World Sales began on March 20, 2009, and concluded on or about June 30, 2009.

Hilco-GB paid approximately $40.4 million for the Boater's World assets.

### (c)    Sale of the Closing Photo Stores.

On March 18, 2009, the Debtor filed its *Motion for (i) Order (a) Approving Bidding Procedures for the Sale of Certain Assets Located at Closing Photo Stores, (b) Authorizing Debtor to Offer Certain Bid Protections and (c) Scheduling Final Sale Hearing and Approving Form and Manner of Notice Thereof, and (ii) Order Authorizing and Approving (a) the Sale of Such Assets Free and Clear of Liens and Other Interests to Successful Bidder(s) at Auction* [Docket No. 246] (the "Photo Store Sale Motion") ultimately seeking approval to sell the Closing Photo Stores.

On April 2, 2009, the Bankruptcy Court entered an order (the "Closing Photo Stores Sale Order") approving the Debtor's proposed sale to a joint venture comprised of the Great American Group, LLC, SB Capital Group, LLC, Tiger Capital Group, LLC and Hudson Capital Partners, LLC (jointly, the "Great American Group") [Docket No. 313]. In conjunction with the Closing Photo Stores Sale Order, the Bankruptcy Court approved: (1) a consulting agreement (the "Consulting Agreement") between the Debtor and the Great American Group to serve as the Debtor's agent in connection with the Closing Photo Store Sales and (2) certain sale guidelines for the conduct of the Closing Photo Store Sales. Pursuant to the Consulting Agreement, the Closing Photo Store Sales began on April 3, 2009, and concluded on or about May 31, 2009.

To maintain the value of its leasehold interests, on February 22, 2009, the Debtor filed the *Debtor's Motion for Order Extending Time to Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 75], asking for an extension of the deadline to assume or reject leases (the "Assumption/Rejection Deadline") through September 21, 2009, pursuant to section 365(d)(4)(B)(i) of the Bankruptcy Code and the ability to enter into lease modifications. The Bankruptcy Court entered an Order granting this Motion on March 20, 2009 [Docket No. 272].

The Debtor also negotiated with Landlords for extensions of (the "Assumption/Rejection Period") for the Debtor's remaining approximately 376 operating stores that could be part of the

Debtor's continuing business beyond the period provided in section 365 of the Bankruptcy Code and as extended by the Bankruptcy Court. In these negotiations, some of the landlords requested and obtained, as part of their consent to extending the Assumption/Rejection Period, modifications to their lease agreements.

**(d)**      <u>**Sale of Substantially All of the Remaining Assets.**</u>

On July 3, 2009, the Debtor filed its *Motion for (i) Order (a) Approving Bidding Procedures for the Sale of All or Substantially All of Debtor's Assets, (b) Authorizing Debtor to Offer Certain Bid Protections, (c) Requiring the United States Trustee to Appoint a Consumer Privacy Ombudsman, and (d) Scheduling Final Sale Hearing and Approving Form and Manner of Notice Thereof, and (ii) Order Authorizing and Approving (a) the Sale of Such Assets Free and Clear of Liens and Other Interests to Successful Bidder(s), and (b) the Assumption and Assignment of Executory Contracts to Successful Bidder(s) at Auction* [Docket No. 701] (the "<u>Remaining Asset Sale Motion</u>") ultimately seeking approval to sell substantially all of its remaining assets.

On July 23, 2009, the Bankruptcy Court entered an order (the "<u>Remaining Asset Sale Order</u>") approving the Debtor's sale of substantially all of its assets to RCI Acquisition, LLC (the "<u>Purchaser</u>") [Docket No. 837].[5] In conjunction with the Remaining Asset Sale Order, the Bankruptcy Court approved the Asset Purchase Agreement (as amended from time to time, the "<u>Sale Agreement</u>") by and between the Debtor and the Purchaser through which the Purchaser purchased, among other things:

- all of the Debtor's inventory;

- certain owned real property, including the Debtor's former Topeka, KS warehouse distribution center (the "<u>Topeka DC</u>");

- intellectual property;

- books and records;

- licenses and permits, to the extent transferrable;

- chapter 5 preference actions against the Debtor's creditors, **which the Purchaser agreed not to pursue and release**;

- furniture, fixtures and equipment;

- cash on hand at certain locations;

- a receivable from Ritz Interactive up to $1 million;

---

[5]     Paragraph 31 of the Remaining Asset Sale Order provides that "any actions taken pursuant hereto shall survive the entry of any order which may be entered confirming any plan of reorganization or which may be entered converting this case from chapter 11 to chapter 7 and shall be binding on any trustee or successor trustee. The Debtors shall not file, nor seek to confirm, any plan of reorganization or liquidation in this case or take any action that is inconsistent with the APA or the Debtor's obligations arising thereunder or that impairs in any way the Purchaser's rights or remedies thereunder."

16

- certain insurance policies, specified in the Sale Agreement; and

- the designation rights for the Debtor's Unexpired Leases.

The Purchaser also assumed certain of the Debtor's liabilities including, but not limited to:

- amounts owed under certain Executory Contract or Unexpired Leases and the cure costs, up to a cap of $2.244 million, in connection with the assumption and assignment of Unexpired Leases;

- certain postpetition trade payables up to $3 million;

- February 2009 stub rent up to $1.7 million;

- postpetition liabilities under extended service plans ("ESPs") issued by the Debtor in connection with its Ritz Camera business up to $1 million;

- all costs for the consumer privacy ombudsman approved in the Bankruptcy Case;

- employee payroll up to $2.5 million and July sale tax liabilities up to $1.824 million;

- health insurance liabilities up to $2.1 million; and

- Gift Cards issued by the Debtor postpetition in connection with its Ritz Camera business up to $1 million.

## F. Post Closing Sale Agreement Modifications and Customer Claims.

The sale of substantially all of the Debtor's assets to the Purchaser closed on July 24, 2009 (the "Closing Date"). The Purchaser paid the Debtor $16,250,000 in cash at closing and the balance of the purchase price was paid in the form of a secured note in the original principal amount of $8,093,271.26, which bears interest at a per annum rate equal to 5.75% (the "Secured Note"). The Secured Note required an initial principal payment of $3 million, plus accrued and unpaid interest, no later than October 30, 2009, which the Purchaser timely paid. The balance of the Secured Note is to be paid in 24 equal monthly payments of principal and interest beginning January 2010, with a final payment due in December 2011. Pursuant, in part, to a modification of the Sale Agreement (the "Modified Sale Agreement"), the Secured Note is secured by the Purchaser's grant of a first priority lien on the Topeka DC, plus a $3 million letter of credit, which may be reduced from time to time in accordance with the Modified Sale Agreement.

Subsequent to the Closing Date, the Purchaser agreed to honor:

(i) the redemption of any Gift Cards sold or issued before the Petition Date (the "Prepetition Gift Cards"); and

(ii) claims made after the Closing Date under any ESPs issued before the Petition Date (the "Prepetition ESP's")

through a date to be set by the Purchaser, in its sole discretion.

At the time of the filing of this Disclosure Statement, the Purchaser is honoring Gift Cards and ESP's issued by the Debtor before or after the Petition Date. However, the Purchaser may elect to cease accepting Prepetition Gift Cards and Gift Cards sold or issued after the Petition Date and prior to the Closing Date and Prepetition ESPs and ESPs sold after the Petition Date but prior to the Closing Date.

At the time of the filing of this Disclosure Statement, the Debtor, the Committee and the Purchaser are negotiating a potential amendment to the Sale Agreement. Under the proposed amendment, the Purchaser:

- would no longer honor Gift Cards issued prior to the Closing Date, whether issued before or after the Petition Date. Holders of Claims on account of unredeemed Gift Cards issued prior to the Closing Date would thus be required to file Claims against the Debtor, subject to a bar date to be set by the Bankruptcy Court.[6] All Claims on account of unredeemed Gift Cards issued after the Petition Date but before the Closing Date are classified under the Plan as Administrative Claims. Under the proposed amendment to the Sale Agreement, all Allowed Administrative Claims on account of Gift Cards issued after the Petition Date but prior to the Closing Date would be paid by the Debtor but reimbursed by the Purchaser, irrespective of the $1 million cap set forth in the Sale Agreement. All Claims on account of unredeemed Gift Cards issued before the Petition Date are classified under the Plan as General Unsecured Claims, which claims shall be treated under the Plan and for which Purchaser shall have no liability; and

- would honor all Ritz ESP's issued before or after the Petition Date, irrespective of the cap set forth in the Sale Agreement.

In consideration for these modifications to the Sale Agreement, the Debtor would reduce the payments owed by the Purchaser under the Secured Note by $500,000, and would waive the Estate's disputed claim for accounts receivable against Ritz Interactive (the collectability of which in any event is uncertain).

If no amendment to the Sale Agreement is reached with the Purchaser, the original terms of the Purchase Agreement, as modified by the Modified Sale Agreement, shall remain in effect. Accordingly, the Plan treats customers claims as follows:

---

[6] Depending upon the negotiations with the Purchaser, the Debtor may file an amended motion requesting the establishment of a deadline by which all Claims on account of unredeemed Gift Cards, ESP's not yet honored by the Debtor or the Purchaser (except N.E.W. ESP Claims) and Debtor Warranties not yet honored by the Debtor or the Purchaser must file a Claim in order to seek to receive a Distribution from the Estate. Any Claim that is not filed by such deadline, if such bar date is approved by the Court, will be forever barred and will not be entitled to receive any Distribution from the Debtor's estate under the Plan.

- (i) Gift Card Claims (if not assumed by the Purchaser) arising out of transactions after the Petition Date but prior to the Closing Date; (ii) Boater's World ESP Claims arising out of transactions after the Petition Date; (iii) Ritz ESP Claims (if not assumed by the Purchaser) arising out of transactions after the Petition Date but prior to the Closing Date; and (iv) Debtor Warranty Claims (if not assumed by the Purchaser) arising out of transactions after the Petition Date but prior to the Closing Date shall be Administrative Claims entitled to receive Cash equal to the amount of such Allowed Administrative Claim either (i) as soon as reasonably practicable after the Effective Date or (ii) if the Administrative Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Administrative Claim becomes an Allowed Administrative Claim.

- (i) Gift Card Claims (if not assumed by the Purchaser), (ii) Boater's World ESP Claims, (iii) Ritz ESP Claims (if not assumed by the Purchaser) and (iv) Debtor Warranty Claims (if not assumed by the Purchaser) arising out of transactions prior to the Petition Date shall be classified as General Unsecured Claims.

- N.E.W. ESP Claims, which are Claims filed on account of an ESP issued by the Debtor (i) in the states of Florida, New York and Oregon and (ii) for televisions sold by the Debtor wherein N.E.W. Customer Service Companies, Inc. ("N.E.W.") is the service provider for such ESP, are deemed disallowed because N.E.W. is obligated to service ESPs issued in those states and for televisions sold by the Debtor.

In the event the Purchaser agrees to honor (i) Gift Card Claims, (ii) Ritz ESP Claims, and/or (iii) Debtor Warranty Claims, holders of such Claims shall not be entitled to any distribution under the Plan and all Claims filed against the Debtor on account of such Claims shall be Disallowed.

## G.    Remaining Assets.

Under the Sale Agreement, the Debtor did not sell a number of assets which it believes have material value (along with the Secured Note, the "Remaining Assets"). Those assets included:

- certain owned real property;

- a home and certain land owned by the Debtor's affiliate, Ray;

- all of the Debtor's ownership rights and equity interests in RZF Hanger, Mufungo, LLC, Ray and Boat House at Boater's World, LLC (other than the Intellectual Property related to "Boater's World Marine Centers");

- an account receivable due to the Debtor from RZF Aviation, LLC;

- all of the Debtor's right, title and interest in and to any additional distributions under a settlement agreement resolving an antitrust litigation against Visa and

MasterCard, pending before the United States District Court for the Eastern District of New York (Case No. CV-96-5238-JG-JC); and

- all of the Debtor's right, title and interest to any tax refunds, vendor credits, warranty payments, rebates, prepaid expenses and other funds owed to the Debtor as a result of its pre-closing date business activities.

Certain of the Remaining Assets were sold by the Debtor after the Closing Date. The Debtor is in the process of liquidating or converting to cash the balance of the Remaining Assets. After the Effective Date, the Remaining Assets shall be transferred to the Liquidation Trust and the Liquidation Trustee shall liquidate the Remaining Assets.

# VI.

## KEY PROVISIONS OF THE PLAN

### 6.1    Plan Objectives.

The primary objectives of the Plan are to: (a) maximize the value of the ultimate recoveries to all creditor groups on a fair and equitable basis; and (b) settle, compromise or otherwise dispose of certain Claims and Equity Interests on terms that the Debtor or the Liquidation Trustee, as the case may be, believes to be fair and reasonable and in the best interests of the Debtor's Estate and creditors. As noted, the Debtor has liquidated substantially all of its assets with the exception of the Remaining Assets. After the Remaining Assets are liquidated, the Plan provides for the Liquidation Trustee to distribute all of the cash, after the payment of expenses of the Estate and the Liquidation Trust, to the holders of Allowed Claims in accordance with the priorities established by the Bankruptcy Code. The Plan also provides for, among other things: (i) the resolution of all Claims against the Debtor in the manner set forth below, and in the Plan; (ii) the rejection of all unexpired Executory Contracts and Unexpired Leases to which any Debtor is a party that are not included on Schedule V.A. to the Plan or that have not been assigned to the Purchaser as part of the sale, or otherwise previously assumed, assumed and assigned, or rejected by the Debtor, and (iii) certain other transactions necessary to effectuate the terms of the Plan.

### 6.2    Classification and Treatment of Claims and Equity Interests.

#### 6.2.1    Administrative Claims and Administrative Claims Bar Date.

**A.    General.** As provided in section 1123(a)(1) of the Bankruptcy Code, Administrative Claims shall not be classified for the purpose of voting or receiving distributions under the Plan. Rather, all such Claims shall be treated separately as unclassified Claims on the terms set forth in Article III.A.1 of the Plan.

Except as otherwise provided in Section III.A.1.d.ii. of the Plan, the Bar Date Order or other order of the Bankruptcy Court, unless previously Filed, **requests for payment of Administrative Claims arising after the Effective Date must be Filed and served on the Plan Notice Parties pursuant to the procedures specified in the Confirmation Order and the notice of occurrence of the Effective Date, no later than thirty (30) days after the**

20

**Effective Date.** Holders of such Administrative Claims that are required to File and serve a request for payment of such Administrative Claims and that do not File and serve such a request by the applicable Bar Date shall be forever barred from asserting such Administrative Claims against the Debtor, the Liquidation Trust or their respective property, and such Administrative Claims shall be deemed discharged as of the Effective Date.

Any objections to the allowance of Administrative Claims must be Filed and served on the requesting party no later than (i) one hundred and fifty (150) days after the Effective Date or (ii) one hundred and twenty (120) days after the date on which a request for payment of an Administrative Claim is filed with the Bankruptcy Court (the "Administrative Claim Objection Deadline"). The Administrative Claim Objection Deadline may be extended for one thirty (30) day period by the Liquidation Trustee, by filing a notice of the extended Administrative Claim Objection Deadline with the Bankruptcy Court. Thereafter, the Administrative Claim Objection Deadline may be further extended only by an order of the Bankruptcy Court.

If no objection to the applicable Administrative Claim is filed on or before that date, such Administrative Claim shall be deemed Allowed as of that date. In the event that an objection is filed to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount, if any, of such Administrative Claim. Notwithstanding the foregoing, Allowed Administrative Claims representing obligations incurred in the ordinary course of business of the Debtor may be paid by the Debtor or the Liquidation Trustee in the ordinary course, consistent with past practice of the Debtor and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

**B.      Professional Compensation and Reimbursement Claims.** Professionals or other entities asserting a Professional Fee Claim for services rendered before the Effective Date must, unless previously Filed, File and serve on the Plan Notice Parties and such other entities who are designated in the Professional Fee Order, an application for final allowance of such Professional Fee Claim no later than sixty (60) days after the Effective Date; provided, however, that any Professional who receives compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date pursuant to the Ordinary Course Professionals Order without further Bankruptcy Court review or approval (except as provided in the Ordinary Course Professionals Order).

**C.      U.S. Trustee Fees.** On and after the Effective Date, Administrative Claims for U.S. Trustee Fees shall be paid in Cash equal to the amount of such Administrative Claims by the Liquidation Trustee from the Liquidation Trust Assets until the earlier of the conversion or dismissal of the Bankruptcy Case under section 1112 of the Bankruptcy Code, or the closing of the Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

**D.      Ordinary Course Liabilities.** Allowed Administrative Claims based on liabilities incurred by the Debtor in the ordinary course of its business after the Effective Date shall be paid by the Debtor and, after the Effective Date, the Liquidation Trustee, pursuant to the terms and conditions of the particular transaction giving rise to those

Administrative Claims, without being required to File or serve any request for payment of such Administrative Claims or further approval by the Bankruptcy Court.

### 6.2.2  Priority Tax Claims.

**A.**     **General.**  As provided in section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims shall not be classified for the purpose of voting or receiving distributions under the Plan.  Rather, all such Priority Tax Claims shall be treated separately as unclassified Claims on the terms set forth in Article III.A.2 of the Plan.

**B.**     **Treatment.**  Unless otherwise agreed by the holder of an Allowed Priority Tax Claim and the Debtor or, after the Effective Date, the Liquidation Trustee, each holder of an Allowed Priority Tax Claim shall receive, from the Liquidation Trust, in full satisfaction of its Priority Tax Claim, payment, in full in Cash, of such Priority Tax Claim (i) as soon as reasonably practicable after the Effective Date or (ii) if the Priority Tax Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim.

### 6.3     Treatment of Classified Claims and Equity Interests.

### 6.3.1  Class 1--Lenders' Secured Claims.

**A.**     **Impairment and Voting.**  Class 1 is unimpaired by the Plan.  The Lenders are not entitled to vote to accept or reject the Plan and are deemed to accept the Plan.

**B.**     **Treatment.**  Except to the extent that the Lenders have been paid by the Debtor prior to the Effective Date or agree to a less favorable treatment, the Lenders shall be paid in full in accordance with the terms of the Termination Agreement, which shall continue in full force and effect after the Effective Date.  As security for the Borrower's "Continuing Obligations" (as defined in the Termination Agreement) under the Termination Agreement, the Lenders shall retain their lien on the "Wachovia Cash Collateral" (as defined in the Termination Agreement) as set forth in the Termination Agreement.

### 6.3.2  Class 2--Other Secured Claims.

**A.**     **Impairment and Voting.**  Class 2 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan and is deemed to accept the Plan.

**B.**     **Treatment.**  Except to the extent that a holder of an Allowed Other Secured Claim has been paid by the Debtor prior to the Effective Date or agrees to a less favorable treatment, at the sole option of the Debtor, with the consent of the Committee, or the Liquidation Trustee, as the case may be, each holder of an Allowed Other Secured Claim that has not elected treatment pursuant to section 1111(b) of the Bankruptcy Code shall receive (a) Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the

Bankruptcy Code, or (b) the collateral securing its Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, in full and complete satisfaction of such Allowed Other Secured Claim as soon as reasonably practicable after the Effective Date, or, if the Other Secured Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim.

### 6.3.3  Class 3--Priority Non-Tax Claims.

**A.**     **Impairment and Voting.**  Class 3 is unimpaired by the Plan.  Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Plan and is deemed to accept the Plan.

**B.**     **Treatment.**  Except to the extent that a holder of an Allowed Priority Claim agrees to a less favorable treatment, as soon as reasonably practicable after the Effective Date, or, if the Priority Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which such Priority Claim becomes an Allowed Priority Claim, each holder of an Allowed Claim in Class 3 shall receive Cash equal to the amount of such Allowed Claim without postpetition interest.

### 6.3.4  Class 4 --General Unsecured Claims.

**A.**     **Impairment and Voting.**  Class 4 is impaired by the Plan. Each holder of an Allowed or partially Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

**B.**     **Treatment.**  Each holder of an Allowed or partially Allowed General Unsecured Claim shall receive its Pro Rata share (if any) of Distributable Cash on each Distribution Date as set forth in, and on the terms of, Article VI of the Plan and the Liquidation Trust Agreement.

On the Effective Date, all holders of Allowed General Unsecured Claims shall receive their Pro Rata Share of the Beneficial Interests in the Liquidation Trust.

### 6.3.5  Class 5--Equity Interests.

**A.**     **Impairment and Voting.**  Class 5 is impaired by the Plan, and holders of such equity interests shall not be entitled to vote on the Plan and are deemed to reject the Plan.

**B.**     **Treatment of Equity Interests.**  On the Effective Date, all Class 5 Equity Interests shall be cancelled, extinguished and shall be deemed to be null and void. No holder of a Class 5 Equity Interest shall be entitled to, or shall receive or retain, any property or interest in property on account of such Class 5 Equity Interest.

1615512 v3/NY

### 6.4    Means for Implementation and Execution of the Plan.

#### 6.4.1    The Liquidation Trust.

**A.    Execution of Liquidation Trust Agreement.** After the entry of the Confirmation Order, the Debtor will take such actions as may be necessary or appropriate to establish the Liquidation Trust pursuant to the Liquidation Trust Agreement. The Liquidation Trust Agreement is attached to the Plan. The Liquidation Trustee shall be Charles Reeves of FTI Consulting, Inc. and the establishment of the Liquidation Trust shall be consistent with Article IV of the Plan.

Except as to the Retained Assets, the Liquidation Trust shall succeed, and shall be the sole entity to succeed, to all of the rights, claims, benefits and obligations of the Debtor, including, but not limited to, those rights, claims, benefits and obligations of the Debtor under the Sale Agreement, and under any order issued by the Bankruptcy Court, including, but not limited to, the Remaining Asset Sale Order.

**B.    Purpose of Liquidation Trust.** The Liquidation Trust is being organized for the primary purpose of holding the Liquidation Trust Assets, liquidating the Liquidation Trust Assets, resolving all Disputed Claims, making all distributions to holders of Allowed Claims in accordance with the terms of the Plan and otherwise implementing the Plan, with no objective to continue or engage in the conduct of a trade or business. The Liquidation Trust shall be established and shall be operated in accordance with Treasury Regulation section 301.7701-4(d).

**C.    Liquidation Trust Assets.** The Liquidation Trust shall consist of any and all assets of the Debtor, as of the Effective Date, other than the Old Common Stock and the Retained Assets, including, without limitation, (i) all Cash on hand, (ii) all accounts receivable, notes receivable and other receivables of the Debtor, including, without limitation, any payments on credit card charges not transferred to the Purchaser under the Sale Agreement, (iii) all of the Debtor's ownership rights and equity interests in Mufungo, Ray Enterprises, and Boat House at Boater's World, LLC (other than the intellectual property related to "Boater's World Marine Centers" as referenced in Section 2.1(b)(viii) of the Sale Agreement), (iv) the Owned Real Property, (v) all of the Debtor's rights under the Sale Agreement and the Sale Order, including, but not limited to, the Debtor's rights under the Purchaser Note, the Security Agreement, the Additional Collateral Agreement, and the Mortgage, (vi) all Executory Contracts or Unexpired Leases not rejected pursuant to the Plan, (vii) any Tax Refund, (viii) any payments due on account of any Sale Agreement Reimbursement Obligation, (ix) all Causes of Action of the Debtor (other than the Transferred Causes of Action), and (x) all proceeds of, and any right or claim of the Debtor on account of, the foregoing and all proceeds of any of the foregoing received by any person or Entity on or after the Effective Date.

**D.    Nontransferability of Liquidation Trust Beneficial Interests.** The holders of Allowed General Unsecured Claims shall have beneficial interests in the Liquidation Trust Assets as provided in the Plan. The ownership of a beneficial interest in the Liquidation Trust shall not be evidenced by any certificate or receipt or any other form or

24

manner whatsoever, except as maintained on the books and records of the Liquidation Trust by the Liquidation Trustee.

### 6.4.2 Accounts.

The Liquidation Trust Accounts will be established and maintained in federally insured domestic banks in the name of the Liquidation Trustee or the Disbursing Agent. At the sole discretion of the Committee or the Oversight Committee, as applicable, the Liquidation Trustee and/or the Disbursing Agent will serve with a bond or similar financial instrument.

**A. Funding of the Liquidation Trust.** In accordance with the terms of the Liquidation Trust Agreement and the Plan, notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional Liquidation Trust Assets become available, the Debtor shall be deemed to have automatically transferred to the Liquidation Trust all of its right, title, and interest in and to all of the Liquidation Trust Assets, and in accordance with Section 1141 of the Bankruptcy Code, all such assets shall automatically vest in the Liquidation Trust free and clear of all Claims and Liens, subject to any liabilities of the Debtor or the Liquidation Trust payable from the proceeds of such assets as provided in the Liquidation Trust Agreement or the Plan. For the avoidance of doubt, except with respect to the Retained Assets, the property of the Debtor's Estate shall not revest in the Debtor or any other person or entity on or after the Effective Date and will vest solely in the Liquidation Trust to be administered by the Liquidation Trustee in accordance with the Plan and the Liquidation Trust Agreement.

**B. Investments.** Funds in the Liquidation Trust shall be invested in demand and time deposits in banks or other savings institutions, or in other temporary, liquid investments, such as Treasury bills, consistent with the liquidity needs of the Liquidation Trust as determined by the Trustee and the Oversight Committee, and need not be invested in accordance with section 345 of the Bankruptcy Code unless the Bankruptcy Court otherwise requires. All such investments shall comply with the limitations contained in Revenue Procedure 94-45, 1994-2 C.B. 684 and any other limitations imposed on a liquidating trust, within the meaning of Treas. Reg. §301.7701-4(d), pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise; provided, however, that should the Liquidation Trustee determine, in its sole discretion, that the administrative costs associated with such investment will exceed the return on such investment, it may direct the Disbursing Agent to not invest such Cash. Distributions of Cash from accounts held by the Disbursing Agent will include a Pro Rata share of the Cash Investment Yield, if any, from such investment of Cash.

In connection with the vesting and transfer of the Liquidation Trust Assets, including rights and Causes of Action, any attorney-client privilege, work-product protection, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidation Trust shall vest in the Liquidation Trust. The Debtor and the Liquidation Trustee are authorized to take all necessary actions to effectuate the transfer of such privileges, protections and immunities.

**6.4.3** **Securities Exempt.** The issuance of the Beneficial Interests in the Liquidation Trust satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act of 1933, as amended, and any state or local law requiring registration.

**6.4.4** **Cancellation of Equity Interests.** On the Effective Date (i) the Equity Interests shall be cancelled, and (ii) the obligations of the Debtor with respect to the Equity Interests and under the Debtor's certificate of incorporation and any related agreements shall be extinguished.

**6.4.5** **Limited Vesting of Assets in Post-Effective Date Debtor and Liquidating Transactions.** The Debtor will continue to exist after the Effective Date with all of the powers of a corporation under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable state law.

Upon entry of the Confirmation Order, the Debtor, through the Liquidation Trustee, may consummate any of the following Liquidating Transactions: (i) execute and deliver appropriate agreements or other documents of transfer, merger, consolidation, disposition, liquidation or dissolution, containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law, as well as other terms to which the Committee or the Oversight Committee, as the case may be, may agree; (ii) execute and deliver appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms as the Committee or the Oversight Committee, as the case may be, may agree; (iii) file appropriate certificates or articles of merger, consolidation, continuance or dissolution or similar instruments with the applicable governmental authorities; (iv) take any actions approved by the Oversight Committee with respect to the Retained Assets; and (v) take all other actions that the Plan Proponents determine to be necessary or appropriate, including making other filings or recordings that may be required by applicable law in connection with the Liquidating Transactions. Any costs and/or expenses incurred in connection with such Liquidating Transactions shall be paid by the Liquidation Trustee from the Liquidation Trust.

**6.4.6** **Closing of the Bankruptcy Case.** After the Estate is fully administered within the meaning of Bankruptcy Rule 3022, the Liquidation Trustee shall seek authority from the Bankruptcy Court to close the Bankruptcy Case in accordance with the Bankruptcy Code and the Bankruptcy Rules. Upon obtaining an order of the Bankruptcy Court authorizing final distribution and closure of the Bankruptcy Case, any funds remaining in any Liquidation Trust Account shall be distributed in accordance with the Plan and the Liquidation Trust Agreement.

**6.4.7** **Role of the Liquidation Trustee.** Pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Liquidation Trustee shall be the (i) exclusive trustee of the assets of the Liquidation Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), and (ii) sole representative, director, officer and responsible person of the Debtor after the Effective Date. The powers, rights and responsibilities of the Liquidation Trustee are

set forth in the Plan and the Liquidation Trust Agreement and include the authority and responsibility to, among other things, take the actions set forth in Article IV.B of the Plan. Pursuant to the Plan, all actions of the Liquidation Trustee shall be subject to approval by the Oversight Committee.

The Liquidation Trust Agreement generally provides for, among other things: (i) the payment of reasonable compensation to the Liquidation Trustee; (ii) the payment of other expenses of the Estate and the Liquidation Trust; (iii) the retention of counsel, accountants, financial advisors or other professionals and the payment of their compensation; (iv) the investment of Cash by the Liquidation Trustee within certain limitations; (v) the orderly liquidation of the Retained Assets and the Liquidation Trust Assets; (vi) litigation of any Causes of Action of the Estate or assigned to the Liquidation Trust, which may include the prosecution, settlement, abandonment or dismissal of any such Causes of Action; and (vii) Distributions from the Estate to the Liquidation Trust, and from the Liquidation Trust.

In furtherance of and consistent with the purpose of the Liquidation Trust and the Plan, subject to the Plan, the Confirmation Order, the Liquidation Trust Agreement or other agreement (or any other order of the Bankruptcy Court entered pursuant to or in furtherance hereof), the Liquidation Trust (and the Liquidation Trustee) shall have the power and authority, to the exclusion of all other parties, but only upon the consent of the Oversight Committee, to:

(i)     effect all actions and execute all agreements, instruments and other documents necessary to implement the Plan;

(ii)     accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the Retained Assets and the Liquidation Trust Assets (directly or through the Disbursing Agent), each in accordance with the Plan and Liquidation Trust Agreement;

(iii)     sell, lease, liquidate, transfer, distribute or otherwise dispose of the Liquidation Trust Assets (directly or through the Disbursing Agent) or any part thereof or any interest therein, including, but not limited to, selling or leasing the Owned Real Property, compromising the Secured Note, and releasing the Lien on the Purchaser's assets;

(iv)     review, reconcile, settle or object to Claims and resolve such objections as set forth in the Plan;

(v)     prosecute, compromise or settle any Causes of Action or Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules; provided, however, that the Liquidation Trustee must seek Bankruptcy Court approval of the compromise or settlement of any Cause of Action or Claim whereby the amount of such compromise or settlement provides the claimant with an Allowed Claim in excess of $500,000;

(vi)     assume and assign, reject or terminate any Executory Contract or Unexpired Lease not otherwise rejected pursuant to the Plan;

(vii)     calculate and make distributions to holders of Allowed Claims pursuant to the procedures for allowing Claims and making distributions prescribed in the Plan;

(viii)     establish and administer the Liquidation Trust Accounts;

(ix)    comply with the Plan and exercise the Liquidation Trust's rights and fulfill its obligations thereunder;

(x)    employ and compensate, without further order of the Bankruptcy Court, professionals (including Professionals previously retained by the Debtor and the Committee) to assist in carrying out its duties hereunder and may compensate and reimburse the expenses of these professionals without further order of the Bankruptcy Court from the Liquidation Trust Assets in accordance with the Plan and the Liquidation Trust Agreement;

(xi)    file appropriate Tax returns and other reports on behalf of the Liquidation Trust and pay Taxes or other obligations owed by the Liquidation Trust;

(xii)    pay Taxes or other obligations owed by the Debtor for all taxable periods ending on or before the Effective Date and the portion through the end of the Effective Date for any taxable period that includes (but does not end on) the Effective Date, and review and reasonably consent to the filing of Tax returns and other reports on behalf of the Debtor for such pre-Effective Date periods; provided, however, that nothing in this clause shall (A) constitute an assumption by the Liquidation Trust of any obligation to pay pre-Effective Date period Taxes that was assumed by the Purchaser in the Sale Agreement or (B) relieve any other person that has assumed or will assume the liability of the Debtor for such pre-Effective Date period Taxes or other obligations from such person's liability for such pre-Effective Date period Taxes or other obligations;

(xiii)    exercise such other powers as may be vested in the Liquidation Trust or as deemed by it to be necessary and proper to implement the provisions of the Plan and the Liquidation Trust Agreement;

(xiv)    take such actions as are necessary or appropriate to close or dismiss the Bankruptcy Case; and

(xv)    dissolve the Liquidation Trust in accordance with the terms of the Liquidation Trust Agreement.

**6.4.9    Compensation of the Liquidation Trustee and Payment of Liquidation Trust Expenses.**    As compensation for services in the administration of the Liquidation Trust, the Liquidation Trustee shall be compensated on an hourly basis consistent with the schedule of hourly rates of FTI employees attached to the Liquidation Trust Agreement. The Trustee shall also be reimbursed for all documented actual, reasonable and necessary out-of-pocket expenses incurred in the performance of his duties hereunder.

The Liquidation Trustee may pay from the Liquidation Trust Assets in accordance with the Plan and the Liquidation Trust Agreement the reasonable fees and expenses that it incurs on or after the Effective Date for Liquidation Trust Expenses, including, without limitation, professionals' fees, disbursements, expenses or related support services (including fees related to the preparation of applications on account of Professional Fee Claims) without application to the Bankruptcy Court.

On a monthly basis, professionals retained by the Debtor, the Liquidation Trustee, the Oversight Committee and the Claims Agent shall serve a detailed invoice on the Plan Notice Parties. If any of the Plan Notice Parties dispute the reasonableness of any such invoice within

fifteen (15) days of service of such invoice, the affected professional or the objecting Plan Notice Party may submit such dispute to the Bankruptcy Court for determination of reasonableness of such invoice, and the Disputed portion of such invoice shall not be paid until the dispute is resolved. If no objections are raised to an invoice in accordance with the deadline established above, the Liquidation Trustee shall promptly pay such invoice in full.

**6.4.10 Retention of Professionals by the Liquidation Trustee.** The Liquidation Trustee may retain and reasonably compensate counsel and other professionals to assist in his duties and Liquidation Trustee on such terms as the Liquidation Trustee deems appropriate without Bankruptcy Court approval. The Liquidation Trustee may retain any professional who represented any party in interest in the Bankruptcy Case, including without limitation FTI Consulting, Inc., Cole, Schotz, Meisel, Forman & Leonard, P.A. and Cooley Godward Kronish LLP.

**6.4.11 Reports to be Filed by the Liquidation Trustee.** The Liquidation Trustee, on behalf of the Liquidation Trust, shall File with the Bankruptcy Court and post on the Document Website quarterly reports regarding the administration of the assets subject to its ownership and control pursuant to the Plan, distributions made by it and other matters relating to the implementation of the Plan. The first quarterly report will be filed forty-five (45) days after the Effective Date and reports shall be filed thereafter every January 15th, April 15th, July 15th, and October 15th until a final decree has been entered or the Bankruptcy Case is dismissed.

**6.4.12 Tax Treatment.** The Liquidation Trust is intended to be treated for U.S. federal income tax purposes as a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d). For federal income tax purposes, the transfer of Liquidation Trust Assets to the Liquidation Trust will be treated as a transfer of Liquidation Trust Assets from the Debtor to the holders of Allowed General Unsecured Claims, subject to any liabilities of the Debtor or the Liquidation Trust payable from the proceeds of such assets, followed by such holders' transfer of such assets (subject to such liabilities) to the Liquidation Trust. The holders of Allowed General Unsecured Claims will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the Liquidation Trust Assets, subject to any liabilities of the Debtor or the Liquidation Trust payable from the proceeds thereof. For the avoidance of doubt, the holders of Allowed General Unsecured Claims are not intended to be treated for federal income tax purposes as receiving Liquidation Trust Assets that are contributed to the Disputed Claims Reserve until such time as the Disputed Claims Reserve makes distributions, in which case (and at which time) the holders of Allowed General Unsecured Claims are intended to be treated as receiving the distributions actually received from the Disputed Claims Reserve, if any. The Liquidation Trust Agreement will: (i) require that the Liquidation Trustee file income tax returns for the Liquidation Trust as a grantor trust; (ii) pay all Taxes owed on any net income or gain of the Liquidation Trust, including net income or gain of the Disputed Claims Reserve, on a current basis from Liquidation Trust Assets; (iii) provide for consistent valuations of all Liquidation Trust Assets by the Liquidation Trustee and holders of Allowed General Unsecured Claims, and require that such valuations be used for all Tax reporting purposes; (iv) provide for the Liquidation Trust's termination no later than five (5) years after the Effective Date unless the Liquidation Trustee elects to extend such period for an

29

additional year as provided for in the Liquidation Trust Agreement or the Bankruptcy Court approves a fixed extension based upon a finding that an extension is necessary for the Liquidation Trust to (a) resolve all Claims, (b) reduce and/or liquidate all Liquidation Trust Assets to Cash, or (c) terminate its existence; (v) limit the investment powers of the Liquidation Trustee; and (vi) require that the Liquidation Trust distribute at least annually all net income and the net proceeds from the sale or other disposition of all Liquidation Trusts asset in excess of amounts reasonably necessary to maintain the value of the remaining Liquidation Trust Assets and pay Claims and contingent liabilities, including Disputed Claims. The Liquidation Trustee intends to treat the Disputed Claims Reserve as a discrete trust taxed pursuant to section 641 *et seq.* of the Internal Revenue Code.

**6.4.13 Compensation and Reimbursement for Services Related to Distributions and Cash Investment Yield.** The Disbursing Agent providing services related to distributions pursuant to the Plan, Lawrence Sarf of Creditntell.com, Inc., will receive from the Liquidation Trust Assets, without further Bankruptcy Court approval, compensation in a base amount of $50,000 for such services and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services. In the event there is more than one distribution to General Unsecured Creditors, the Disbursing Agent shall receive an additional $25,000.

# VII.

## PROCEDURES FOR RESOLVING AND TREATING DISPUTED CLAIMS

### 7.1 Method of Distributions to Holders of Allowed Claims.

The Disbursing Agent will make all distributions of Cash required under the Plan to holders of Allowed Claims against the Debtor. At the sole discretion of the Oversight Committee, the Disbursing Agent will serve with bond or similar financial instrument, and with the approval of the Oversight Committee, the Disbursing Agent may employ or contract with other entities to assist in or make the distributions required by the Plan.

### 7.2 Partial Distributions Pending Allowance.

No payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim. Distributions on account of any Disputed Claim that has become an Allowed Claim will be governed by the Liquidation Trust Agreement. In addition, the Liquidation Trust Agreement includes reasonable and customary provisions establishing reserves to account for Disputed Claims that become Allowed Claims.

Notwithstanding Section VII.C.1.a. of the Plan, holders of Disputed Claims in Class 4 are entitled to distributions on account of the Allowed portion, if any, of such Disputed Claims pending final resolution of the disputed portion of such Claim. The Liquidation Trustee shall take a reserve for the full amount of the disputed portion of any such Claim on the Distribution Date that the Allowed portion of such Claim is distributed.

1615512 v3/NY

### 7.3    **Tort Claims.**

All Tort Claims are Disputed Claims and shall be administered by the Liquidation Trust. Any Tort Claim as to which a proof of Claim was timely filed in the Bankruptcy Case shall, at the option of the Plan Proponents, either be estimated or determined and liquidated. With respect to any and all insurance policies that may cover one or more Tort Claims, all parties (including the holders of the Tort Claims, the Debtor, and the Liquidation Trustee, as well as the insurers) shall reserve and retain all of their respective rights, claims and defenses with respect to such insurance policies; provided, however, that no provision of the Plan (including the assignment of any insurance policy to the Liquidation Trust) shall impair the rights of the holders of the Tort Claims, the Debtor, the Estate, or the Liquidation Trustee, with respect to the availability of coverage under any such insurance policies.

After the Effective Date, and in accordance with Article VII of the Plan, at the Liquidation Trust's option, any unliquidated Tort Claim (as to which a proof of Claim was timely Filed in the Bankruptcy Case) not resolved through Final Order of the Bankruptcy Court or as agreed to by the holder of such unliquidated Tort Claim and the Debtor or the Liquidation Trust, shall be (i) determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction; (ii) estimated, pursuant to section 502(c) of the Bankruptcy Code, in a proceeding before the United States District Court for the District of Delaware; or (iii) resolved through an alternative dispute resolution program approved by the Bankruptcy Court after notice and a hearing.

Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with Section VII.A.1 of the Plan and applicable non-bankruptcy law that is no longer appealable or subject to review shall be deemed an Allowed Claim, as applicable, in Class 4 against the Debtor in such liquidated amount, provided that only the amount of such Allowed Claim that is less than or equal to the Debtor's self-insured retention or deductible in connection with any applicable insurance policy and that cannot be satisfied from proceeds of insurance payable to the holder of such Allowed Tort Claim under the Debtor's insurance policies shall be treated as an Allowed Claim for the purposes of distributions under the Plan. In the event a Tort Claim is determined and liquidated pursuant to a judgment or order that is obtained in accordance with Section VII.A.1 and is no longer appealable or subject to review, and applicable non-bankruptcy law provides for no recovery against the Debtor, such Tort Claim shall be deemed expunged without the necessity for further Bankruptcy Court approval upon the Debtor's, or, after the Effective Date, the Liquidation Trustee's, service of a copy of such judgment or order upon the holder of such Tort Claim.

Nothing contained in this Section shall constitute or be deemed a waiver of any claim, right or Cause of Action that the Debtor or the Liquidation Trustee may have against any person or entity in connection with or arising out of any Tort Claim, including but not limited to, any rights under section 157(b)(5) of title 28 of the United States Code. All claims, demands, rights, defenses and Causes of Action that the Debtor or the Liquidation Trust may have against any person or entity in connection with or arising out of any Tort Claim are expressly retained and preserved.

31

### 7.4    Resolution of Disputed Claims.

Unless otherwise ordered by the Bankruptcy Court, the Debtor or the Liquidation Trustee may make and file all objections to Disputed Claims that are the subject of proofs of Claim or requests for payment filed with the Bankruptcy Court (other than applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code) and serve such objections upon the holders of the Claims to which the objections are made as soon as practicable, but in no event later than 120 days after the Effective Date or such later date as may be approved by the Bankruptcy Court.

### 7.5    Estimation of Claims.

The Liquidation Trustee, as the case may be, may, at any time, request the Bankruptcy Court to estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor has previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to such Claim. In the event the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. On and after the Confirmation Date, Claims which have been estimated may be compromised, settled, withdrawn or otherwise resolved, without further order of the Bankruptcy Court.

### 7.6    Amounts Retained to Pay Disputed Claims.

On and after the Effective Date, the Liquidation Trustee shall establish and maintain reserves for Disputed and unpaid Secured Claims, Administrative Claims, Priority Tax Claims, Priority Claims and the Disputed portion of General Unsecured Claims (collectively, the "Disputed Claims" and the "Disputed Claim Reserve"). The Disputed Claim Reserve shall initially be allocated the Cash or, in the case of a General Unsecured Claim, the other Liquidation Trust Assets that would, in each case, have been distributed to or held on behalf of the holders on account of the Disputed Claims had their Disputed Claims been deemed fully Allowed Claims on the Effective Date or such other amount as may be approved by Final Order of the Bankruptcy Court. The balance of the Disputed Claim Reserve, if any, remaining after all such Disputed Claims have been resolved and distributions with respect to and on account of the Disputed Claims have been made shall be added to any other reserve under the Liquidation Trust Agreement if necessary or distributed to holders of Allowed Claims in a manner consistent with the Plan.

### 7.7    Allowance of Disputed Claims.

Distributions with respect to any Disputed Claim that becomes an Allowed Claim shall be made as soon as practicable after an order, judgment, decree or settlement agreement with respect to such Claim becomes a Final Order of the Bankruptcy Court. As provided for in the

32

Plan, no distribution shall be made on account of Disputed Claims other than those in Class 4 until such claims become Allowed Claims. Notwithstanding the foregoing, Holders of Disputed Claims in Class 4 shall be entitled to distributions on account of the Allowed portion, if any, of such Disputed Claims pending final resolution of the Disputed portion of such Claim.

### 7.8 No Distribution in Respect of Disallowed Claims.

To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any distribution on account of the portion of such Claim that is disallowed.

# VIII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1 Executory Contracts and Unexpired Leases to be Rejected.

On the Effective Date, except for the Executory Contracts or Unexpired Leases listed on **Exhibit V.A.** to be attached to the Plan on or before the seventh (7th) day prior to the Plan Objection Deadline (as it may be amended), if any, which Executory Contracts or Unexpired Leases shall be treated pursuant to the terms and conditions of the Sale Agreement, the Sale Order and any agreement by the Debtor and the non-Debtor party to an Unexpired Lease extending the Debtor's time to assume or reject such Unexpired Lease, and except to the extent that the Debtor either previously assumed and assigned or rejected (or terminated in accordance with its terms) an Executory Contract or Unexpired Lease pursuant to an order of the Bankruptcy Court (if required), or has filed a motion to assume and assign or reject an Executory Contract or Unexpired Lease prior to the Effective Date, each Executory Contract and Unexpired Lease entered into by the Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to section 365 of the Bankruptcy Code. Each such contract and lease will be rejected only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

### 8.2 Bar Date for Rejection Claims.

Notwithstanding anything in the Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan gives rise to a Claim by the other party or parties to such contract or lease, such rejection Claim will be forever barred and will not be enforceable against the Liquidation Trust unless a proof of Claim is Filed and served on the Plan Notice Parties no later than thirty (30) days after the Effective Date.

### 8.3 Executory Contracts and Unexpired Leases Not Rejected.

Executory Contracts or Unexpired Leases set forth on Schedule V.A. of the Plan will not be deemed rejected pursuant to the Plan but will vest in the Liquidation Trust to be administered by the Liquidation Trustee, who may assume and assign any such Executory Contracts or

Unexpired Leases to the Purchaser in accordance with the Plan, the Liquidation Trust Agreement, the Sale Agreement and the Remaining Asset Sale Order. For the avoidance of doubt, the Executory Contracts or Unexpired Leases set forth on Schedule V.A. shall be treated in accordance with the designation rights provisions set forth in the Sale Agreement and the Remaining Asset Sale Order.

### 8.4 Approval of Rejection of Executory Contract and Unexpired Leases.

Entry of the Confirmation Order shall constitute the approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Article V.A of the Plan

### 8.5 Reservation of Rights with Respect to the Debtor's Insurance Policies.

Nothing herein shall be deemed to waive, release, bar and/or estop any Cause of Action, claim or right of setoff the Debtor may hold against any insurer on account of any insurance policy or agreement issued to or on behalf of the Debtor prior to or after the Petition Date, all of which shall be expressly reserved by the Debtor as part of the Retained Assets.

## IX.

## PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN

### 9.1 Voting of Claims.

Each holder of an Allowed Claim in an impaired Class of Claims that is entitled to vote on the Plan pursuant to Article III of the Plan, or the holder of a Claim that has been temporarily allowed for voting purposes only under Bankruptcy Rule 3018(a), shall be entitled to vote separately to accept or reject the Plan as provided for in such order as is entered by the Bankruptcy Court approving the Disclosure Statement, or any other order or orders of the Bankruptcy Court. For purposes of calculating the number of Allowed Claims in a Class that has voted to accept or reject the Plan under section 1126(c) of the Bankruptcy Code, all Allowed Claims in such Class held by one entity or its "affiliate" (as defined in the Securities Act of 1933 and the rules and regulations promulgated with respect to such Act) shall be aggregated and treated as one Allowed Claim in such Class; provided, however, that Claims acquired by an entity from unrelated entities shall not be aggregated for purposes of voting.

### 9.2 Nonconsensual Confirmation.

If any impaired Class does not accept the Plan by the requisite statutory majorities provided in section 1126(c) or 1126(d) of the Bankruptcy Code, as applicable, the Plan Proponents reserve the right (a) to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, (b) to reallocate distribution of assets to Claims if necessary to obtain entry of the Confirmation Order, and (c) to amend the Plan in accordance with Article XII of the Plan as necessary to obtain entry of the Confirmation Order.

1615512 v3/NY

**9.3** **Method and Timing of Distributions Under the Plan.**

      **9.3.1** **Distributions by the Disbursing Agent.** Subject to Article VI of the Plan, all distributions under the Plan shall be made by the Disbursing Agent at the direction of the Liquidation Trustee.

      **9.3.2** **Timing of Distributions.** Distributions on account of Allowed Claims in Classes 1 and 2 shall be made at the times specified in Article III of the Plan. Distributions to holders of Allowed (or partially Allowed) General Unsecured Claims shall be made on one or more Distribution Dates, as established by the Liquidation Trustee at the direction of the Oversight Committee. On each Distribution Date, the Disbursing Agent shall distribute to holders of Allowed General Unsecured Claims their Pro Rata share of all Distributable Cash, calculated so as to take account of all prior distributions to holders of such Allowed Claims.

      Each holder of an Allowed Claim will receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class pursuant to the terms and conditions of the Plan and the Liquidation Trust Agreement, subject to any setoffs or deductions set forth therein. Holders of partially Allowed General Unsecured Claims shall receive partial distributions as provided for in Section VII C.1.b of the Plan. Distributions to holders of Allowed or partially Allowed General Unsecured Claims shall be made on each Distribution Date.

      **9.3.3** **Delivery of Distributions.** Subject to Bankruptcy Rule 9010 and except as otherwise provided in the Plan, all distributions to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Debtor or its agents, unless the Liquidation Trustee, or the Disbursing Agent, as the case may be, have been notified in writing of a change of address, including, without limitation, by the filing of a proof of Claim or interest by such holder that contains an address for such holder different from the address reflected on such Schedules for such holder.

      **9.3.4** **Distributions to Holders of Allowed Claims as of the Distribution Record Date.** Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of any Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Confirmation Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Confirmation Date. The Disbursing Agent will have no obligation to recognize the transfer or sale of any Claim that occurs after 4:00 p.m. Wilmington Delaware time on the Confirmation Date and will be entitled for all purposes herein to recognize and make distributions only to those holders who are holders of such Claims as of the close of business on the Confirmation Date.

      **9.3.5** **Undeliverable and Unclaimed Distributions.** If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Liquidation Trustee or the Disbursing Agent, as the case may be, is notified

of such holder's then-current address, at which time all missed distributions shall be made as soon as is practicable to such holder, without interest. Checks issued by the Liquidation Trustee or the Disbursing Agent shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Any holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable distribution to be made by the Disbursing Agent within one hundred and eighty (180) days after the later of (i) the Effective Date and (ii) the last date on which a distribution was deliverable to such holder will have its Claim for such undeliverable distribution deemed satisfied and released and will be forever barred from asserting any such Claim against the Debtor, the Liquidation Trust, the Liquidation Trustee and their respective property or the Liquidation Trust Accounts. In such cases, unclaimed distributions will be maintained in the applicable Liquidation Trust Account for redistribution to other claimants entitled to distribution from such Liquidation Trust Account.

**9.3.6   Distributions of Cash.** Any payment of Cash made pursuant to the Plan may be made at the option of the Liquidation Trustee or the Disbursing Agent, as may be applicable, either by check drawn on a domestic bank or by wire transfer.

**9.3.7   Minimum Distributions.** Neither the Liquidation Trustee nor the Disbursing Agent will be required to make a Distribution to a holder of an Allowed Claim if the amount of such Distribution would be $25.00 or less. Any holder of an Allowed Claim on account of which the amount of Cash to be distributed is equal to or less than $25.00 in the aggregate will be forever barred from asserting its Claim for such distribution against the Liquidation Trust or its property. Any Cash not distributed pursuant to this Section VI.F.2 of the Plan will be the property of the Liquidation Trust free of any restrictions thereon, and any such Cash held by the Disbursing Agent shall be transferred or returned to the Liquidation Trust.

**9.3.8   Withholding and Reporting Requirements.** In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements, to the extent applicable. Notwithstanding the above, each holder of an Allowed Claim or Beneficial Interest in the Liquidation Trust that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. The Disbursing Agent shall have the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such tax obligations.

**9.3.9   Abandonment of Certain Property by the Liquidation Trust.** The Liquidation Trust may abandon in any commercially reasonable manner (including abandonment or donation to a charitable organization of the Liquidating Trustee's choice) any property that the Liquidation Trust reasonably concludes is of no benefit to its distributees and beneficiaries or that it reasonably determines, at the conclusion of distributions or dissolution of the Liquidation Trust, to be too impractical to distribute.

**9.3.10 Setoffs.** The Liquidation Trustee and/or Disbursing Agent, as may be applicable, may set off against or recoup from any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim), the claims, rights and causes of action of any nature that the Debtor may hold against the holder of such Allowed Claim, to the extent that such rights of setoff and/or recoupment exist under applicable nonbankruptcy law; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the Liquidation Trustee of any claims, rights and Causes of Action that the Liquidation Trust may possess (by virtue of the transfer to it of the Liquidation Trust Assets) against such a Claim holder, which are expressly preserved and vested in the Liquidation Trust as Liquidation Trust Assets under Section I.A. of the Plan

# X.

## EFFECT OF CONFIRMATION OF PLAN

### 10.1    Term of Injunctions or Stays.

Unless otherwise provided, all injunctions or stays provided for in the Bankruptcy Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the close of the Bankruptcy Case.

### 10.2    Preservation of All Causes of Action Not Expressly Settled or Released.

The Plan Proponents are currently investigating potential Causes of Action against certain persons or entities but have not yet completed their investigations.  Therefore, on the Effective Date, all Causes of Action, with the exception of the Transferred Causes of Action and the Causes of Action related to or arising out of the Retained Assets, shall vest in the Liquidation Trust, which shall hold and possess all rights on behalf of the Debtor, its Estate and the Liquidation Trust to commence and pursue any and all Causes of Action (under any theory of law, including, without limitation the Bankruptcy Code, and in any court or other tribunal).  The Liquidation Trustee, on behalf of the Liquidation Trust, shall have the sole and exclusive right to commence, prosecute, pursue, settle, compromise or abandon such Causes of Action as set forth herein and in the Liquidation Trust Agreement.

The Debtor hereby reserves the rights of the Liquidation Trust and the Liquidation Trustee, on behalf of the Liquidation Trust, to pursue administer, settle, litigate, enforce and liquidate:

(a)    Any Causes of Action, whether legal, equitable or statutory in nature;

(b)    Any and all actions arising under or actionable pursuant to the Bankruptcy Code, including, without limitation, sections 544, 545, 548, 549, 550, 551, 553(b) and/or 724(a) of the Bankruptcy Code; and

1615512 v3/NY

(c)     Any Causes of Action that currently exist or may subsequently arise and which have not been set forth herein because the facts upon which such Causes of Action are based are not currently or fully known by the Plan Proponents (collectively, the "Unknown Causes of Action").  The failure to list or describe any such Unknown Cause of Action herein is not intended to limit the rights of the Liquidation Trustee, on behalf of the Liquidation Trust, to pursue any Unknown Cause of Action.

Unless Causes of Action against a person or entity are expressly waived, relinquished, released, compromised or settled in the Plan, or any Final Order, the Debtor (before the Effective Date) and the Liquidation Trustee, on behalf of the Liquidation Trust (post-Effective Date), expressly reserve all Causes of Action (including the Unknown Causes of Action) for later adjudication and therefore, no preclusion doctrine or other rule of law, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a result of the confirmation or Effective Date of the Plan, or the Confirmation Order.  In addition, the Debtor and the Liquidation Trustee, on behalf of the Liquidation Trust, and any successors-in-interest thereto, expressly reserve the right to pursue or adopt any Causes of Action not so waived, relinquished, released, compromised or settled that are alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any Person or Entity, including, without limitation, the plaintiffs and co-defendants in such lawsuits.

### 10.3    Avoidance Actions.

All avoidance actions pursuant to Chapter 5 of the Bankruptcy Code were purchased by the Purchaser.  Thus, from and after the Effective Date, no Avoidance Actions shall be transferred to the Liquidation Trust.

### 10.4    Exculpation.

From and after the Effective Date, the Debtor, the Liquidation Trustee, the Liquidation Trust, the Committee and its members (solely in their capacity as such), the Oversight Committee and its members (solely in their capacity as such), the Disbursing Agent (solely in such capacity) and the Representatives of each of the foregoing (collectively and individually, the "Exculpated Parties") shall neither have nor incur any liability to any entity for any act taken or omitted to be taken in connection with, related to or arising out of the Bankruptcy Case, the Debtor, its Estate, the Liquidation Trust or the consideration, formulation, preparation, dissemination, implementation, Confirmation, consummation or administration of the Plan, the Disclosure Statement, the Sale, the Liquidation Trust Agreement or any transaction proposed in connection with the Bankruptcy Case or any contract, instrument, release or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection therewith; provided, however, that the foregoing provisions of this Section shall have no effect on:  (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan or (b) the liability of any entity that would otherwise result from any such act, omission or occurrence to the extent that

38

such act, omission or occurrence is determined in a Final Order to have constituted gross negligence or willful misconduct.

Notwithstanding any other provision of the Plan, no holder of a Claim or Equity Interest, no other party in interest, none of their respective agents, employees, Representatives, financial advisors, attorneys or affiliates, and no successors or assigns of the foregoing, shall have any right of action against any Exculpated Party for any act or omission in connection with, relating to or arising out of the Bankruptcy Case, the Debtor, its Estate, the Liquidation Trust or the consideration, formulation, preparation, dissemination, implementation, Confirmation, consummation or administration of the Plan, the Disclosure Statement, the Liquidation Trust Agreement or any transaction or document created or entered into, or any other act taken or omitted to be taken, in connection therewith, except for: (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan or (b) the liability of any entity that would otherwise result from any such act, omission or occurrence to the extent that such act, omission or occurrence is determined in a Final Order to have constituted gross negligence or willful misconduct.

### 10.5   Injunction.

**Except as provided in the Plan or the Confirmation Order and other than with respect to a right of recoupment or setoff, as of the Effective Date, all entities that held, currently hold or may hold (i) a Claim or other debt or liability subject to the Plan or (ii) an Equity Interest or other right of an equity security holder, will be permanently enjoined from taking any of the following actions in respect of any such Claims, debts, liabilities, Equity Interests or rights:  (a) commencing or continuing in any manner any action or other proceeding against the Debtor, the Liquidation Trust, the Liquidation Trustee, the Committee or its members, the Oversight Committee or its members, the Disbursing Agent or any Professional, other than to enforce any right under the Plan for a distribution from the Liquidation Trust Assets; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the Liquidation Trust, the Liquidation Trustee, the Disbursing Agent, the Committee or its members, the Oversight Committee or its members, or any Professional other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtor, the Liquidation Trust, their respective property or the Liquidation Trust Assets; (d) asserting a right of subrogation of any kind against any debt, liability or obligation due to the Debtor or the Liquidation Trust; and (e) commencing or continuing any action, in any manner or in any jurisdiction that does not comply with or is inconsistent with the provisions of the Plan.**

### 10.6   Subordination Rights.

The classification and manner of satisfying Claims and Equity Interests under the Plan does not take into consideration subordination rights among and between holders of Claims against the Debtor, and nothing in the Plan or Confirmation Order shall affect any subordination rights that a holder of a Claim among and between holders of Claims against the Debtor have

39

with respect to any distribution to be made pursuant to the Plan, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code or otherwise.

<h1 style="text-align:center">XI.</h1>

<h2 style="text-align:center">EFFECTIVENESS OF THE PLAN</h2>

### 11.1   Conditions Precedent to the Effective Date.

#### A.        Conditions to the Effective Date.

The Effective Date shall not occur, and the Plan shall not be consummated, unless and until the following conditions have been satisfied or duly waived pursuant to Section 11.B of the Disclosure Statement, which corresponds to Section VIII.B. of the Plan:

1.        The Bankruptcy Court shall have entered the Confirmation Order in form and substance satisfactory to the Plan Proponents, which shall be a Final Order.

2.        The Liquidation Trust Agreement has been executed and at least one the Liquidation Trust Accounts has been established.

3.        The Liquidation Trustee and the Disbursing Agent shall have obtained a bond or similar financial instrument satisfactory to the Committee.

#### B.        Waiver of Conditions to the Effective Date.

The conditions to the Effective Date set forth in Section 11.A.1, but not Section 11.A.2, may be waived in whole or part at any time by the Plan Proponents without an order of the Bankruptcy Court.  The condition to the Effective Date set forth in Section 11.A.3. may only be waived by the Committee.

#### C.        Effect of Nonoccurrence of Conditions to the Effective Date.

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section 11.B, then upon motion by the Plan Proponents or any party in interest made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order shall be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated pursuant to this Section 11.C:  (1) the Plan shall be null and void in all respects and (2) nothing contained in the Plan shall (a) constitute a waiver or release of any claims by or against, or any Equity Interest in, the Debtor or (b) prejudice in any manner the rights of the Plan Proponents or any other party in interest.

1615512 v3/NY

# XII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction of all matters arising under, arising out of, or related to, the Bankruptcy Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(i)     allow, disallow, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims or Equity Interests;

(ii)     grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

(iii)     resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor, the Purchaser or the Liquidation Trustee may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

(iv)     ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(v)     decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor or the Liquidation Trustee that may be pending on the Effective Date or brought thereafter;

(vi)     enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement, the Confirmation Order and the Liquidation Trust Agreement;

(vii)     resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Liquidation Trust Agreement or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan, including, but not limited to, the Liquidation Trust Agreement, or any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(viii)     modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

1615512 v3/NY

(ix)     issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan and the Confirmation Order;

(x)     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

(xi)     determine any other matters that may arise in connection with or relate to the Plan, the Confirmation Order, the Liquidation Trust or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan and the Confirmation Order;

(xii)     resolve any controversies that may arise in connection with the Sale Agreement and the Remaining Asset Sale Order;

(xiii)     determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes and the right of the Liquidation Trust to receive Tax Refunds under the Plan;

(xiv)     adjudicate any matters delegated or transferred to the Oversight Committee, including, but not limited to, the prosecution of any Causes of Action that are Liquidation Trust Assets;

(xv)     recover all assets of the Estate, wherever located;

(xvi)     enter a final decree closing the Bankruptcy Case; and

(xvii)     hear any other matter not inconsistent with the Bankruptcy Code.

# XIII.

## MISCELLANEOUS PROVISIONS

### 13.1     Dissolution of the Committee.

On the Effective Date, immediately after the formation of the Oversight Committee pursuant to Section 12.2 of the Plan, the Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Bankruptcy Case (except those duties or obligations which may arise from membership in the Oversight Committee), and the retention or employment of its attorneys, accountants, and other agents, shall terminate.  The Committee shall continue to exist after such date solely with respect to (a) any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or Filed and served after the Effective Date pursuant to Section III.A.1.d.ii.A of the Plan; or (b) in connection with any appeal pending as of the Effective Date, including any appeal of the Confirmation Order.

1615512 v3/NY

### 13.2   The Oversight Committee.

(i)     The Oversight Committee shall be formed on the Effective Date and shall initially consist of the members of the Committee.  Members of the Oversight Committee may be added, removed or substituted from time to time, provided that all members of the Oversight Committee shall be persons or entities who were  members of the Committee as of the Effective Date.

(ii)    The Oversight Committee shall be authorized to adopt such by-laws as it deems appropriate without further order of the Bankruptcy Court.

(iii)   The Oversight Committee shall be authorized to direct the affairs of the Liquidation Trust and the Liquidation Trustee, as provided for in the Liquidation Trust Agreement, which authority shall include, without limitation:  (a) overseeing the General Unsecured Claims reconciliation and settlement process conducted by the Liquidation Trustee; (b) formulating with the Liquidation Trustee appropriate procedures for the settlement of Claims; (c) overseeing the distributions to the holders of General Unsecured Claims under the Plan; (d) implementing the provisions of the Plan; (e) appearing before and being heard by the Bankruptcy Court and other courts of competent jurisdiction in connection with the above duties; and (e) such other matters as may be agreed upon between the Liquidation Trustee and the Oversight Committee or specified in the Plan.

(iv)    The Oversight Committee may employ, without further order of the Bankruptcy Court, professionals to assist it in carrying out its duties, including any professionals previously retained by the Debtor or the Committee in the Bankruptcy Case, and the Liquidation Trustee shall pay the reasonable costs and expenses of the Oversight Committee, including reasonable professional fees and the reasonable out-of-pocket expenses of members of the Oversight Committee, in the ordinary course without further order of the Bankruptcy Court in accordance with the procedures set forth in Section IV.B.3 of the Plan.  Nothing herein shall disqualify the Liquidation Trustee from retaining the same professionals as those employed or retained by the Debtor or the Committee.

(v)     For so long as the Liquidation Trust shall continue, the Liquidation Trustee shall make regular reports to the Oversight Committee as and when required under the Liquidation Trust Agreement.

### 13.3   Termination of Ordinary Course Professionals.

As of the Effective Date, all Ordinary Course Professionals retained by the Debtor pursuant to the Ordinary Course Professionals Order shall be deemed terminated by the Debtor; provided, however, that the Liquidating Trustee may retain such Professionals on terms acceptable to the Oversight Committee.

### 13.4   Effectuating Documents and Further Transactions.

Upon entry of the Confirmation Order, each of the Debtor and the Liquidation Trustee shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be reasonably necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

43

### 13.5 Corporate Action.

On the Effective Date, all matters provided for under the Plan, or that are contemplated by the Plan (including the liquidation of the remaining assets of the Debtor's Estate by and through the Liquidation Trust) that would otherwise require approval of the stockholders or directors shall be deemed to have occurred (without having to have obtained such approval) and shall be in effect from and after the Effective Date pursuant to the applicable general corporation law of the states in which the Debtor is incorporated, without any requirement of action by the stockholders or further action by the directors of the Debtor.

### 13.6 Exemption from Transfer Taxes.

Pursuant to section 1146(c) of the Bankruptcy Code, the assignment or surrender of any lease or sublease, or the delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any deeds, bills of sale or assignments executed in connection with any disposition of assets under, in furtherance of, or in connection with the Plan shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax. In particular and without limitation, the sale of the Debtor's real property shall be exempt from transfer, recordation and similar taxes pursuant to section 1146(c) of the Bankruptcy Code.

### 13.7 Request for Expedited Determination of Taxes.

The Debtor shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through, and including, the dissolution of the Debtor.

### 13.8 Payment of Statutory Fees.

On and after the Effective Date, all fees payable pursuant to Section 1930 of title 28, United States Code shall be paid by the Liquidation Trustee from the Liquidation Trust Assets until the earlier of the conversion or dismissal of the Bankruptcy Case under section 1112 of the Bankruptcy Code, or the closing of the Bankruptcy Case pursuant to section 350(a) of the Bankruptcy Code.

### 13.9 Modification of Plan.

The Debtor reserves the right, with the consent of the other Plan Proponents, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan at any time prior to the entry of the Confirmation Order; provided, however, that any material modifications of the Plan, the Schedules to the Plan or the Plan Supplement shall be subject to the consent of the Committee, which shall not be unreasonably withheld. After the entry of the Confirmation Order, the Plan Proponents may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. A holder of an Allowed Claim or

Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such holder.

### 13.10 Withdrawal or Revocation.

The Debtor may withdraw or revoke the Plan, with the consent of the other Plan Proponents, at any time prior to the Confirmation Date. If the Plan Proponents revoke or withdraw the Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, then the Plan shall be deemed null and void and nothing contained in the Plan shall: (1) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor; (2) prejudice in any manner the rights of the Plan Proponents or any other party in interest; or (3) constitute an admission of any sort by the Plan Proponents or any other party in interest.

### 13.11 Binding Effect.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtor and its respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan. The rights, benefits and obligations of any entity named or referred to in the Plan, whose actions may be required to effectuate the terms of the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity (including, but not limited to, any trustee appointed for the Debtor under chapters 7 or 11 of the Bankruptcy Code).

### 13.12 Service of Certain Plan and Disclosure Statement Exhibits.

With respect to any Schedules or Exhibits that are not being Filed or served with copies of the Plan and this Disclosure Statement, the Plan Proponents shall File such Schedules or Exhibits no later than ten (10) days before the deadline to vote to accept or reject the Plan. Once Filed, the Plan Proponents shall make available for review the relevant Schedules or Exhibits on the Document Website.

### 13.13 Notices.

Any notices to or requests of the Debtor by parties in interest under or in connection with the Plan shall be in writing and served either by (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

| If to the Debtor: | If to the Committee or the Oversight Committee: |
|---|---|
| COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A. | COOLEY GODWARD KRONISH LLP |
| Norman L. Pernick | Jay Indyke |
| npernick@coleschotz.com | jindyke@cooley.com |
| Karen M. Grivner | Cathy Hershcopf |
| | chershcopf@cooley.com |

1615512 v3/NY

kgrivner@coleschotz.com
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

Brent Weisenberg
bweisenberg@cooley.com
1114 Avenue of the Americas
New York, NY 10036
Telephone: (212) 479-6000
Facsimile: (212) 479-6275

COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.
Irving E. Walker
iwalker@coleschotz.com
Gary H. Leibowitz
gleibowitz@coleschotz.com
300 East Lombard Street, Suite 2000
Baltimore, MD 21202
Telephone: (410) 230-0660
Facsimile: (410) 230-0667

BIFFERATO GENTILOTTI LLC
Garvan McDaniel
gmcdaniel@bglawde.com
800 N. King Street
P.O. Box 2165
Wilmington, DE 19801
Telephone: (302) 429-1900
Facsimile: (302) 429-8600

**If to the Liquidation Trustee:**

FTI CONSULTING, INC.
Charles Reeves
charlie.reeves@fticonsulting.com
2001 Ross Avenue, Suite #400
Dallas, TX 75201
Telephone: (214) 397-1633
Facsimile: (214) 397-1791

**If to the Disbursing Agent:**

CREDITNTELL.COM INC.
Lawrence Sarf
larrys@creditntell.com
310 East Shore Road
Great Neck, NY 11023
Telephone: (800) 789-0123
Facsimile: (516) 487-4538

**If to the Claims Agent:**

RITZ CAMERA CENTERS, INC. CLAIMS
PROCESSING CENTER
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, CA 90245
Telephone: (310) 823-9000

### 13.14  Severability.

In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of the Plan is invalid, void or unenforceable, the Bankruptcy Court shall, with the consent of the Plan Proponents, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

46

### 13.15 Governing Law.

Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof. Nothing in this provision shall resolve any choice of law issue in the Lawsuit.

### 13.16 Headings.

Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

### 13.17 Plan Controls.

To the extent the Plan is inconsistent with the Disclosure Statement, the provisions of the Plan shall be controlling

# XIV.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    General.

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW.  THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE"), TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT.  CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION MAY HAVE RETROACTIVE EFFECT, WHICH MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.  NO RULING HAS BEEN REQUESTED FROM THE IRS AND NO LEGAL OPINION HAS BEEN REQUESTED FROM COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THIS DESCRIPTION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO HOLDERS OF CLAIMS.  FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX EXEMPT ORGANIZATIONS, TAXPAYERS WHOSE FUNCTIONAL CURRENCY IS NOT THE U.S. DOLLAR AND FOREIGN TAXPAYERS, NOR DOES IT ADDRESS TAX CONSEQUENCES TO THE DEBTOR OR HOLDERS OF EQUITY INTERESTS IN THE DEBTOR.  THIS DESCRIPTION DOES NOT DISCUSS THE POSSIBLE STATE TAX OR

NON-U.S. TAX CONSEQUENCES THAT MIGHT APPLY TO THE DEBTOR, TO HOLDERS OF EQUITY INTERESTS OR TO HOLDERS OF CLAIMS.

**FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.**

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

      **B.**      **Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally.**

The federal income tax consequences of the implementation of the Plan to the holders of Allowed Claims will depend, among other things, on the consideration to be received by the holder, whether the holder reports income on the accrual or cash method, whether the holder receives distributions under the Plan in more than one taxable year, whether the holder's claim is Allowed or Disputed on the Effective Date, and whether the holder has taken a bad debt deduction or worthless security deduction with respect to its Claim.

      **1.**      **Recognition of Gain or Loss.**

In general, a holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the holder's tax basis in the Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount. If the holder realizes a capital loss, the holder's deduction of the loss may be subject to limitation. The holder's tax basis for any property received under the Plan generally will equal the amount realized. The holder's amount realized generally will equal the sum of the cash and the fair market value of any other property received by the holder under the Plan on the Effective Date or a subsequent distribution date, less the amount (if any) treated as interest, as discussed below.

48

### 2. Post-Effective Date Cash Distributions.

Because certain holders of Allowed Claims, including Disputed Claims that ultimately become Allowed Claims, may receive cash distributions after the Effective Date, the imputed interest provisions of the Internal Revenue Code may apply and cause a portion of the subsequent distributions to be treated as interest. Additionally, because holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the Initial Distribution, any loss and a portion of any gain realized by the holder may be deferred. All holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their claims.

### 3. Receipt of Interest.

Holders of Allowed Claims will recognize ordinary income to the extent that they receive cash or property, including interests in the Liquidation Trust, that is allocable to accrued but unpaid interest which the holder has not yet included in its income. If an Allowed Claim includes interest, and if the holder receives less than the amount of the Allowed Claim pursuant to the Plan, the holder must allocate the Plan consideration between principal and interest. The proper allocation of Plan consideration between principal and interest is unclear, and holders of Allowed Claims should consult their own tax advisors in this regard. If the Plan consideration allocable to interest with respect to an Allowed Claim is less than the amount that the holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

### 4. Bad Debt or Worthless Securities Deduction.

A holder who receives in respect of an Allowed Claim an amount less than the holder's tax basis in the claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under Section 166(a) of the Internal Revenue Code or a worthless securities deduction under Section 165(g) of the Internal Revenue Code. The rules governing the character, timing and amount of bad debt and worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### C. Treatment of the Liquidation Trust and its Beneficial Owners.

The Debtor intends that the Liquidation Trust be a liquidating trust treated as a "grantor trust" under Section 671 of the Internal Revenue Code. The remainder of this section assumes that this treatment is correct. If the IRS succeeds in requiring a different characterization of the Liquidation Trust, the Liquidation Trust could be subject to tax on all of its net income and gains, with the result that the amounts received by holders of Allowed Claims could be reduced.

### 1. Liquidating Trust.

Except as discussed under "—Disputed Claims Reserve" below, the Liquidation Trust will not be treated as a separate entity for federal income tax purposes. Instead, the holders of beneficial interests in the Liquidation Trust will be treated as owning their respective pro rata shares of the Liquidation Trust Assets, subject to any liabilities of the Debtor assumed by the Liquidation Trust and any liabilities of the Liquidation Trust itself.

Each holder of an Allowed General Unsecured Claim on the Effective Date should be treated as transferring its claim to the Debtor in exchange for the holder's pro rata share of the Liquidation Trust Assets, less any Debtor liabilities assumed by the Liquidation Trust and any Liquidation Trust liabilities (including amounts contributed to the Disputed Claims Reserve), followed by the holder's transfer of such assets (subject to such liabilities) to the Liquidation Trust. The holder should recognize gain or loss equal to the difference between the fair market value such assets (subject to such liabilities) and the holder's adjusted basis in its Allowed General Unsecured Claim. The tax basis of the Liquidation Trust Assets deemed received in the exchange will equal the amount realized by the holder and the holding period for such assets will begin on the day following the exchange. For the avoidance of doubt, the holders of Allowed General Unsecured Claims are not intended to be treated for federal income tax purposes as receiving Liquidation Trust Assets that are contributed to the disputed claims reserve until such time as the disputed claims reserve makes distributions, in which case (and at which time) the holders of Allowed General Unsecured Claims are intended to be treated as receiving the distributions actually received from the disputed claims reserve, if any.

Each holder of an Allowed General Unsecured Claim will be required to include in income the holder's allocable share of any income, gain, loss, deduction or credit recognized by the Liquidation Trust, including interest or dividend income earned on bank accounts and other investments. If the Liquidation Trust sells or otherwise disposes of a Liquidation Trust Asset in a transaction in which gain or loss is recognized, each holder of an Allowed General Unsecured Claim will be required to include in income gain or loss equal to the difference between (i) the holder's pro rata share of the cash or property received in exchange for the asset sold or otherwise disposed of, and (ii) the holder's adjusted basis in the holder's pro rata share of the asset. The character and amount of any gain or loss will be determined by reference to the character of the asset sold or otherwise disposed of. Holders of Allowed General Unsecured Claims will be required to report any income or gain recognized on the sale or other disposition of a Liquidation Trust Asset whether or not the Liquidation Trust distributes the sales proceeds currently and may, as a result, incur a tax liability before the holder receives a distribution from the Liquidation Trust.

## 2.    **Disputed Claims Reserve.**

The disputed claims reserve will be treated as a discrete trust taxed under Sections 641 et seq. of the Internal Revenue Code. Under these provisions, income and gain recognized with respect to the Liquidation Trust Assets in the disputed claims reserve will be subject to an entity-level tax to the extent the income or gain is not distributed to holders of Allowed Claims within the same taxable year.

## D.    **Information Reporting and Withholding.**

1615512 v3/NY

Under the Internal Revenue Code's backup withholding rules, the holder of an Allowed Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the holder comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Holders of Allowed Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

# XV.

## FEASIBILITY OF THE PLAN AND BEST INTEREST OF THE CREDITORS

### 15.1    Feasibility of the Plan.

In connection with confirmation of the Plan, the Bankruptcy Court will be asked to determine that the Plan is feasible pursuant to section 1129(a)(1) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless contemplated by the Plan. The Plan provides for the liquidation and conversion of all of the Debtor's remaining assets to cash. The Debtor believes that the value of its assets are more than sufficient to meet all Plan obligations and that the Plan is feasible.

### 15.2    Acceptance of the Plan.

Class 4 (General Unsecured Claims) is impaired under the Plan and the holders of such Claims are the only parties entitled to vote to accept or reject the Plan. Only those votes cast by holders of Allowed Claims in Class 4 shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain confirmation, and that the Plan is feasible.

Administrative Claims and Priority Tax Claims are not classified for voting purposes and the holders of such Claims are unimpaired and not entitled to vote. Classes 1, 2 and 3 (Lenders' Secured Claims, Other Secured Claims and Priority Non-Tax Claims) are unimpaired and are not entitled to vote. Class 5 (Equity Interests) are impaired under the Plan. Holders of Equity Interests shall not be entitled to vote on the Plan and are deemed to vote to reject the Plan.

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims actually voting in such Class, but for that purpose counts only those who actually vote to accept the Plan.

1615512 v3/NY

### 15.3    **Best Interest Test.**

Even if a plan is accepted by holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan. The "best interest" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires the Bankruptcy Court to find either (a) that all members of an impaired class of claims or interests have accepted the Plan or (b) that the Plan will provide a creditor that has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under Chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the debtor's assets if the case was converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a sale of the debtor's assets by a Chapter 7 trustee and the prosecution by such trustee of any causes of action held by the estate.

The Plan Proponents believe that the Plan is in the best interests of each class of creditors and that each impaired class of Claims will receive distributions under the Plan which are at least equal in value to the distributions such classes would receive in a Chapter 7 liquidation of the Debtor. To demonstrate that the Plan is in the best interest of creditors, the Debtor's Chief Restructuring Officer has developed an analysis of a hypothetical result in the event this Bankruptcy Case were to be converted to Chapter 7 and the Debtor were to be liquidated under the direction of a Chapter 7 trustee. The Best Interest of Creditors Analysis is attached to the Disclosure Statement as **Exhibit "B."**

THE BEST INTEREST OF CREDITORS ANALYSIS HAS BEEN PREPARED SOLELY FOR USE IN THIS DISCLOSURE STATEMENT AND DOES NOT REPRESENT VALUES THAT ARE APPROPRIATE FOR ANY PURPOSE OTHER THAN PROCEEDINGS RELATING TO CONFIRMATION OF THE PLAN. NOTHING CONTAINED IN THE BEST INTEREST OF CREDITORS ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY OF THE PLAN PROPONENTS FOR ANY PURPOSE. The assumptions used in developing these analyses are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtor or a Chapter 7 trustee. Accordingly, there can be no assurances that the values assumed in the Best Interest of Creditors Analysis would be realized if the Debtor was actually liquidated. In addition, any liquidation would take place in the future at which time circumstances may exist which cannot presently be predicted.

The Plan is the result of good faith, arms'-length negotiations between the Debtor and the Committee. Moreover, the Plan Proponents believe that the Plan is in the best interests of creditors because it provides for an orderly liquidation and expeditious distribution of the Debtor's assets, thus maximizing creditor recovery. By contrast, in the event of a liquidation under Chapter 7 of the Bankruptcy Code, it is likely that creditors would receive a reduced distribution on account of their Allowed Claims, because additional administrative expenses,

including trustee's commissions, would be incurred with priority over General Unsecured Claims under section 507(a)(l) of the Bankruptcy Code, and the Plan Proponents believes that net recoveries would be further reduced by delays and inefficiencies that would occur in the event of the appointment of a Chapter 7 Trustee who has no prior knowledge of the Bankruptcy Case.

FOR THESE REASONS, THE PLAN PROPONENTS BELIEVE THAT THE PLAN WILL PROVIDE CREDITORS THAT HAVE NOT ACCEPTED THE PLAN WITH A RECOVERY OF PROPERTY OF A VALUE, AS OF THE EFFECTIVE DATE OF THE PLAN, THAT IS NOT LESS THAN THE AMOUNT THAT SUCH HOLDER WOULD RECOVER IF THE DEBTOR WERE LIQUIDATED UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

**ACCORDINGLY, THE COMMITTEE SUPPORTS AND ENDORSES THE PLAN AND BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTEREST OF THE DEBTOR'S CREDITORS.**

### 15.4    Confirmation Without Acceptance of All Impaired Classes.

The Plan Proponents will request confirmation of the Plan, as it may be modified from time to time, under section 1129(a) of the Bankruptcy Code, and have reserved the right to modify the Plan to the extent, if any, that confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification.

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if it is not accepted by all impaired classes of claims and interests, as long as at least one impaired class of claims has accepted the Plan. A bankruptcy court may confirm a plan notwithstanding the rejection or deemed rejection of an unimpaired class of claims or interests if the plan does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has rejected, or is deemed to have rejected, the plan.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank. The Bankruptcy Code establishes different standards for what is "fair and equitable" for holders of unsecured claims, and equity interests.

The Plan Proponents believe that the Plan may be confirmed pursuant to the foregoing "cramdown" provisions, over the dissent of certain classes of Claims and Interests in view of the treatment proposed. The Plan Proponents would seek confirmation of the Plan pursuant to the "cramdown" provisions over the dissent of any Class. In addition, the Plan Proponents do not believe the Plan unfairly discriminates against, or is otherwise unfair or inequitable, with respect to any Class who may vote to reject the Plan.

# XVI.

## CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting on the Plan, each holder of a Claim entitled to vote should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

### 16.1    Risk of Non-Confirmation of Plan.

Although the Plan Proponents believe the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate a re-solicitation of votes.

### 16.2    Delays of Confirmation and/or Effective Date.

Any delay in confirmation and effectiveness of the Plan could result in, among other things, increased Administrative Claims. These or any other negative effects of delays in confirmation or effectiveness of the Plan could endanger the ultimate approval of the Plan by the Bankruptcy Court and reduce recoveries to Class 4 Claim holders.

### 16.3    Allowance of Claims.

The estimates of Allowed Claims in this Disclosure Statement are based on the Debtor's review of its books and records. Although the Bar Date has passed, the Debtor has not finally reconciled, or settled any Claims. Upon the completion of further analyses of the proofs of Claim, the completion of Claims litigation and related matters, the total amount of Claims that ultimately become Allowed Claims in the Bankruptcy Case may differ from the Debtor's estimates, and such difference could be material. With respect to Class 4 in particular, the actual ultimate aggregate amount of Allowed General Unsecured Claims in such Class may differ significantly from the estimates set forth in this Disclosure Statement. Accordingly, the amount of Pro Rata distributions of Liquidation Trust Assets that may be received by a particular holder of an Allowed General Unsecured Claim in Class 4 may be adversely or favorably affected by the aggregate amount of Claims ultimately allowed in such Class.

### 16.4    The Purchaser's Obligations Under the Sale Agreement.

Pursuant to the Sale Agreement, the Purchaser agreed to assume certain of the Debtor's obligations, as summarized in Paragraph 5.13(E)(iii) above. In addition a portion of the purchase price under the Sale Agreement was paid in the form of the Secured Note. If the Purchaser fails to pay down the Secured Note, and to make other payments to or for the benefit of the Debtor in accordance with the Sale Agreement, the amount of Liquidation Trust Assets available for holders of Allowed General Unsecured Claims in Class 4 may be less than the Debtor's current

54

estimates. Likewise, if certain Claims assumed by the Purchaser exceed the agreed upon caps in the Sale Agreement, the Debtor will become liable to pay such Claims. In that event, the amount of Liquidation Trust Assets available for holders of Allowed General Unsecured Claims in Class 4 may be less than the Debtor's current estimates.

### 16.5   Dependence Upon the Purchaser.

After the sale of the Debtor's assets to the Purchaser, the Debtor was left with no employees. As such, the Estate is dependent upon the Purchaser's personnel for, among other things, access to the Debtor's books and records in order to assess and process Claims and for other related matters, and for other transition services that the Debtor requires of the Purchaser. The Debtor believes that the transition services agreement provisions of the Sale Agreement require the Purchaser to provide such access to books and records and transition services that the Debtor requires to properly wind-down the Estate. To the extent that the Purchaser becomes unable or refuses to adhere to the terms of the Sale Agreement with respect to these matters, the Debtor's Estate will be negatively impacted and it is likely that the Debtor will incur additional, unexpected costs and expenses to wind-down the Estate, which costs and expenses may be material.

### 16.6   Expected Sale of Owned Real Property.

The Debtor did not sell six (6) Owned Real Properties to the Purchaser under the Sale Agreement. In order to maximize the value of the Owned Real Properties, the Debtor retained Hilco Real Estate, LLC, a real estate consulting and advisory firm, to, among other things, market the properties. The Debtor has included the projected mid-range purchase price for the Owned Real Properties, one of which has been sold since the Closing Date, in the projected recoveries for holders of Claims in Class 4 under the Plan. Should such properties be sold for significantly less than expected, distributions to holders of Claims in Class 4 may be materially less than projected in the Plan.

### 16.7   Liquidation Trustee.

The ultimate amount of Cash available to satisfy the allowed amount of Claims in Class 4 depends, in part, on the manner in which the Liquidation Trustee operates the Liquidation Trust and the expenses the Liquidation Trustee incurs. The expenses of the Liquidation Trustee will be given priority over distributions to holders of Claims in Class 4. As a result, if the Liquidation Trustee incurs professional or other expenses in excess of current expectations, the amount of Cash remaining to satisfy Allowed Claims in Class 4 will decrease. In particular, pursuant to the Liquidation Trust Agreement, if the Liquidation Trustee determines that funds available for its expenses are insufficient, it may transfer equal funds from each of the Liquidation Trust Accounts otherwise designated for payment of Allowed Claims in Class 4 to satisfy Liquidation Trust Expenses.

The ultimate amount of Cash available for distribution to holders of Allowed Claims in Class 4 also will be affected by the performance and relative success of the Liquidation Trustee in pursuing setoff and other claims against potential parties under the Bankruptcy Code. The less successful the Liquidation Trustee is in pursuing such matters, the less Cash there will be

available for distribution to satisfy Allowed Claims. However, the Debtor has not assumed any recovery on account of such potential Causes of Action in estimating the recoveries to Allowed Claims under the Plan.

# XVII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan Proponents believe that the Plan affords holders of Claims the greatest opportunity for recovery on account of their Claims and, therefore, is in the best interests of such holders. If the Plan is not confirmed, however, the alternatives include (a) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code, or (b) an alternative plan of liquidation.

### 17.1   Liquidation Under Chapter 7.

If no plan can be confirmed, the Bankruptcy Case could be converted to a case under Chapter 7 of the Bankruptcy Code in which a trustee would be appointed to liquidate the remaining assets of the Debtor for distribution to the Debtor's creditors in accordance with the priorities established by the Bankruptcy Code. As reflected in Article XV above, a trustee would need time to investigate the Debtor's prepetition transactions, and its assets and liabilities. The trustee would retain professionals and liquidate the Debtor's remaining assets, and if necessary, investigate and pursue causes of action.

The Plan Proponents believe that the conversion of the case to Chapter 7 would increase the costs of administration, and reduce and delay the distribution to holders of Allowed Claims. Under a Chapter 7 liquidation, the Plan Proponents believe that the recovery for holders of Allowed Unsecured Claims would be less than that provided for under the Plan. For the reasons noted above, the Plan Proponents have concluded that holders of Allowed Claims are more likely than not to receive an amount under the Plan that is more than the amount such holder would receive under a Chapter 7 liquidation.

### 17.2   Alternative Plan.

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan. However, the additional costs, all of which would constitute Administrative Claims senior in priority to General Unsecured Claims, may be so significant that one or more parties in interest could request that the Case be converted to Chapter 7. Accordingly, the Plan Proponents believe that the Plan enables creditors to realize the best return under the circumstances.

# XVIII.

## RECOMMENDATION AND CONCLUSION

In summary, the Plan Proponents believe that the Plan is substantially preferable to a liquidation under Chapter 7 of the Bankruptcy Code. Likewise, conversion of this Bankruptcy Case would result in substantial delays in the distributions available under such an alternative,

56

and significantly increase administrative costs, including trustee's fees and expenses, and, therefore, would likely materially reduce Creditor recoveries. For these reasons, the Plan Proponents urge all holders of Allowed Claims in Impaired Classes to vote to ACCEPT the Plan, and to complete and return their ballots so that they are actually RECEIVED by the Balloting Agent on or before **5:00 p.m.** on **April 9, 2010** (Prevailing Eastern Time).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

1615512 v3/NY

Dated: March 4, 2010

**RCC Liquidating Corp. f/k/a Ritz Camera Centers, Inc.**

By: _Maslin_
Name: _Mark Sinkway_
Title: _CRO_

**The Official Committee of Unsecured Creditors of RCC Liquidating Corp. f/k/a Ritz Camera Centers, Inc.**

By: _____
Name: _____
Title: _____

Dated: March ___, 2010

| | |
|---|---|
| **RCC Liquidating Corp. f/k/a Ritz Camera Centers, Inc.** | **The Official Committee of Unsecured Creditors of RCC Liquidating Corp. f/k/a Ritz Camera Centers, Inc.** |

By: _____

Name: _____

Title: _____

By: _Ronald M. _____

Name: _Ronald M. Tucker_

Title: _Chairman of the Committee_
_of unsecured Creditors_

41